Steve Bonfiglio, Esq. (051220)
GHIDOTTI | BERGER, LLP
1920 Old Tustin Avenue
Santa Ana CA, 92705
Tel: (949) 427-2010
Fax: (949)427-2732
Email: sbonfiglio@ghidottiberger.com
Attorneys for *Plaintiff THE MONEY SOURCE INC.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **THE MONEY SOURCE INC.**<br><br>**Plaintiff,**<br><br>v.<br><br>**MAX SASS, COLLIN PSIODA, CHAOS HOME LOANS, LLC, YOAV GUERON, and 911 RESTORATION, INC.,**<br><br>**Defendants.** | **Case No.:**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff The Money Source Inc. ("TMS" or "Plaintiff"), as and for its Complaint against the Defendants, hereby alleges as follows:

**NATURE OF THE ACTION**

1.    This case arises from a failed Portland redevelopment project and the fraudulent cash extractions that accompanied its collapse. Defendant Max Sass ("Sass") acquired real property located at 4617 N. Minnesota Avenue (also referenced in City lien and foreclosure records as 4611 N. Minnesota Avenue, collectively, the "Property"), and promoted plans to redevelop it.

1

COMPLAINT

When those plans began to falter, Sass and his associates conspired to extract nearly $600,000 in two moves: first, by selling Plaintiff a mortgage loan in December 2021 (the "Loan"), while concealing outstanding liens and municipal violations; and second, by diverting hazard-insurance proceeds after the Property burned in April 2022.

2.      Sass's longtime mortgage broker, Defendant Collin Psioda ("Psioda"), controlled Defendant Chaos Home Loans, LLC ("Chaos"), which both originated and sold the Loan to TMS. Defendant Yoav Gueron ("Gueron"), Sass's partner in the development of a separate Portland property, caused his restoration company, Defendant 911 Restoration, Inc. ("911 Restoration"), to be added as a payee even though 911 Restoration performed no repairs at the Property.

3.      Together, Defendants orchestrated and executed this fraudulent "cash grab," leaving Plaintiff with more than $600,000 in losses: $370,000 paid out of pocket for the Loan, $269,000 in diverted insurance proceeds, and, ultimately, the loss of its collateral through municipal foreclosure.

## PARTIES

### I.      Plaintiff

4.      Plaintiff The Money Source Inc. is an Arizona corporation with its principal place of business in Arizona. At all relevant times, TMS was the owner and holder of the mortgage loan secured by the real property located at 4617 N. Minnesota Avenue, Portland, Oregon (also referenced in municipal lien and foreclosure records as 4611 N. Minnesota Avenue).

### II.      Defendants

5.      Defendant Sass is an individual domiciled in Nevada. He owned the Property during all relevant times and orchestrated and participated in the fraudulent scheme to extract value

2

COMPLAINT

through mortgage and insurance fraud. Sass is also a managing partner of Founders Developments with Gueron.

6.     Defendant Psioda is an individual domiciled in Nevada. He is the founder, principal, and sole member of Chaos, the entity through which he directed the origination, refinancing, and sale of the Loan to TMS. Even after the sale, Psioda ensured Chaos remained positioned as mortgagee of record. This allowed the Defendants to intercept hazard-insurance proceeds that rightfully belonged to TMS.

7.     Defendant Chaos, a now-defunct Nevada limited liability company owned and controlled by Psioda, held an undisclosed lien against the Property. As a result, it was listed as a joint payee on the May 2022 hazard-insurance proceeds, in place of TMS.

8.     Defendant Gueron is an individual domiciled in Oregon. Gueron is the sole shareholder of Defendant 911 Restoration, Inc. and, with Sass, a managing partner of Founders Developments. Gueron caused 911 Restoration to be added as a joint payee on the May 2022 hazard-insurance proceeds despite the company performing no repairs at the Property, and participated directly in diverting those funds for Defendants' benefit.

9.     Defendant 911 Restoration, Inc. is an Oregon corporation with its principal place of business in Oregon. Although added as a joint payee on the hazard-insurance proceeds check, 911 Restoration performed no repairs to the Property after the April 2022 fire and had no legitimate claim to those funds.

## **JURISDICTION AND VENUE**

10.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists

COMPLAINT

between the parties. Plaintiff TMS is a citizen of Arizona; Defendants Sass, Chaos, and Psioda are citizens of Nevada; and Defendants Gueron and 911 Restoration are citizens of Oregon.

11.     This Court has personal jurisdiction over all Defendants because they purposefully directed their conduct toward Oregon, and the claims arise from events centered on Oregon real property.

12.     Each Defendant joined and participated in the common scheme described herein, the core acts and effects of that scheme were centered in Oregon. Under principles of agency and concerted action, this court may exercise jurisdiction over all Defendants consistent with due process.

13.     Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b)(2) because a substantial part of the fraudulent acts and omissions occurred in this District, and the real property at issue is located here.

**FACTUAL ALLEGATIONS**

**I.     Sass, Chaos, and Psioda's Lending Pattern**

14.     Between 2020 and 2023, Defendants Collin Psioda and Chaos Home Loans, LLC, funded at least seven mortgage loans to Defendant Max Sass across four properties in Oregon and Nevada. This repeated insider financing arrangement was unusual and indicative of a coordinated strategy rather than ordinary arm's-length lending.

15.     Five of those seven loans involved successive liens on just two Portland properties, 4617 N. Minnesota Avenue (the Property) and 5605 N. Maryland Avenue, recorded in quick succession:

4

COMPLAINT

| DATE | PROPERTY | LOAN AMOUNT | LENDER | RECORDING REFERENCE |
|---|---|---|---|---|
| 8/4/2020 | 4617 N. Minnesota Ave. | $352,800.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2020-100846 |
| 9/15/2020 | 5605 N. Maryland Ave. | $492,000.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2020-121529 |
| 7/29/2021 | 4617 N. Minnesota Ave. | $359,100.00 | Chaos Home Loans LLC | Multonmah Cty. Doc. 2021-119111 |
| 7/29/2021 | 5605 N. Maryland Ave. | $497,500.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2020-118930 |
| 11/18/2021 | 4617 N. Minnesota Ave. | $359,100.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2021-170288 |

16.    By layering and refinancing liens in this manner, Psioda, Chaos, and Sass created an artificial churn of encumbrances that positioned them to mislead mortgage investors about title and equity. This structure also ensured that Chaos could later exploit its lingering position to divert hazard-insurance proceeds when the 4617 N. Minnesota Avenue property suffered a fire loss.[1]

## II.    The Struggling Redevelopment Plan and the Founders' Project

17.    On August 4, 2020, Sass purchased the Property, financing the acquisition with a $352,800 loan from Chaos Home Loans, LLC. (Ex. A – Aug. 7, 2020 Deed of Trust, Chaos Home Loans, LLC – 4617 N. Minnesota Ave.). At the time, Sass publicly promoted plans to redevelop the site into a 23-unit apartment project. (Ex. B – *A Las Vegas Developer Planned to Turn a House into Apartments. He Didn't,* Lucas Manfield, *Willamette Week* (Sept. 18, 2024)).

18.    By May 2021, however, little, if any, work had begun, and City inspectors began to cite Sass for serious violations, including sewage flooding, foul odor, and an unpermitted basement conversion. (Ex. C – City of Portland, Notice of Violation – Property Maintenance Code (May 13, 2021); Ex. D. – Affidavit for Administrative Search Warrant for Residential Premises, at ¶ 2). The

---

[1] Public records confirm that Chaos Home Loans, LLC ceased operating as an active mortgage lender by 2021, retaining only its shell registration. By July 2024, the entity was administratively dissolved.

COMPLAINT

City warned that unless violations were cured, enforcement charges would accrue as liens against the Property.

19.     At the same time that the N. Minnesota Avenue project lay dormant, Sass and Defendant Gueron shifted their attention to another venture: the acquisition and redevelopment of the Northwest Neighborhood Cultural Center, a historic church in Portland's Alphabet District, into a boutique hotel (the "Founders' Project"). (Ex. E – *Impending Sale of the Northwest Neighborhood Cultural Center Hits Snag with Las Vegas Developer,* Sophie Peel, *Willamette Week* (Jan. 26, 2023)). The Founders' Project required substantial new capital, competing directly with the stalled N. Minnesota Avenue redevelopment for resources and attention.

20.     Despite the lack of progress, Chaos recorded a second deed of trust on July 29, 2021 for $359,100 (the "July Lien"), effectively re-papering its prior lien. (Ex. F – July 29, 2021 Deed of Trust, Chaos Home Loans, LLC – 4617 N. Minnesota Ave.). Yet no construction followed, and the property remained vacant and hazardous.

21.     In September 2021, the City assessed its first municipal lien against the Property for code violations. (Ex. G – City of Portland Foreclosure Recommendation Report (Lien No. 173424)). Over the next two years, additional nuisance and enforcement liens piled up, totaling more than $29,000 by May 2024. In recommending foreclosure, the City described the N. Minnesota Avenue property as a "distressed vacant property" that posed an ongoing hazard to the neighborhood. The Bureau of Revenue and Financial Services emphasized that such properties were "magnets for crime" and a threat to public health and safety.

22.     Confronted with mounting code violations, a failing redevelopment plan, and the simultaneous capital demands of the Founders' Project, Sass and his associates turned to fraudulent

COMPLAINT

means to generate liquidity – using the N. Minnesota Avenue property as their vehicle for extraction.

## III.    The Two-Part Cash Grab

23.    Against this backdrop, Sass and his co-Defendants executed a two-part scheme to extract cash from the Property. First, they sold a new loan to Plaintiff, concealing the unreleased liens and mounting code violations to generate immediate liquidity. Then, when the Property, which was already slated for demolition and treated as disposable, burned, they exploited Chaos's lingering record interest to divert the hazard-insurance proceeds.


### A.    Step One: The Mortgage Fraud

24.    On November 19, 2021, Sass, Chaos, and Psioda recorded a third deed of trust against the Property in the amount of $359,100, stacked on top of the still-recorded July Lien. (Ex. H – Nov. 18, 2021 Deed of Trust, Chaos Home Loans, LLC – 4617 N. Minnesota Ave.). Barely a month later, on December 21, 2021, Chaos sold the resulting loan to Plaintiff for $370,067.68. (Ex. I – Dec. 21, 2021 Purchase Advice).

25.    In connection with the December 2021 sale, Defendants concealed critical facts, including: (i) that the July Lien remained a recorded lien of public record; and (ii) that on September 18, 2021, the City had already assessed a municipal lien against the Property.

26.    Concealment of these encumbrances constituted a material breach of the parties' Loan Purchase Agreement, which, among other things, required Chaos to:

- Fully underwrite the Loan prior to submission to TMS. (Ex. J – Loan Purchase Agreement (the "LPA"), §2(B));

- Represent and warrant that the Loan was a valid first lien and that the mortgaged property was free and clear of all encumbrances and liens having priority over the lien of the Loan. (*Id.* at §7(A)(5)); and

7

COMPLAINT

- Represent and warrant that "[n]o fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to the Loan has taken place on the part of the Seller, or any other party . . . involved in the origination or sale of the Loan." (*Id.* at §7(A)(19)).

27.     Pursuant to the terms of the LPA, Plaintiff was permitted to rely upon Chaos' representations and warranties, and was not required to conduct its own underwriting of the Loan. (*Id.* at §4(C) (providing that Chaos remained responsible for assuring the Loan's compliance.)

28.     Accordingly, Plaintiff relied on Defendants' representations in purchasing the Loan, unaware that the Property was already impaired by unreleased liens and municipal charges.

29.     Defendants also failed to timely notify Allstate, the hazard-insurance carrier, of the Loan transfer. This was not a clerical oversight. The failure to timely notify Allstate ensured that when the Property later burned, Allstate would continue to treat Chaos as the mortgagee of record, enabling Chaos, Psioda, and ultimately Gueron (through 911 Restoration) to share in the insurance proceeds, to the exclusion of Plaintiff.

30.     The December 21, 2021 transaction produced immediate liquidity for Defendants while saddling Plaintiff with a Loan secured by property already encumbered by liens and code violations.

31.     Within a week, on December 28, 2021, Sass submitted a building-permit application to construct the 23-unit apartment building at the Property and simultaneously sought approval for a ten-year tax abatement. (Ex. K –  Portland Maps, 4611 N. Minnesota Ave, 2021-117514). The timing underscores that Sass used Plaintiff's cash infusion to prop up a failing redevelopment proposal, even as the Property was already collapsing into blight.

**B.  Step Two: The Insurance Fraud**

8

COMPLAINT

32.     Having first extracted cash by selling the Loan, Defendants turned to the second phase of their scheme: positioning themselves to divert the hazard-insurance proceeds that would inevitably flow once the already blighted Property succumbed to fire and demolition. Because Chaos remained of record as mortgagee, and because the July Lien was never released, Allstate continued to recognize Chaos, not Plaintiff, as the party entitled to payment.

33.     In early 2022, the Property suffered two separate fires. On March 20, 2022, Portland Fire & Rescue responded to a basement blaze, which investigators attributed to transients and accumulated debris, though the precise cause remained undetermined. (Ex. L – City of Portland, Fire Marshal Report (March 21, 2022)). No insurance claim was filed. Less than a month later, on April 18, 2022, a second and far more destructive fire erupted, destroying the structure entirely. Investigators classified the April fire as "homeless related due to known presence of squatters on property" but noted "[t]here were no witnesses or other information as to how the fire started." (Ex. M – City of Portland, Fire Marshal Report (April 18, 2022)).

34.     Against a backdrop of stalled redevelopment, outstanding municipal liens, and the capital demands of the Founders' Project, the April fire provided Defendants the opportunity to activate the second half of their scheme. The loss of the structure created the pretext to draw down the maximum insurance coverage, while Chaos's unreleased lien position ensured Defendants, not Plaintiff, would be paid. (Ex. N – City of Portland – Fire & Rescue Photos).

35.     In May 2022, Allstate issued hazard-insurance proceeds totaling $269,098.20, via two separate checks. The first check, in the amount of $20,000, named Sass as the sole payee (the "Sass-Only Check"). The second, in the amount of $249,098.20, named Chaos, Sass, and 911 Restoration as joint payees (the "Joint-Payee Check"). Each check was endorsed by the designated

9

COMPLAINT

payees, with Psioda personally signing on behalf of Chaos, and deposited into accounts under Defendants' control. (Ex. O – Joint-Payee Check).

36.    Allstate's correspondence to Sass confirmed that this payment represented the policy limits available under Sass's Deluxe Homeowners policy. (Ex. P – Allstate May 27, 2022 Settlement Letter). Yet, Allstate's own replacement-cost estimate placed demolition and rebuild costs at over $321,000. (Ex. Q – Allstate Replacement Cost Estimate). Thus, even if the proceeds had been properly applied, they were insufficient to restore the collateral. This made it all the more critical that every dollar be applied to preserve Plaintiff's security interest.

37.    Instead, Defendants diverted the funds for their own use. Plaintiff – the actual holder of the Loan and the intended beneficiary of the insurance protection – was excluded entirely. By structuring the transaction in this manner, Defendants transformed the very omissions made during the December 2021 Loan sale, i.e., the unreleased July Lien and the failure to timely notify Allstate of the transfer, into tools for siphoning off insurance proceeds.

38.    The outcome was predictable. Plaintiff lost more than $269,000 in insurance protection, the Property remained unrepaired, municipal liens mounted, and within two years the collateral was extinguished altogether through municipal foreclosure. The City's escalating enforcement, spurred by the very conditions Defendants left unremedied, provides the final chapter of this scheme. (Ex. R – Post Fire 2024 Photos).

**C.  Concerted Action and Common Scheme**

39.    At all relevant times, Defendants Sass, Psioda, Chaos, Gueron, and 911 Restoration acted in concert and pursuant to a common scheme to extract cash from the Property and to deprive Plaintiff of the benefit of its collateral. Defendants agreed, expressly or implicitly, to (i) originate, re-paper, and sell the November 2021 Loan to Plaintiff while concealing unreleased liens and

COMPLAINT

municipal code violations, and (ii) position Chaos and 911 Restoration to divert hazard-insurance proceeds following the April 2022 fire.

40.     In do so, each Defendant knew of the scheme's wrongful purpose, intended that their own acts assist in accomplishing that purpose, and substantially participated in or encouraged the others' tortious conduct. Under Oregon Law, Defendants' concerted action renders each participant jointly and severally liable for the torts committed in furtherance of the scheme, even if that participant did not personally commit ever tortious acts or receive every dollar of the diverted funds.

## IV.    TMS's Insurance Claim and Foreclosure

41.     In March 2024, Sass defaulted on his Loan obligations to Plaintiff. As a result, TMS's sub-servicer, Servbank, conducted a preservation inspection of the Property and discovered, for the first time, that the structure had been destroyed by fire. Unaware that Defendants had already submitted and collected on an insurance claim, Servbank's vendor, Dimont, filed a claim with Allstate, on Plaintiff's behalf on August 6, 2024.

42.     On August 9, 2024, Allstate denied the claim, explaining that it was a duplicate of the earlier claim already paid to Defendants. (Ex. S – August 9, 2024 email from Allstate to Dimont). TMS first learned of the duplicate claim on August 13, 2024.

43.     That same month, TMS also received notice that the Portland City Council had approved foreclosure of the Property. In doing so, the Council cited the Property's deteriorated condition, unpaid municipal liens, and its classification as a "distressed vacant property" that posed

11

COMPLAINT

risks to neighborhood health and safety. (Ex. T – City of Portland - Council Ordinance No. 191773).

44.     On January 15, 2025, the Property was sold through municipal foreclosure for $65,077. As a result, Plaintiff's collateral was extinguished entirely.

45.     The combined effect of Defendants' misconduct was to strip Plaintiff of both its investment and its collateral. First, Defendants induced Plaintiff to pay more than $370,000 for a Loan they knew was encumbered by unreleased liens and municipal code charges. Then, when the Property burned, they diverted over $269,000 in hazard-insurance proceeds that should have preserved the collateral. By concealing liens to induce the Loan sale, diverting insurance proceeds, and leaving the Property to be lost through municipal foreclosure, Defendants deprived Plaintiff of more than $639,000 in value and extinguished its security interest.

## CAUSES OF ACTION

46.     Plaintiff realleges and incorporated by reference the allegations set forth above as though fully restated herein. As detailed in the foregoing factual allegations, Defendants engaged in a coordinated scheme to misrepresent the condition of the Property, conceal material encumbrances, divert insurance proceeds, and ultimately deprive Plaintiff of its collateral. Their conduct gives rise to the following causes of action.

### Count I – Fraud (Mortgage Fraud)
Against Sass, Chaos, and Psioda

47.     Plaintiff realleges and incorporates by reference the allegations set forth above.

48.     Defendants Sass, Chaos, and Psioda knowingly and intentionally made material misrepresentations and omissions in order to obtain immediate liquidity through the sale of a loan they knew was impaired, and to deprive Plaintiff of the benefit of its security interest in the Property.

COMPLAINT

49.　　On November 19, 2021, Sass, Chaos, and Psioda recorded a new deed of trust in the amount of $359,100, stacked on top of a still-recorded July 2021 Chaos lien, and then sold the resulting loan to Plaintiff on December 21, 2021 for $370,067.68.

50.　　In connection with that loan sale, Sass, Chaos, and Psioda misrepresented and concealed material facts, including: (i) that the July 2021 deed of trust remained a recorded lien of public record; (ii) that the City of Portland had already assessed a code lien against the Property on September 18, 2021; and (iii) that they had failed to timely notify the hazard-insurance carrier of the transfer, ensuring Chaos would remain payee of record. Defendants made these misrepresentations and omissions with the intent that Plaintiff rely on them in deciding whether to purchase the Loan.

51.　　At the time of this transaction, Chaos had effectively ceased operating as a legitimate lender. Its lending operations had wound down earlier in 2021, yet Sass and Psioda continued to use its shell status to give the appearance of legitimacy and to induce Plaintiff to purchase the Loan.

52.　　These misrepresentations and omissions violated express representations and warranties made in connection with the Loan Purchase Agreement, including warranties that the Loan was a valid first lien, that the collateral was free of undisclosed encumbrances, and that no fraud or misrepresentation had occurred in connection with the Loan.

53.　　Pursuant to the terms of the Loan Purchase Agreement, Plaintiff was entitled to rely on these representations and was not required to conduct independent underwriting. Plaintiff justifiably relied on Defendants' misrepresentations and omissions by purchasing the Loan. Plaintiff would not have purchased the Loan, or would have done so on materially different terms, had it known the true facts.

COMPLAINT

54.     As a result, Plaintiff paid $370,067.68 for a loan secured by a property that was already encumbered, impaired by code violations, and exposed to municipal enforcement, leaving Plaintiff with worthless collateral.

55.     Defendants' fraudulent conduct caused Plaintiff to suffer damages in an amount to be determined at trial, but not less than the Loan purchase price of $370,067.68, together with consequential losses arising from Defendants' fraud.

56.     Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

57.     In committing the foregoing acts, Defendants acted in concert pursuant to their common scheme described above. Under Oregon law, such concerted action makes each participating Defendant jointly and severally liable for the fraud committed in furtherance of the scheme.

### Count II – Fraud (Insurance Fraud)
Against Sass, Psioda, Chaos, Gueron, and 911 Restoration

58.     Plaintiff realleges and incorporates by reference the allegations set forth above.

59.     Defendants Sass, Psioda, Chaos, Gueron, and 911 Restoration knowingly and intentionally made material misrepresentations and omissions in order to obtain the limited hazard-insurance proceeds available under the Property's hazard-insurance policy, i.e., funds intended to protect Plaintiff's collateral, and to deprive Plaintiff of the benefit of its security interest.

60.     Following the April 18, 2022 fire, Sass, Psioda, Gueron, and 911 Restoration diverted hazard-insurance proceeds that should have been applied to repair the collateral or to satisfy municipal liens necessary to preserve it.

14

COMPLAINT

61.     Defendants falsely represented by conduct and implication, that Chaos remained the rightful mortgagee entitled to payment and that 911 Restoration had been retained to perform repair work at the Property. Psioda personally endorsed the Joint-Payee Check on behalf of Chaos, and Gueron caused 911 Restoration to be included as a payee despite the company performing no work on the Property.

62.     In truth, the Loan had been sold to Plaintiff months earlier, Chaos no longer held any interest in the Loan, and 911 Restoration performed no repairs. Defendants nonetheless retained the proceeds for their own benefit, leaving the Property unrepaired, subject to escalating municipal liens, and ultimately lost to foreclosure.

63.     As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff suffered damages including, but not limited to: (i) the loss of $269,098.20 in hazard-insurance proceeds diverted by Defendants; (ii) the impairment of its collateral through accruing municipal liens; and (iii) complete loss of its secured interest when the City foreclosed on the Property.

64.     Defendants' fraudulent conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

65.     In committing the foregoing acts, Defendants acted in concert pursuant to their common scheme described above. Under Oregon law, such concerted action makes each participating Defendant jointly and severally liable for the fraud committed in furtherance of the scheme.

### Count III – Conversion (the Joint-Payee Check)
Against Sass, Psioda, Chaos, Gueron, and 911 Restoration

66.     Plaintiff realleges and incorporates by reference the allegations set forth above.

15

COMPLAINT

67.     Following the April 2022 fire, Allstate issued hazard-insurance proceeds in the total amount of $269,098.20, including a $249,098.20 Joint-Payee Check made payable to Sass, Chaos, and 911 Restoration.

68.     The $249,098.20 represented by the Joint-Payee Check consisted of specific, segregated, and readily identifiable funds belonging to Plaintiff under the terms of the November 2021 deed of trust and applicable law.

69.     Plaintiff, as the true owner and holder of the Loan at that time, had a superior right to possession and control of the insurance proceeds, which were intended to protect its collateral.

70.     Defendants Sass, Chaos, Psioda, Gueron, and 911 Restoration wrongfully exercised dominion and control over the insurance proceeds in a manner inconsistent with Plaintiff's rights and in exclusion of Plaintiff's superior claim to those funds by endorsing and negotiating the Joint-Payee Check, retaining the funds, and failing to apply them to repair the Property or to satisfy liens necessary to preserve Plaintiff's interest.

71.     Defendants' actions were inconsistent with Plaintiff's rights and were undertaken without authorization.

72.     As a direct and proximate result of Defendants' conversion, Plaintiff was deprived of the insurance proceeds, suffered impairment of its collateral through escalating municipal liens, and ultimately lost its secured interest when the Property was foreclosed and sold at auction for a fraction of its value.

73.     Defendants' conversion was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

COMPLAINT

74.     In committing the foregoing acts, Defendants acted in concert pursuant to their common scheme described above. Under Oregon law, such concerted action makes each participating Defendant jointly and severally liable for the conversion committed in furtherance of the scheme.

**Count IV – Conversion (the Sass-Only Check)**
Against Sass

75.     Plaintiff realleges and incorporates by reference the allegations set forth above.

76.     Following the April 2022 fire, Allstate issued hazard-insurance proceeds in the total amount of $269,098.20, including a $20,000 check made payable solely to Sass.

77.     The $20,000 represented by the Sass-Only Check consisted of specific, segregated, and readily identifiable funds belonging to Plaintiff under the terms of the November 2021 deed of trust and applicable law.

78.     Plaintiff, as the true owner and holder of the Loan at that time, had a superior right to possession and control of the insurance proceeds, which were intended to preserve its collateral.

79.     Defendant Sass wrongfully exercised dominion and control over the insurance proceeds in a manner inconsistent with Plaintiff's rights and in exclusion of Plaintiff's superior claim to those funds by endorsing and negotiating the Sass-Only Check, retaining the funds, and failing to apply them to repair the Property or to satisfy liens necessary to preserve Plaintiff's interest.

80.     Defendant's actions were inconsistent with Plaintiff's rights and were undertaken without authorization.

81.     As a direct and proximate result of Defendant's conversion, Plaintiff was deprived of the insurance proceeds, suffered impairment of its collateral through escalating municipal liens,

17

COMPLAINT

and ultimately lost its secured interest when the Property was foreclosed and sold at auction for a fraction of its value.

82.     Defendant's conversion was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendant and deter similar misconduct in the future.

**Count V - Breach of Contract**
Against Sass

83.     Plaintiff realleges and incorporates by reference the allegations set forth above.

84.     On November 19, 2021, Sass executed a Note in the original principal amount of $359,100 and a Deed of Trust encumbering the Property in favor of Chaos Home Loans, LLC. Chaos thereafter sold and assigned the Note and Deed of Trust to Plaintiff on December 21, 2021. Plaintiff is the lawful holder and beneficiary of the Note and Deed of Trust.

85.     Under the express terms of the Note and Deed of Trust, Sass covenanted, among other things, to: (i) maintain the Property in good repair and in compliance with applicable law; (ii) apply any hazard-insurance proceeds to the repair and restoration of the Property or, if repair was not feasible, to the reduction of the secured debt; (iii) refrain from committing waste or otherwise impairing the lender's collateral; and (iv) pay all amounts due under the Note and Deed of Trust when required.

86.     Sass materially breached these obligations by: (i) failing to maintain the Property in compliance with code, resulting in repeated violations and municipal liens; (ii) diverting hazard-insurance proceeds for his own benefit rather than applying them to repair the Property or reduce the debt; and (iii) abandoning the Property to foreclosure, thereby extinguishing Plaintiff's security interest.

COMPLAINT

87.     Plaintiff fully performed its obligations under the Note and Deed of Trust or was excused from doing so by Sass's material breaches.

88.     As a direct and proximate result of Sass's breaches, Plaintiff suffered damages including, but not limited to: (i) the loss of $269,098.20 in hazard-insurance proceeds; (ii) impairment of its collateral through escalating municipal liens; and (iii) the extinguishment of its secured interest when the Property was sold at foreclosure.

89.     The Note and Deed of Trust also provide that the lender is entitled to recover its costs and reasonable attorneys' fees incurred in enforcing its rights. Plaintiff is therefore entitled to recover attorneys' fees and costs in addition to compensatory damages.

### Count VI – Breach of Contract
Against Chaos Home Loans, LLC

90.     Plaintiff realleges and incorporates by reference the allegations set forth above.

91.     On or about December 21, 2021, Chaos entered in a Loan Purchase Agreement with Plaintiff governing the sale of the November 2021 Loan secured by the Property. Under the LPA, Chaos made numerous express representations, warranties, and covenants, including that: (i) the Loan was a valid first lien and the mortgaged property was free of all encumbrances having priority over the lien of the Loan; (ii) the Loan had been fully underwritten in accordance with applicable standards; (iii) no fraud, error, omission, or misrepresentation had occurred in the origination or sale of the Loan; and (iv) Chaos would indemnify Plaintiff against losses arising from any breach of its representations or warranties.

92.     These representations and warranties were material to Plaintiff's decision to purchase the Loan, and Plaintiff was expressly entitled to, and did, rely on them under the LPA.

19

COMPLAINT

93.     Chaos materially breached the LPA by, among other things: (i) selling Plaintiff a Loan that was not a valid first lien, because the July 2021 Chaos deed of trust remained unreleased of record; (iii) failing to disclose that the City of Portland had already assessed municipal code liens against the Property; and (iii) misrepresenting that no fraud, omission, or misrepresentation had occurred when, in fact, the transaction was structured to conceal the impaired status of the collateral.

94.     Plaintiff fully performed its obligation under the LPA, including paying $370,067.68 to purchase the Loan, or was excused from further performance by Chaos's material breaches.

95.     As a direct and proximate result of Chaos's breaches, Plaintiff suffered damages including, but not limited to: (i) the $370,067.68 paid to purchase the Loan; (ii) the loss of $269,098.20 in hazard-insurance proceeds; (iii) impairment of its collateral through escalating municipal liens; and (iii) the extinguishment of its secured interest when the Property was sold at foreclosure.

96.     The LPA provides that Plaintiff is entitled to recover its costs and reasonable attorneys' fees incurred in enforcing its rights. Plaintiff is therefore entitled an award of damages, together with costs, interest, and attorneys' fees.

### Count VII – Unjust Enrichment
Against Sass, Chaos, Psioda, Gueron, and 911 Restoration

97.     Plaintiff realleges and incorporates by reference the allegations set forth above.

98.     Defendants Sass, Psioda, Chaos, Gueron, and 911 Restoration wrongfully obtained and retained funds at Plaintiff's expense through two related schemes: (i) the December 2021 sale of the Loan to Plaintiff without disclosure of unreleased liens and municipal code charges; and (ii) the diversion of hazard-insurance proceeds following the April 2022 fire.

20

COMPLAINT

99. The funds Defendants obtained including, $370,067.68 in loan-sale proceeds and $269,096.20 in hazard-insurance proceeds, were intended to preserve and protect Plaintiff's collateral. Defendants knew they had received these benefits, and, under the circumstances alleged, it would be unjust to permit them to retain those benefits without compensating Plaintiff.

100. Even so, Defendants retained and used the benefits for their own purposes, conferring no benefit upon Plaintiff.

101. By retaining the benefit of the loan-sale proceeds and the insurance proceeds without applying them to the Property or remitting them to Plaintiff, Defendants were unjustly enriched at Plaintiff's expense.

102. It would be inequitable and unjust for Defendants to retain the benefits of their conduct, given that Plaintiff has been deprived of both the proceeds themselves and the collateral they were intended to protect.

103. As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $639,165.88 (the combined value of the $370,067.68 loan sold in December 2021 and the $269,098.20 in diverted insurance proceeds).

104. To the extent an enforceable contract governs Sass's duties with respect to the Note and Deed of Trust, this claim is pled in the alternative. To the extent that an enforceable contract governs Chaos's duties with respect to the LPA, this claim is pled in the alternative. As to Psioda, Gueron, and 911 Restoration, who were not parties to the Note or Deed of Trust or the LPA, unjust enrichment provides a direct and independent basis for restitution.

## **PRAYER FOR RELIEF**

COMPLAINT

**WHEREFORE**, Plaintiff The Money Source Inc. respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, as follows:

A.    On Counts I and II (Fraud):

    1.    Compensatory damages in an amount not less than $639,165.88, representing the $370,067.68 paid for the December 2021 Loan and the $269,098.20 in diverted hazard-insurance proceeds, together with consequential damages arising from the impairment and loss of Plaintiff's collateral, including municipal lien assessments and abatement charges;

    2.    Punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

B.    On Counts III and IV (Conversion):

    1.    Compensatory damages in the amount of the converted insurance proceeds ($249,098.20 and $20,000, respectively), together with consequential damages for the impairment and foreclosure of Plaintiff's collateral;

    2.    Punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

C.    On Count V (Breach of Contract against Sass):

    1.    Compensatory damages in an amount not less than $269,098.20, or such other amount as may be proven at trial, together with consequential damages caused by Sass's breaches, including municipal lien accruals and foreclosure;

    2.    Plaintiff's reasonable attorneys' fees, costs, and disbursements as provided under the Note and Deed of Trust.

D.    On Count VI (Breach of Contract against Chaos)

    1.    Compensatory damages in an amount not less than $370,067.68, or such other amount as may be proven at trial, together with consequential damages caused by Chaos's breaches, including the loss of insurance proceeds and extinguishment of Plaintiff's security interest;

    2.    Plaintiff's reasonable attorneys' fees, costs, and disbursements as provided under the Loan Purchase Agreement.

E.    On Count VII (Unjust Enrichment, pled in the alternative):

22

COMPLAINT

   1.  Restitution in the amount of Defendants' unjust enrichment, not less than $639,165.88, or such other amount as may be proven at trial.

F.    On All Counts:

   1.  Pre- and post-judgment interest as allowed by law;

   2.  Such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated: December 9, 2025

Ghidotti | Berger LLP



By:

Steve Bonfiglio, Esq., OSB No. 051220

Attorneys for Plaintiff

Email: sbonfiglio@ghidottiberger.com

23

COMPLAINT