Steve Bonfiglio (SBN 051220)
GHIDOTTI | BERGER LLP
4145 SW Watson Avenue, Suite 350
Beaverton OR 97005
Tel: (949) 427-2010
Fax: (949) 427-2732
sbonfiglio@ghidottiberger.com
Attorneys for *Plaintiff THE MONEY SOURCE INC.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| THE MONEY SOURCE INC. | Case No.: 3:25-cv-012295-SI |
| Plaintiff, | |
| v. | |
| MAX SASS, COLLIN PSIODA, CHAOS HOME LOANS, LLC,  YOAV GUERON, and 911 RESTORATION, INC., | **DECLARATION OF MAILING TO SECRETARY OF STATE** |
| Defendants. | |

1. I, Adam Tammaro, am over 18 years of age and an employee of the law firm of Ghidotti Berger LLP, which represents Plaintiff, The Money Source, Inc. in the above-captioned action.

2. On March 5, 2026, I caused to be mailed, by certified mail, the Complaint and Summons in a Civil Action directed to Chaos Home Loans, LLC, to the Oregon

1

Secretary of State, c/o its Corporation Division/Process Service.  Copies of the documents delivered to the Secretary of State are attached hereto as Exhibit "A".

3.  The mailing was accompanied by check no. 134044 in the amount of $20.00.

4.  Defendant Chaos Home Loans, LLC appointed Paracorp Inc. as its resident agent in the State of Oregon.  According to the Secretary of State of Oregon, Paracorp Inc. was located at 7185 SW Sandburg Street, Suite 110, Portland, Oregon 97223.

5.  Paracorp Inc. resigned as the resident agent of Chaos Home Loan in 2023.  Chaos Home Loans did not appoint a new resident agent following the resignation of its resident agent.

6.  Plaintiff is serving Chaos Home Loans via the Federal Rules of Civil Procedure 4, which allows service of process through the State of Oregon Rules of Civil Procedure (ORCP) 7.

7.  The ORCP permit service on a defendant's resident agent through the Secretary of State of Oregon pursuant to ORCP 7(D)(3)(b)(ii)(D) as well as Oregon Revised Statutes 60.121 and 60.731.

8.  Specifically, ORS 60.121(2) provides that the Secretary of State of Oregon shall be an agent of a corporation including a dissolved corporation upon whom any such process, notice or demand may be served whenever the corporation fails to appoint or maintain a registered agent in this state or whenever the corporation's registered agent cannot with reasonable diligence be found at the registered office.

9.  Because Chaos Home Loans failed to appoint a resident agent in the State of Oregon, Plaintiff served Chaos Home Loan by way of the Secretary of State of Oregon.

10. Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury under the law of the State of Oregon that the foregoing is true and correct.

Dated this 27th day of April, 2026.

*/s/ Adam Tammaro*
Adam Tammaro

2



**Service of Process**

Secretary of State - Corporation Division / Process Service - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business
Phone: (503) 986-2200

---

The Secretary of State's role in the service of process is ministerial, and does not necessarily mean you have satisfied all of the law's requirements. Under some circumstances, such as domestic general partnerships, service with the Secretary may not be an option. You or your attorney should review the relevant business entity and ORCP statutes to determine proper service before filing with our office.

In accordance with Oregon Revised Statute 192.410-192.490, all information on this form is publicly available, including addresses.
We must release this information to all parties upon request.

---

Please Type or Print Legibly in **Black** Ink. Attach Additional Sheet if Necessary.

1) **TYPE OF DOCUMENT:** (Check the appropriate box)

[✔] Summons/Complaint    [ ] Small Claim & Notice of Small claim    [ ] Third-Party Summons    [ ] Trustee's Notice of Sale

[ ] Other _____

2) **ENTITY SERVED:**

Chaos Home Loans LLC

3) [✔] **I HAVE ATTACHED A COPY OF THE SUMMONS.**

4) **CASE:**

| PLAINTIFF/S: | DEFENDANT/S: |
|---|---|
| The Money Source, Inc. | Max Sass, Collin Psioda, Chaos Home Loans LLC, Yoav Gueron, 911 Restoration, Inc. |

5) **ATTORNEY NAME:** Steve Bonfiglio, Esq.

6) **ADDRESS:** (Mailing address, city, state, zip)

1920 Old Tustin Ave., Santa Ana CA 92705

7) **PERSON DELIVERING THE SERVICE:**

Adam Tammaro

8) **HOW IS SERVICE OF PROCESS DELIVERED:** (Check the appropriate box)

[ ] Hand Delivered    [✔] Certified Mail

[ ] Regular Mail    [ ] Unknown/Unclear

9) **COURT:** (What court was the case filed in.)

US District Court-District of Oregon

10) **CASE / DOCKET NUMBER:**

25-008530

11) [✔] **ALL OTHER REQUIRED ATTEMPTS TO SERVE THE BUSINESS OR ITS REGISTERED AGENT, HAVE BEEN UNSUCCESSFUL.**

---

After accepting service of process, the Secretary of State records the information regarding the complaint in our database. The Secretary of State does not attempt to notify or contact the business identified in the complaint, or its registered agent regarding the complaint.

**CONTACT NAME:** (To resolve questions with this filing.)

Steve Bonfiglio

**PHONE NUMBER:** (Include area code.)

(949) 427-2010

| FEES |
|---|
| Required Processing Fee      $20 |
| Processing Fees are nonrefundable |
| Please make check payable to "Corporation Division." |

280 - Service of Process (01/10)



**Service of Process**

Secretary of State - Corporation Division / Process Service - 255 Capitol St. NE, Suite 151 - Salem, OR 97310-1327 - sos.oregon.gov/business
Phone: (503) 986-2200

The Secretary of State's role in the service of process is ministerial, and does not necessarily mean you have satisfied all of the law's requirements. Under some circumstances, such as domestic general partnerships, service with the Secretary may not be an option. You or your attorney should review the relevant business entity and ORCP statutes to determine proper service before filing with our office.

In accordance with Oregon Revised Statute 192.410-192.490, all information on this form is publicly available, including addresses.
We must release this information to all parties upon request.

Please Type or Print Legibly in **Black** Ink. Attach Additional Sheet if Necessary.

1) **TYPE OF DOCUMENT:** (Check the appropriate box)

[✔] Summons/Complaint    [ ] Small Claim & Notice of Small claim    [ ] Third-Party Summons    [ ] Trustee's Notice of Sale

[ ] Other _____

2) **ENTITY SERVED:**

Chaos Home Loans LLC

3) [✔] **I HAVE ATTACHED A COPY OF THE SUMMONS.**

4) **CASE:**

**PLAINTIFF/S:**

The Money Source, Inc.

**DEFENDANT/S:**

Max Sass, Collin Psioda, Chaos Home Loans LLC, Yoav Gueron, 911 Restoration, Inc.

5) **ATTORNEY NAME:** Steve Bonfiglio, Esq.

6) **ADDRESS:** (Mailing address, city, state, zip)

1920 Old Tustin Ave., Santa Ana CA 92705

7) **PERSON DELIVERING THE SERVICE:**

Adam Tammaro

8) **HOW IS SERVICE OF PROCESS DELIVERED:** (Check the appropriate box)

[ ] Hand Delivered    [✔] Certified Mail

[ ] Regular Mail    [ ] Unknown/Unclear

9) **COURT:** (What court was the case filed in.)

US District Court-District of Oregon

10) **CASE / DOCKET NUMBER:**

25-008530

11) [✔] **ALL OTHER REQUIRED ATTEMPTS TO SERVE THE BUSINESS OR ITS REGISTERED AGENT, HAVE BEEN UNSUCCESSFUL.**

After accepting service of process, the Secretary of State records the information regarding the complaint in our database. The Secretary of State does not attempt to notify or contact the business identified in the complaint, or its registered agent regarding the complaint.

**CONTACT NAME:** (To resolve questions with this filing.)

Steve Bonfiglio

**PHONE NUMBER:** (Include area code.)

(949) 427-2010

**FEES**

Required Processing Fee     $20

Processing Fees are nonrefundable

Please make check payable to "Corporation Division."

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Oregon

| | | |
|---|---|---|
| THE MONEY SOURCE INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No.3:25-cv-02295-SI |
| | ) | |
| MAX SASS, COLLIN PSIODA, | ) | |
| CHAOS HOME LOANS, LLC,  YOAV GUERON, and | ) | |
| 911 RESTORATION, INC., | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  CHAOS HOME LOANS, LLC,
c/o INCORP. SERVICES, INC., AS REGISTERED AGENT
9107 WEST RUSSELL RD, SUITE 100
LAS VEGAS NV 89148

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    GHIDOTTI BERGER LLP
1920 OLD AUSTIN AVENUE SANTA ANA CA 92705

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

MELISSA AUBIN, Clerk of Court

Date: 12/09/2025                     By: s/A. Morrissey, Deputy Clerk

Steve Bonfiglio, Esq. (051220)
GHIDOTTI | BERGER, LLP
1920 Old Tustin Avenue
Santa Ana CA, 92705
Tel: (949) 427-2010
Fax: (949)427-2732
Email: sbonfiglio@ghidottiberger.com
Attorneys for *Plaintiff THE MONEY SOURCE INC.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **THE MONEY SOURCE INC.**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MAX SASS, COLLIN PSIODA, CHAOS HOME LOANS, LLC,  YOAV GUERON, and 911 RESTORATION, INC.,**<br><br>**Defendants.** | **Case No.:**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff The Money Source Inc. ("TMS" or "Plaintiff"), as and for its Complaint against

the Defendants, hereby alleges as follows:

**NATURE OF THE ACTION**

1.    This case arises from a failed Portland redevelopment project and the fraudulent

cash extractions that accompanied its collapse. Defendant Max Sass ("Sass") acquired real

property located at 4617 N. Minnesota Avenue (also referenced in City lien and foreclosure records

as 4611 N. Minnesota Avenue, collectively, the "Property"), and promoted plans to redevelop it.

1

COMPLAINT

When those plans began to falter, Sass and his associates conspired to extract nearly $600,000 in two moves: first, by selling Plaintiff a mortgage loan in December 2021 (the "Loan"), while concealing outstanding liens and municipal violations; and second, by diverting hazard-insurance proceeds after the Property burned in April 2022.

2.      Sass's longtime mortgage broker, Defendant Collin Psioda ("Psioda"), controlled Defendant Chaos Home Loans, LLC ("Chaos"), which both originated and sold the Loan to TMS. Defendant Yoav Gueron ("Gueron"), Sass's partner in the development of a separate Portland property, caused his restoration company, Defendant 911 Restoration, Inc. ("911 Restoration"), to be added as a payee even though 911 Restoration performed no repairs at the Property.

3.      Together, Defendants orchestrated and executed this fraudulent "cash grab," leaving Plaintiff with more than $600,000 in losses: $370,000 paid out of pocket for the Loan, $269,000 in diverted insurance proceeds, and, ultimately, the loss of its collateral through municipal foreclosure.

## PARTIES

### I.      Plaintiff

4.      Plaintiff The Money Source Inc. is an Arizona corporation with its principal place of business in Arizona. At all relevant times, TMS was the owner and holder of the mortgage loan secured by the real property located at 4617 N. Minnesota Avenue, Portland, Oregon (also referenced in municipal lien and foreclosure records as 4611 N. Minnesota Avenue).

### II.      Defendants

5.      Defendant Sass is an individual domiciled in Nevada. He owned the Property during all relevant times and orchestrated and participated in the fraudulent scheme to extract value

2

COMPLAINT

through mortgage and insurance fraud. Sass is also a managing partner of Founders Developments with Gueron.

6.     Defendant Psioda is an individual domiciled in Nevada. He is the founder, principal, and sole member of Chaos, the entity through which he directed the origination, refinancing, and sale of the Loan to TMS. Even after the sale, Psioda ensured Chaos remained positioned as mortgagee of record. This allowed the Defendants to intercept hazard-insurance proceeds that rightfully belonged to TMS.

7.     Defendant Chaos, a now-defunct Nevada limited liability company owned and controlled by Psioda, held an undisclosed lien against the Property. As a result, it was listed as a joint payee on the May 2022 hazard-insurance proceeds, in place of TMS.

8.     Defendant Gueron is an individual domiciled in Oregon. Gueron is the sole shareholder of Defendant 911 Restoration, Inc. and, with Sass, a managing partner of Founders Developments. Gueron caused 911 Restoration to be added as a joint payee on the May 2022 hazard-insurance proceeds despite the company performing no repairs at the Property, and participated directly in diverting those funds for Defendants' benefit.

9.     Defendant 911 Restoration, Inc. is an Oregon corporation with its principal place of business in Oregon. Although added as a joint payee on the hazard-insurance proceeds check, 911 Restoration performed no repairs to the Property after the April 2022 fire and had no legitimate claim to those funds.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and complete diversity exists

3

COMPLAINT

between the parties. Plaintiff TMS is a citizen of Arizona; Defendants Sass, Chaos, and Psioda are citizens of Nevada; and Defendants Gueron and 911 Restoration are citizens of Oregon.

11.     This Court has personal jurisdiction over all Defendants because they purposefully directed their conduct toward Oregon, and the claims arise from events centered on Oregon real property.

12.     Each Defendant joined and participated in the common scheme described herein, the core acts and effects of that scheme were centered in Oregon. Under principles of agency and concerted action, this court may exercise jurisdiction over all Defendants consistent with due process.

13.     Venue is proper in the District of Oregon under 28 U.S.C. § 1391(b)(2) because a substantial part of the fraudulent acts and omissions occurred in this District, and the real property at issue is located here.

## FACTUAL ALLEGATIONS

### I.     Sass, Chaos, and Psioda's Lending Pattern

14.     Between 2020 and 2023, Defendants Collin Psioda and Chaos Home Loans, LLC, funded at least seven mortgage loans to Defendant Max Sass across four properties in Oregon and Nevada. This repeated insider financing arrangement was unusual and indicative of a coordinated strategy rather than ordinary arm's-length lending.

15.     Five of those seven loans involved successive liens on just two Portland properties, 4617 N. Minnesota Avenue (the Property) and 5605 N. Maryland Avenue, recorded in quick succession:

COMPLAINT

| DATE | PROPERTY | LOAN AMOUNT | LENDER | RECORDING REFERENCE |
|---|---|---|---|---|
| 8/4/2020 | 4617 N. Minnesota Ave. | $352,800.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2020-100846 |
| 9/15/2020 | 5605 N. Maryland Ave. | $492,000.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2020-121529 |
| 7/29/2021 | 4617 N. Minnesota Ave. | $359,100.00 | Chaos Home Loans LLC | Multonmah Cty. Doc. 2021-119111 |
| 7/29/2021 | 5605 N. Maryland Ave. | $497,500.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2020-118930 |
| 11/18/2021 | 4617 N. Minnesota Ave. | $359,100.00 | Chaos Home Loans LLC | Multnomah Cty. Doc. 2021-170288 |

16.     By layering and refinancing liens in this manner, Psioda, Chaos, and Sass created an artificial churn of encumbrances that positioned them to mislead mortgage investors about title and equity. This structure also ensured that Chaos could later exploit its lingering position to divert hazard-insurance proceeds when the 4617 N. Minnesota Avenue property suffered a fire loss.[1]

## II.     The Struggling Redevelopment Plan and the Founders' Project

17.     On August 4, 2020, Sass purchased the Property, financing the acquisition with a $352,800 loan from Chaos Home Loans, LLC. (Ex. A – Aug. 7, 2020 Deed of Trust, Chaos Home Loans, LLC – 4617 N. Minnesota Ave.). At the time, Sass publicly promoted plans to redevelop the site into a 23-unit apartment project. (Ex. B – *A Las Vegas Developer Planned to Turn a House into Apartments. He Didn't,* Lucas Manfield, *Willamette Week* (Sept. 18, 2024)).

18.     By May 2021, however, little, if any, work had begun, and City inspectors began to cite Sass for serious violations, including sewage flooding, foul odor, and an unpermitted basement conversion. (Ex. C – City of Portland, Notice of Violation – Property Maintenance Code (May 13, 2021); Ex. D. – Affidavit for Administrative Search Warrant for Residential Premises, at ¶ 2). The

---

[1] Public records confirm that Chaos Home Loans, LLC ceased operating as an active mortgage lender by 2021, retaining only its shell registration. By July 2024, the entity was administratively dissolved.

COMPLAINT

City warned that unless violations were cured, enforcement charges would accrue as liens against the Property.

19. At the same time that the N. Minnesota Avenue project lay dormant, Sass and Defendant Gueron shifted their attention to another venture: the acquisition and redevelopment of the Northwest Neighborhood Cultural Center, a historic church in Portland's Alphabet District, into a boutique hotel (the "Founders' Project"). (Ex. E – *Impending Sale of the Northwest Neighborhood Cultural Center Hits Snag with Las Vegas Developer,* Sophie Peel, *Willamette Week* (Jan. 26, 2023)). The Founders' Project required substantial new capital, competing directly with the stalled N. Minnesota Avenue redevelopment for resources and attention.

20. Despite the lack of progress, Chaos recorded a second deed of trust on July 29, 2021 for $359,100 (the "July Lien"), effectively re-papering its prior lien. (Ex. F – July 29, 2021 Deed of Trust, Chaos Home Loans, LLC – 4617 N. Minnesota Ave.). Yet no construction followed, and the property remained vacant and hazardous.

21. In September 2021, the City assessed its first municipal lien against the Property for code violations. (Ex. G – City of Portland Foreclosure Recommendation Report (Lien No. 173424)). Over the next two years, additional nuisance and enforcement liens piled up, totaling more than $29,000 by May 2024. In recommending foreclosure, the City described the N. Minnesota Avenue property as a "distressed vacant property" that posed an ongoing hazard to the neighborhood. The Bureau of Revenue and Financial Services emphasized that such properties were "magnets for crime" and a threat to public health and safety.

22. Confronted with mounting code violations, a failing redevelopment plan, and the simultaneous capital demands of the Founders' Project, Sass and his associates turned to fraudulent

6

COMPLAINT

means to generate liquidity – using the N. Minnesota Avenue property as their vehicle for extraction.

### III. The Two-Part Cash Grab

23. Against this backdrop, Sass and his co-Defendants executed a two-part scheme to extract cash from the Property. First, they sold a new loan to Plaintiff, concealing the unreleased liens and mounting code violations to generate immediate liquidity. Then, when the Property, which was already slated for demolition and treated as disposable, burned, they exploited Chaos's lingering record interest to divert the hazard-insurance proceeds.

#### A. Step One: The Mortgage Fraud

24. On November 19, 2021, Sass, Chaos, and Psioda recorded a third deed of trust against the Property in the amount of $359,100, stacked on top of the still-recorded July Lien. (Ex. H – Nov. 18, 2021 Deed of Trust, Chaos Home Loans, LLC – 4617 N. Minnesota Ave.). Barely a month later, on December 21, 2021, Chaos sold the resulting loan to Plaintiff for $370,067.68. (Ex. I – Dec. 21, 2021 Purchase Advice).

25. In connection with the December 2021 sale, Defendants concealed critical facts, including: (i) that the July Lien remained a recorded lien of public record; and (ii) that on September 18, 2021, the City had already assessed a municipal lien against the Property.

26. Concealment of these encumbrances constituted a material breach of the parties' Loan Purchase Agreement, which, among other things, required Chaos to:

- Fully underwrite the Loan prior to submission to TMS. (Ex. J – Loan Purchase Agreement (the "LPA"), §2(B));

- Represent and warrant that the Loan was a valid first lien and that the mortgaged property was free and clear of all encumbrances and liens having priority over the lien of the Loan. (*Id.* at §7(A)(5)); and

7

COMPLAINT

- Represent and warrant that "[n]o fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to the Loan has taken place on the part of the Seller, or any other party . . . involved in the origination or sale of the Loan." (*Id.* at §7(A)(19)).

27.    Pursuant to the terms of the LPA, Plaintiff was permitted to rely upon Chaos' representations and warranties, and was not required to conduct its own underwriting of the Loan. (*Id.* at §4(C) (providing that Chaos remained responsible for assuring the Loan's compliance.)

28.    Accordingly, Plaintiff relied on Defendants' representations in purchasing the Loan, unaware that the Property was already impaired by unreleased liens and municipal charges.

29.    Defendants also failed to timely notify Allstate, the hazard-insurance carrier, of the Loan transfer. This was not a clerical oversight. The failure to timely notify Allstate ensured that when the Property later burned, Allstate would continue to treat Chaos as the mortgagee of record, enabling Chaos, Psioda, and ultimately Gueron (through 911 Restoration) to share in the insurance proceeds, to the exclusion of Plaintiff.

30.    The December 21, 2021 transaction produced immediate liquidity for Defendants while saddling Plaintiff with a Loan secured by property already encumbered by liens and code violations.

31.    Within a week, on December 28, 2021, Sass submitted a building-permit application to construct the 23-unit apartment building at the Property and simultaneously sought approval for a ten-year tax abatement. (Ex. K –  Portland Maps, 4611 N. Minnesota Ave, 2021-117514). The timing underscores that Sass used Plaintiff's cash infusion to prop up a failing redevelopment proposal, even as the Property was already collapsing into blight.

**B.  Step Two: The Insurance Fraud**

8

COMPLAINT

32.     Having first extracted cash by selling the Loan, Defendants turned to the second phase of their scheme: positioning themselves to divert the hazard-insurance proceeds that would inevitably flow once the already blighted Property succumbed to fire and demolition. Because Chaos remained of record as mortgagee, and because the July Lien was never released, Allstate continued to recognize Chaos, not Plaintiff, as the party entitled to payment.

33.     In early 2022, the Property suffered two separate fires. On March 20, 2022, Portland Fire & Rescue responded to a basement blaze, which investigators attributed to transients and accumulated debris, though the precise cause remained undetermined. (Ex. L – City of Portland, Fire Marshal Report (March 21, 2022)). No insurance claim was filed. Less than a month later, on April 18, 2022, a second and far more destructive fire erupted, destroying the structure entirely. Investigators classified the April fire as "homeless related due to known presence of squatters on property" but noted "[t]here were no witnesses or other information as to how the fire started." (Ex. M – City of Portland, Fire Marshal Report (April 18, 2022)).

34.     Against a backdrop of stalled redevelopment, outstanding municipal liens, and the capital demands of the Founders' Project, the April fire provided Defendants the opportunity to activate the second half of their scheme. The loss of the structure created the pretext to draw down the maximum insurance coverage, while Chaos's unreleased lien position ensured Defendants, not Plaintiff, would be paid. (Ex. N – City of Portland – Fire & Rescue Photos).

35.     In May 2022, Allstate issued hazard-insurance proceeds totaling $269,098.20, via two separate checks. The first check, in the amount of $20,000, named Sass as the sole payee (the "Sass-Only Check"). The second, in the amount of $249,098.20, named Chaos, Sass, and 911 Restoration as joint payees (the "Joint-Payee Check"). Each check was endorsed by the designated

9

COMPLAINT

payees, with Psioda personally signing on behalf of Chaos, and deposited into accounts under Defendants' control. (Ex. O – Joint-Payee Check).

36.     Allstate's correspondence to Sass confirmed that this payment represented the policy limits available under Sass's Deluxe Homeowners policy. (Ex. P – Allstate May 27, 2022 Settlement Letter). Yet, Allstate's own replacement-cost estimate placed demolition and rebuild costs at over $321,000. (Ex. Q – Allstate Replacement Cost Estimate). Thus, even if the proceeds had been properly applied, they were insufficient to restore the collateral. This made it all the more critical that every dollar be applied to preserve Plaintiff's security interest.

37.     Instead, Defendants diverted the funds for their own use. Plaintiff – the actual holder of the Loan and the intended beneficiary of the insurance protection – was excluded entirely. By structuring the transaction in this manner, Defendants transformed the very omissions made during the December 2021 Loan sale, i.e., the unreleased July Lien and the failure to timely notify Allstate of the transfer, into tools for siphoning off insurance proceeds.

38.     The outcome was predictable. Plaintiff lost more than $269,000 in insurance protection, the Property remained unrepaired, municipal liens mounted, and within two years the collateral was extinguished altogether through municipal foreclosure. The City's escalating enforcement, spurred by the very conditions Defendants left unremedied, provides the final chapter of this scheme. (Ex. R – Post Fire 2024 Photos).

**C.  Concerted Action and Common Scheme**

39.     At all relevant times, Defendants Sass, Psioda, Chaos, Gueron, and 911 Restoration acted in concert and pursuant to a common scheme to extract cash from the Property and to deprive Plaintiff of the benefit of its collateral. Defendants agreed, expressly or implicitly, to (i) originate, re-paper, and sell the November 2021 Loan to Plaintiff while concealing unreleased liens and

COMPLAINT

municipal code violations, and (ii) position Chaos and 911 Restoration to divert hazard-insurance proceeds following the April 2022 fire.

40.     In do so, each Defendant knew of the scheme's wrongful purpose, intended that their own acts assist in accomplishing that purpose, and substantially participated in or encouraged the others' tortious conduct. Under Oregon Law, Defendants' concerted action renders each participant jointly and severally liable for the torts committed in furtherance of the scheme, even if that participant did not personally commit ever tortious acts or receive every dollar of the diverted funds.

## IV.     TMS's Insurance Claim and Foreclosure

41.     In March 2024, Sass defaulted on his Loan obligations to Plaintiff. As a result, TMS's sub-servicer, Servbank, conducted a preservation inspection of the Property and discovered, for the first time, that the structure had been destroyed by fire. Unaware that Defendants had already submitted and collected on an insurance claim, Servbank's vendor, Dimont, filed a claim with Allstate, on Plaintiff's behalf on August 6, 2024.

42.     On August 9, 2024, Allstate denied the claim, explaining that it was a duplicate of the earlier claim already paid to Defendants. (Ex. S – August 9, 2024 email from Allstate to Dimont). TMS first learned of the duplicate claim on August 13, 2024.

43.     That same month, TMS also received notice that the Portland City Council had approved foreclosure of the Property. In doing so, the Council cited the Property's deteriorated condition, unpaid municipal liens, and its classification as a "distressed vacant property" that posed

11

COMPLAINT

risks to neighborhood health and safety. (Ex. T – City of Portland - Council Ordinance No. 191773).

44.     On January 15, 2025, the Property was sold through municipal foreclosure for $65,077. As a result, Plaintiff's collateral was extinguished entirely.

45.     The combined effect of Defendants' misconduct was to strip Plaintiff of both its investment and its collateral. First, Defendants induced Plaintiff to pay more than $370,000 for a Loan they knew was encumbered by unreleased liens and municipal code charges. Then, when the Property burned, they diverted over $269,000 in hazard-insurance proceeds that should have preserved the collateral. By concealing liens to induce the Loan sale, diverting insurance proceeds, and leaving the Property to be lost through municipal foreclosure, Defendants deprived Plaintiff of more than $639,000 in value and extinguished its security interest.

## CAUSES OF ACTION

46.     Plaintiff realleges and incorporated by reference the allegations set forth above as though fully restated herein. As detailed in the foregoing factual allegations, Defendants engaged in a coordinated scheme to misrepresent the condition of the Property, conceal material encumbrances, divert insurance proceeds, and ultimately deprive Plaintiff of its collateral. Their conduct gives rise to the following causes of action.

### Count I – Fraud (Mortgage Fraud)
Against Sass, Chaos, and Psioda

47.     Plaintiff realleges and incorporates by reference the allegations set forth above.

48.     Defendants Sass, Chaos, and Psioda knowingly and intentionally made material misrepresentations and omissions in order to obtain immediate liquidity through the sale of a loan they knew was impaired, and to deprive Plaintiff of the benefit of its security interest in the Property.

12

COMPLAINT

49.  On November 19, 2021, Sass, Chaos, and Psioda recorded a new deed of trust in the amount of $359,100, stacked on top of a still-recorded July 2021 Chaos lien, and then sold the resulting loan to Plaintiff on December 21, 2021 for $370,067.68.

50.  In connection with that loan sale, Sass, Chaos, and Psioda misrepresented and concealed material facts, including: (i) that the July 2021 deed of trust remained a recorded lien of public record; (ii) that the City of Portland had already assessed a code lien against the Property on September 18, 2021; and (iii) that they had failed to timely notify the hazard-insurance carrier of the transfer, ensuring Chaos would remain payee of record. Defendants made these misrepresentations and omissions with the intent that Plaintiff rely on them in deciding whether to purchase the Loan.

51.  At the time of this transaction, Chaos had effectively ceased operating as a legitimate lender. Its lending operations had wound down earlier in 2021, yet Sass and Psioda continued to use its shell status to give the appearance of legitimacy and to induce Plaintiff to purchase the Loan.

52.  These misrepresentations and omissions violated express representations and warranties made in connection with the Loan Purchase Agreement, including warranties that the Loan was a valid first lien, that the collateral was free of undisclosed encumbrances, and that no fraud or misrepresentation had occurred in connection with the Loan.

53.  Pursuant to the terms of the  Loan Purchase Agreement, Plaintiff was entitled to rely on these representations and was not required to conduct independent underwriting. Plaintiff justifiably relied on Defendants' misrepresentations and omissions by purchasing the Loan. Plaintiff would not have purchased the Loan, or would have done so on materially different terms, had it known the true facts.

13

COMPLAINT

54. As a result, Plaintiff paid $370,067.68 for a loan secured by a property that was already encumbered, impaired by code violations, and exposed to municipal enforcement, leaving Plaintiff with worthless collateral.

55. Defendants' fraudulent conduct caused Plaintiff to suffer damages in an amount to be determined at trial, but not less than the Loan purchase price of $370,067.68, together with consequential losses arising from Defendants' fraud.

56. Defendants' conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

57. In committing the foregoing acts, Defendants acted in concert pursuant to their common scheme described above. Under Oregon law, such concerted action makes each participating Defendant jointly and severally liable for the fraud committed in furtherance of the scheme.

### Count II – Fraud (Insurance Fraud)
Against Sass, Psioda, Chaos, Gueron, and 911 Restoration

58. Plaintiff realleges and incorporates by reference the allegations set forth above.

59. Defendants Sass, Psioda, Chaos, Gueron, and 911 Restoration knowingly and intentionally made material misrepresentations and omissions in order to obtain the limited hazard-insurance proceeds available under the Property's hazard-insurance policy, i.e., funds intended to protect Plaintiff's collateral, and to deprive Plaintiff of the benefit of its security interest.

60. Following the April 18, 2022 fire, Sass, Psioda, Gueron, and 911 Restoration diverted hazard-insurance proceeds that should have been applied to repair the collateral or to satisfy municipal liens necessary to preserve it.

14

COMPLAINT

61.     Defendants falsely represented by conduct and implication, that Chaos remained the rightful mortgagee entitled to payment and that 911 Restoration had been retained to perform repair work at the Property. Psioda personally endorsed the Joint-Payee Check on behalf of Chaos, and Gueron caused 911 Restoration to be included as a payee despite the company performing no work on the Property.

62.     In truth, the Loan had been sold to Plaintiff months earlier, Chaos no longer held any interest in the Loan, and 911 Restoration performed no repairs. Defendants nonetheless retained the proceeds for their own benefit, leaving the Property unrepaired, subject to escalating municipal liens, and ultimately lost to foreclosure.

63.     As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff suffered damages including, but not limited to: (i) the loss of $269,098.20 in hazard-insurance proceeds diverted by Defendants; (ii) the impairment of its collateral through accruing municipal liens; and (iii) complete loss of its secured interest when the City foreclosed on the Property.

64.     Defendants' fraudulent conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

65.     In committing the foregoing acts, Defendants acted in concert pursuant to their common scheme described above. Under Oregon law, such concerted action makes each participating Defendant jointly and severally liable for the fraud committed in furtherance of the scheme.

### Count III – Conversion (the Joint-Payee Check)
Against Sass, Psioda, Chaos, Gueron, and 911 Restoration

66.     Plaintiff realleges and incorporates by reference the allegations set forth above.

15

COMPLAINT

67.     Following the April 2022 fire, Allstate issued hazard-insurance proceeds in the total amount of $269,098.20, including a $249,098.20 Joint-Payee Check made payable to Sass, Chaos, and 911 Restoration.

68.     The $249,098.20 represented by the Joint-Payee Check consisted of specific, segregated, and readily identifiable funds belonging to Plaintiff under the terms of the November 2021 deed of trust and applicable law.

69.     Plaintiff, as the true owner and holder of the Loan at that time, had a superior right to possession and control of the insurance proceeds, which were intended to protect its collateral.

70.     Defendants Sass, Chaos, Psioda, Gueron, and 911 Restoration wrongfully exercised dominion and control over the insurance proceeds in a manner inconsistent with Plaintiff's rights and in exclusion of Plaintiff's superior claim to those funds by endorsing and negotiating the Joint-Payee Check, retaining the funds, and failing to apply them to repair the Property or to satisfy liens necessary to preserve Plaintiff's interest.

71.     Defendants' actions were inconsistent with Plaintiff's rights and were undertaken without authorization.

72.     As a direct and proximate result of Defendants' conversion, Plaintiff was deprived of the insurance proceeds, suffered impairment of its collateral through escalating municipal liens, and ultimately lost its secured interest when the Property was foreclosed and sold at auction for a fraction of its value.

73.     Defendants' conversion was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

COMPLAINT

74. In committing the foregoing acts, Defendants acted in concert pursuant to their common scheme described above. Under Oregon law, such concerted action makes each participating Defendant jointly and severally liable for the conversion committed in furtherance of the scheme.

### Count IV – Conversion (the Sass-Only Check)
Against Sass

75. Plaintiff realleges and incorporates by reference the allegations set forth above.

76. Following the April 2022 fire, Allstate issued hazard-insurance proceeds in the total amount of $269,098.20, including a $20,000 check made payable solely to Sass.

77. The $20,000 represented by the Sass-Only Check consisted of specific, segregated, and readily identifiable funds belonging to Plaintiff under the terms of the November 2021 deed of trust and applicable law.

78. Plaintiff, as the true owner and holder of the Loan at that time, had a superior right to possession and control of the insurance proceeds, which were intended to preserve its collateral.

79. Defendant Sass wrongfully exercised dominion and control over the insurance proceeds in a manner inconsistent with Plaintiff's rights and in exclusion of Plaintiff's superior claim to those funds by endorsing and negotiating the Sass-Only Check, retaining the funds, and failing to apply them to repair the Property or to satisfy liens necessary to preserve Plaintiff's interest.

80. Defendant's actions were inconsistent with Plaintiff's rights and were undertaken without authorization.

81. As a direct and proximate result of Defendant's conversion, Plaintiff was deprived of the insurance proceeds, suffered impairment of its collateral through escalating municipal liens,

17

COMPLAINT

and ultimately lost its secured interest when the Property was foreclosed and sold at auction for a fraction of its value.

82.    Defendant's conversion was willful, malicious, and carried out with reckless disregard for Plaintiff's rights. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendant and deter similar misconduct in the future.

**<u>Count V - Breach of Contract</u>**
Against Sass

83.    Plaintiff realleges and incorporates by reference the allegations set forth above.

84.    On November 19, 2021, Sass executed a Note in the original principal amount of $359,100 and a Deed of Trust encumbering the Property in favor of Chaos Home Loans, LLC. Chaos thereafter sold and assigned the Note and Deed of Trust to Plaintiff on December 21, 2021. Plaintiff is the lawful holder and beneficiary of the Note and Deed of Trust.

85.    Under the express terms of the Note and Deed of Trust, Sass covenanted, among other things, to: (i) maintain the Property in good repair and in compliance with applicable law; (ii) apply any hazard-insurance proceeds to the repair and restoration of the Property or, if repair was not feasible, to the reduction of the secured debt; (iii) refrain from committing waste or otherwise impairing the lender's collateral; and (iv) pay all amounts due under the Note and Deed of Trust when required.

86.    Sass materially breached these obligations by: (i) failing to maintain the Property in compliance with code, resulting in repeated violations and municipal liens; (ii) diverting hazard-insurance proceeds for his own benefit rather than applying them to repair the Property or reduce the debt; and (iii) abandoning the Property to foreclosure, thereby extinguishing Plaintiff's security interest.

COMPLAINT

87. Plaintiff fully performed its obligations under the Note and Deed of Trust or was excused from doing so by Sass's material breaches.

88. As a direct and proximate result of Sass's breaches, Plaintiff suffered damages including, but not limited to: (i) the loss of $269,098.20 in hazard-insurance proceeds; (ii) impairment of its collateral through escalating municipal liens; and (iii) the extinguishment of its secured interest when the Property was sold at foreclosure.

89. The Note and Deed of Trust also provide that the lender is entitled to recover its costs and reasonable attorneys' fees incurred in enforcing its rights. Plaintiff is therefore entitled to recover attorneys' fees and costs in addition to compensatory damages.

### Count VI – Breach of Contract
Against Chaos Home Loans, LLC

90. Plaintiff realleges and incorporates by reference the allegations set forth above.

91. On or about December 21, 2021, Chaos entered in a Loan Purchase Agreement with Plaintiff governing the sale of the November 2021 Loan secured by the Property. Under the LPA, Chaos made numerous express representations, warranties, and covenants, including that: (i) the Loan was a valid first lien and the mortgaged property was free of all encumbrances having priority over the lien of the Loan; (ii) the Loan had been fully underwritten in accordance with applicable standards; (iii) no fraud, error, omission, or misrepresentation had occurred in the origination or sale of the Loan; and (iv) Chaos would indemnify Plaintiff against losses arising from any breach of its representations or warranties.

92. These representations and warranties were material to Plaintiff's decision to purchase the Loan, and Plaintiff was expressly entitled to, and did, rely on them under the LPA.

19

COMPLAINT

93.     Chaos materially breached the LPA by, among other things: (i) selling Plaintiff a Loan that was not a valid first lien, because the July 2021 Chaos deed of trust remained unreleased of record; (iii) failing to disclose that the City of Portland had already assessed municipal code liens against the Property; and (iii) misrepresenting that no fraud, omission, or misrepresentation had occurred when, in fact, the transaction was structured to conceal the impaired status of the collateral.

94.     Plaintiff fully performed its obligation under the LPA, including paying $370,067.68 to purchase the Loan, or was excused from further performance by Chaos's material breaches.

95.     As a direct and proximate result of Chaos's breaches, Plaintiff suffered damages including, but not limited to: (i) the $370,067.68 paid to purchase the Loan; (ii) the loss of $269,098.20 in hazard-insurance proceeds; (iii) impairment of its collateral through escalating municipal liens; and (iii) the extinguishment of its secured interest when the Property was sold at foreclosure.

96.     The LPA provides that Plaintiff is entitled to recover its costs and reasonable attorneys' fees incurred in enforcing its rights. Plaintiff is therefore entitled an award of damages, together with costs, interest, and attorneys' fees.

## Count VII – Unjust Enrichment
Against Sass, Chaos, Psioda, Gueron, and 911 Restoration

97.     Plaintiff realleges and incorporates by reference the allegations set forth above.

98.     Defendants Sass, Psioda, Chaos, Gueron, and 911 Restoration wrongfully obtained and retained funds at Plaintiff's expense through two related schemes: (i) the December 2021 sale of the Loan to Plaintiff without disclosure of unreleased liens and municipal code charges; and (ii) the diversion of hazard-insurance proceeds following the April 2022 fire.

20

COMPLAINT

99.     The funds Defendants obtained including, $370,067.68 in loan-sale proceeds and $269,096.20 in hazard-insurance proceeds, were intended to preserve and protect Plaintiff's collateral. Defendants knew they had received these benefits, and, under the circumstances alleged, it would be unjust to permit them to retain those benefits without compensating Plaintiff.

100.     Even so, Defendants retained and used the benefits for their own purposes, conferring no benefit upon Plaintiff.

101.     By retaining the benefit of the loan-sale proceeds and the insurance proceeds without applying them to the Property or remitting them to Plaintiff, Defendants were unjustly enriched at Plaintiff's expense.

102.     It would be inequitable and unjust for Defendants to retain the benefits of their conduct, given that Plaintiff has been deprived of both the proceeds themselves and the collateral they were intended to protect.

103.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has suffered damages in an amount to be determined at trial, but not less than $639,165.88 (the combined value of the $370,067.68 loan sold in December 2021 and the $269,098.20 in diverted insurance proceeds).

104.     To the extent an enforceable contract governs Sass's duties with respect to the Note and Deed of Trust, this claim is pled in the alternative. To the extent that an enforceable contract governs Chaos's duties with respect to the LPA, this claim is pled in the alternative. As to Psioda, Gueron, and 911 Restoration, who were not parties to the Note or Deed of Trust or the LPA, unjust enrichment provides a direct and independent basis for restitution.

## **PRAYER FOR RELIEF**

21

COMPLAINT

**WHEREFORE**, Plaintiff The Money Source Inc. respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally, as follows:

A.    On Counts I and II (Fraud):

1.    Compensatory damages in an amount not less than $639,165.88, representing the $370,067.68 paid for the December 2021 Loan and the $269,098.20 in diverted hazard-insurance proceeds, together with consequential damages arising from the impairment and loss of Plaintiff's collateral, including municipal lien assessments and abatement charges;

2.    Punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

B.    On Counts III and IV (Conversion):

1.    Compensatory damages in the amount of the converted insurance proceeds ($249,098.20 and $20,000, respectively), together with consequential damages for the impairment and foreclosure of Plaintiff's collateral;

2.    Punitive damages in an amount sufficient to punish Defendants and deter similar misconduct in the future.

C.    On Count V (Breach of Contract against Sass):

1.    Compensatory damages in an amount not less than $269,098.20, or such other amount as may be proven at trial, together with consequential damages caused by Sass's breaches, including municipal lien accruals and foreclosure;

2.    Plaintiff's reasonable attorneys' fees, costs, and disbursements as provided under the Note and Deed of Trust.

D.    On Count VI (Breach of Contract against Chaos)

1.    Compensatory damages in an amount not less than $370,067.68, or such other amount as may be proven at trial, together with consequential damages caused by Chaos's breaches, including the loss of insurance proceeds and extinguishment of Plaintiff's security interest;

2.    Plaintiff's reasonable attorneys' fees, costs, and disbursements as provided under the Loan Purchase Agreement.

E.    On Count VII (Unjust Enrichment, pled in the alternative):

22

COMPLAINT

1. Restitution in the amount of Defendants' unjust enrichment, not less than $639,165.88, or such other amount as may be proven at trial.

F.      On All Counts:

1. Pre- and post-judgment interest as allowed by law;

2. Such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated: December 9, 2025

Ghidotti | Berger LLP



By:

Steve Bonfiglio, Esq., OSB No. 051220

Attorneys for Plaintiff

Email: sbonfiglio@ghidottiberger.com

23

COMPLAINT

# EXHIBIT A

| Multnomah County Official Records | **2020-100847** |
|---|---|
| E Murray, Deputy Clerk | 08/12/2020 12:44:16 PM |
| MORT-MORT  Pgs=21 Stn=68 ATJN $105.00 $11.00 $10.00 $60.00 | **$186.00** |

Until a change is requested, all tax statements shall be sent to the following address.

Tax Account Number: ███494

True and actual consideration is $_____

This instrument was prepared by:
CHAOS HOME LOANS LLC ISAOA/ATIMA
900 S 4TH ST
LAS VEGAS, NV 89101

WHEN RECORDED, MAIL TO:
CHAOS HOME LOANS LLC ISAOA/ATIMA
900 S 4TH ST
LAS VEGAS, NEVADA 89101

Lender:        CHAOS HOME LOANS LLC ISAOA/ATIMA
(Beneficiary)  900 S 4TH ST
               LAS VEGAS, NV 89101

Trustee:  FIRST AMERICAN TITLE INSURANCE
          COMPANY
          5335 SW MEADOWS ROAD, SUITE 100
          LAKE OSWEGO, OR 97035

Borrower(s):   MAX SASS
               3535 E SUNSET RD
               LAS VEGAS, NV 89120

_____ (Space Above This Line For Recording Data) _____

# DEED OF TRUST

MIN: ███████████4462
SIS Telephone #: (888) 679-MERS

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated, **August 7, 2020**, together with all Riders to this document.

**(B) "Borrower"** is MAX SASS, A SINGLE MAN. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is CHAOS HOME LOANS LLC ISAOA/ATIMA, organized and existing under the laws of NEVADA. Lender's address is 900 S 4TH ST, LAS VEGAS, NEVADA 89101. Lender is the BENEFICIARY under this Security Instrument.

**(D) "Trustee"** is FIRST AMERICAN TITLE INSURANCE COMPANY. Trustee's address is 5335 SW MEADOWS ROAD, SUITE 100, LAKE OSWEGO, OREGON 97035.

**(E) "MERS"** is the Mortgage Electronic Registration Systems, Inc. Lender has appointed MERS as the nominee for Lender for this Loan, and attached a MERS Rider to this Security Instrument, to be executed by Borrower, which further describes the relationship between Lender and MERS, and which is incorporated into and amends and supplements this Security Instrument.

---

OREGON – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider
Page 1 of 12

Form 3038  1/01

IDS, Inc. - 54198

Borrower(s) Initials _____ _____

**(F) "Note"** means the promissory note signed by Borrower and dated **August 7, 2020.** The Note states that Borrower owes Lender **THREE HUNDRED FIFTY-TWO THOUSAND EIGHT HUNDRED AND NO/100** Dollars (U.S. $352,800.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **September 1, 2050.**

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☒ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ VA Rider |
| ☒ 1-4 Family Rider | ☐ Biweekly Payment Rider | |
| ☒ Other (Specify) **MERS Rider,** | | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose,

---

**OREGON** – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT with MERS Rider**                    Form 3038   1/01
Page 2 of 12
Borrower(s) Initials MS ____

IDS, Inc. - 54198

Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of MULTNOMAH:

**LOTS 7 AND 8, BLOCK 12, M. PATTON'S ADDITION TO ALBINA, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON. EXCEPTING FROM LOT 8, THAT PART THEREOF CONVEYED TO THE STATE OF OREGON, BY AND THROUGH ITS STATE HIGHWAY COMMISSION**

which currently has the address of:   **4617 N MINNESOTA AVE**
                                        **PORTLAND, OREGON 97217**                          ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic

---

OREGON – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider                                    Form 3038   1/01
Page 3 of 12

Borrower(s) Initials _____ _____

IDS, Inc. - 54198

Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are

OREGON – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider**                                         Form 3038   1/01

Page 4 of 12

IDS, Inc. - 54198                                                                                        Borrower(s) Initials **M**

concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss

reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or Might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance. To have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to

the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to

---

OREGON – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider**
Page 8 of 12

Form 3038  1/01

Borrower(s) Initials

IDS, Inc. - 54198

Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by

OREGON – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider**
Page 9 of 12

Form 3038  1/01

Borrower(s) Initials _____  _____

IDS, Inc. - 54198

a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and**

OREGON – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider

Page 10 of 12

Form 3038   1/01

IDS, Inc. - 54198

Borrower(s) Initials _AS_ ____

under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Attorneys' Fees. As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

26. Protective Advances. This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

27. Required Evidence of Property Insurance.

## WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

---

OREGON – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT with MERS Rider

Page 11 of 12

IDS, Inc. - 54198

Form 3038  1/01

Borrower(s) Initials _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____
                                                        -Witness

_____
                                              (Seal)
**MAX SASS**                          -Borrower

_____
                                                        -Witness

_____
                                              (Seal)
                                              -Borrower

~~OREGON,~~ Nevada *RH* Clark _____ County ss:

On this ___7___ day of __August__, __2026__,
personally appeared the above named **MAX SASS** and acknowledged the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: April 18, 2022
(Official Seal)                                    Before me:

RAMONA HARRIS
Notary Public, State of Nevada
Appointment No. 13-10279-1
My Appt. Expires Apr 18, 2022

_____
Notary Public for Oregon

Loan originator (Organization): **CHAOS HOME LOANS LLC ISAOA/ATIMA**; NMLS #: ███5544
Loan originator (Individual): **COLLIN BRIAN PSIODA**; NMLS #: ███489

MIN: ██████████4462

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. RIDER
## (MERS Rider)

THIS MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. RIDER ("MERS Rider") is made this **7th day of August, 2020**, and is incorporated into and amends and supplements the Deed of Trust (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to **CHAOS HOME LOANS LLC ISAOA/ATIMA** ("Lender") of the same date and covering the Property described in the Security Instrument, which is located at:

**4617 N MINNESOTA AVE**
**PORTLAND, OREGON 97217**
(Property Address)

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that the Security Instrument is amended as follows:

## A. DEFINITIONS

1. The Definitions section of the Security Instrument is amended as follows:

**"Lender"** is **CHAOS HOME LOANS LLC ISAOA/ATIMA** organized and existing under the laws of **NEVADA**. Lender's address is **900 S 4TH ST, LAS VEGAS, NEVADA 89101**. Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is the Nominee for Lender and is acting solely for Lender. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. MERS is appointed as the Nominee for Lender to exercise the rights, duties and obligations of Lender as Lender may from time to time direct, including but not limited to appointing a successor trustee, assigning, or releasing, in whole or in part this Security Instrument, foreclosing or directing Trustee to institute foreclosure of this Security Instrument, or taking such other actions as Lender may deem necessary or appropriate under this Security Instrument. The term "MERS" includes any

---

**MERS RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3158   04/2014**
**Page 1 of 4**
Borrower(s) Initials _MS_ _____

IDS, Inc.

successors and assigns of MERS. This appointment shall inure to and bind MERS, its successors and assigns, as well as Lender, until MERS' Nominee interest is terminated.

2. The Definitions section of the Security Instrument is further amended to add the following definition:

"Nominee" means one designated to act for another as its representative for a limited purpose.

B. TRANSFER OF RIGHTS IN THE PROPERTY

The Transfer of Rights in the Property section of the Security Instrument is amended to read as follows:

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

_____County_____ of _____MULTNOMAH_____ :
(Type of Recording Jurisdiction)    (Name of Recording Jurisdiction)

LOTS 7 AND 8, BLOCK 12, M. PATTON'S ADDITION TO ALBINA, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON. EXCEPTING FROM LOT 8, THAT PART THEREOF CONVEYED TO THE STATE OF OREGON, BY AND THROUGH ITS STATE HIGHWAY COMMISSION

which currently has the address of  4617 N MINNESOTA AVE _____
                                                          (Street)

PORTLAND_____ , OREGON_____ 97217_____ ("Property Address"):
          (City)                    (State)         (Zip Code)

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Lender, as the beneficiary under this Security Instrument, designates MERS as the Nominee for Lender. Any notice required by Applicable Law or this Security Instrument to be served on Lender must be served on MERS as the designated Nominee for Lender. Borrower understands and agrees that MERS, as the designated Nominee for Lender, has the right to exercise any or all interests granted by Borrower to Lender, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, assigning and releasing this Security Instrument, and substituting a successor trustee.

C. NOTICES

MERS RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3158   04/2014
Page 2 of 4

Borrower(s) Initials

IDS, Inc.

Section 15 of the Security Instrument is amended to read as follows:

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Borrower acknowledges that any notice Borrower provides to Lender must also be provided to MERS as Nominee for Lender until MERS' Nominee interest is terminated. Any notice provided by Borrower in connection with this Security Instrument will not be deemed to have been given to MERS until actually received by MERS. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

D. SALE OF NOTE; CHANGE OF LOAN SERVICER; NOTICE OF GRIEVANCE

Section 20 of the Security Instrument is amended to read as follows:

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. Lender acknowledges that until it directs MERS to assign MERS's Nominee interest in this Security Instrument, MERS remains the Nominee for Lender, with the authority to exercise the rights of Lender. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by

---

**MERS RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3158    04/2014
Page 3 of 4

Borrower(s) Initials MS

IDS, Inc.

reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

### E. SUBSTITUTE TRUSTEE

Section 24 of the Security Instrument is amended to read as follows:

**24. Substitute Trustee.** In accordance with Applicable Law, Lender or MERS may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this MERS Rider.

| | | |
|---|---|---|
| _____ (Seal) | | _____ (Seal) |
| **MAX SASS** -Borrower | | -Borrower |

---

**MERS RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3158   04/2014
Page 4 of 4

IDS, Inc.

MIN: ████████4462

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **7th day of August, 2020**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

### CHAOS HOME LOANS LLC ISAOA/ATIMA

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**4617 N MINNESOTA AVE**
**PORTLAND, OREGON 97217**
(Property Address)

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the

---

**MULTISTATE 1-4 FAMILY RIDER-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**       **Form 3170 1/01**
**Page 1 of 3**

Borrower(s) Initials _____

IDS, Inc.

Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**G. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage

---

**MULTISTATE 1-4 FAMILY RIDER-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**   Form 3170 1/01
**Page 2 of 3**

Borrower(s) Initials _____

IDS, Inc.

the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**H. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)  
MAX SASS                                     -Borrower

_____ (Seal)  
                                             -Borrower

MULTISTATE 1-4 FAMILY RIDER-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170 1/01  
Page 3 of 3

IDS, Inc.

MIN:  4462

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this **7th day of August, 2020,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to

### CHAOS HOME LOANS LLC ISAOA/ATIMA

(the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at:

**4617 N MINNESOTA AVE**
**PORTLAND, OREGON 97217**
(Property Address)

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

**6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home. Borrower will maintain exclusive control over the occupancy of the Property, including short-term rentals, and will not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person or entity any control over the occupancy or use of the Property. Borrower will keep the Property available primarily as a residence for Borrower's personal use and enjoyment for at least one year after the date of this Second Home Rider, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

---

**MULTISTATE SECOND HOME RIDER--Single Family**
**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

**Form 3890  1/01 (rev. 4/19)**

Page 1 of 2

IDS, Inc.

Borrower(s) Initials

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

_____ (Seal)                    _____ (Seal)
MAX SASS                        -Borrower                                                 -Borrower

MULTISTATE SECOND HOME RIDER--Single Family                          Form 3890  1/01 (rev. 4/19)
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
                                    Page 2 of 2

IDS, Inc.

# EXHIBIT B

A Las Vegas Developer Planned to Turn a House Into Apartments. He Didn't.

The city now wants someone to take the North Portland property off his hands.

By **Lucas Manfield**

September 18, 2024 7:17AM PDT5044 Chasing Ghosts 4611 N Minnesota Ave. (Lucas Manfield)



ADDRESS: 4611 N Minnesota Ave.

YEAR BUILT: 1905

SQUARE FOOTAGE: 1,036

MARKET VALUE: $499,320

OWNER: Max Sass

HOW LONG IT'S BEEN EMPTY: 3 years

WHY IT'S EMPTY: Out-of-state investment gone wrong

Las Vegas developer Max Sass makes frequent appearances in our vacant-property files.

He popped up in Northeast Portland four years ago, promising to build affordable housing at an abandoned car wash. (State funding dried up and Sass dropped out.) The next year he promised to turn a historic Alphabet District church into a luxury hotel. (The deal stalled.)

Meanwhile, he's been snatching up properties in North Portland with plans to turn them into condos. Surprise, surprise: There have been a few hiccups.

In 2020, Sass purchased a pair of homes in the Overlook neighborhood. One is vacant and the subject of neighbors' complaints. The other, the subject of this week's inquiry, is a two-bedroom house on a dead-end road overlooking Interstate 5. It has since attracted so much attention from firefighters and city inspectors that it's now in foreclosure.

Sass, city permit records show, planned to turn it into a 23-unit apartment building. The City Council granted him a partial tax break after he promised to make three of the units affordable.

But financing hasn't come together, Sass told the city. Permitting stalled. Then, last year, his architect died. (The city says the architect's associates have stepped in to usher other projects through the process—but not this one.)

Meanwhile, the property was left to rot. Shortly after Sass bought it, someone complained of foul-smelling water leaking into the basement. City inspectors arrived to find that the garage had been converted into an unpermitted living space. The home's tenants had left.

Squatters moved in. Firefighters responded to a pair of blazes in early 2022, one in an SUV out front and the second inside the home, which was "full of trash needles and other drug items," according to a state fire marshal report.

The city gave Sass a fee waiver, reserved for those "making a good-faith effort to address the violations," city spokesman Ken Ray says. Sass apparently didn't make an effort, and the waiver was revoked after the city cited the property for new nuisance violations. The city has filed more than $30,000 worth of liens on the property.

The city is trying to get the building demolished, and initiated foreclosure proceedings earlier this year. Neighbors have emailed city officials demanding legal action against the owners, records show.

Sass did not return *WW*'s calls. His property manager, Sonya Haggerty, put the blame on bottlenecks in the city permitting process. "He's still trying to develop it," she said.



**Lucas Manfield**

| [lmanfield@wweek.comOpens in new window](mailto:lmanfield@wweek.com)

Lucas Manfield covers health care.

| [lmanfield@wweek.comOpens in new window](mailto:lmanfield@wweek.com)

# EXHIBIT C



**City of Portland, Oregon**
**Bureau of Development Services**
**Property Compliance**
FROM CONCEPT TO CONSTRUCTION

Carmen Rubio, Commissioner
David Kuhnhausen, Interim Director
Phone: (503) 823-7300
TTY: 711
www.portland.gov/bds

# NOTICE OF VIOLATION-PROPERTY MAINTENANCE CODE

May 13, 2021

SASS,MAX                                         **Case #:  21-033041-HS**
9516 W FLAMINGO RD STE 205                       **Posted:  05/13/21**
LAS VEGAS, NV 89147

**RE:    4617 N MINNESOTA AVE**
        **M PATTONS ADD & 2ND; BLOCK 12; LOT 7; 1N1E22BC  06100        Tax #:  R52050-1050**

On April 8, 2021, a City Housing Inspector visited the above address and found violations of Portland's Property Maintenance Code. This code requires properties be maintained in a safe, sound, and sanitary condition. Attached to this letter is a list of the violations.  Please correct these conditions promptly.  **You have t</u>hirty (30) days from the date of this letter</u> to correct any Fire, Life, Safety, and/or Health, Sanitation violations, and sixty days (60) to correct any other violations before incurring a fee.**

***You must call for a re-inspection to close your case without incurring a fee.***

- If violations continue uncorrected beyond the deadline, a monthly code enforcement fee is charged as a lien against your property. If housing violations continue uncorrected three (3) months from the initial notice of violation, the monthly code enforcement fee doubles.

- If your property or any part thereof is vacant or becomes vacant, it cannot be occupied until the violations are corrected.  In the event the property or any part thereof is reoccupied before all violations are corrected a $780.00 per month penalty, in addition to the monthly enforcement fee, will be charged until the property is vacated and/or all violations are corrected and approved by the housing inspector.

- For complete details on fees, appeals, or to see if you may qualify for an enforcement fee waiver, refer to the enclosed information sheet.

Thank you in advance for your cooperation. Please call our office if you have any questions,


Sherryi Yang
Housing Inspector
(503)-823-8451,  Yi.Yang@portlandoregon.gov

**OCCUPANT**
**4617 N MINNESOTA AVE**
**PORTLAND OR 97217**

Mail to: 1900 SW 4th Avenue, Suite # 5000, Portland, Oregon 97201

# LIST OF VIOLATIONS

*The Inspector identified work done without obtaining required permits and inspections detailed in violations 1 through 4. Portions of work on this property were performed under permits that were voided; other portions have been performed without benefit of the required permits.*

*All permitted work will require final inspection approvals from a Building Inspector. Please note that while work was identified that was accomplished without the required permits, the Building Inspector approving the work may require additional corrections.   29.05.040, 29.50.010, 29.50.020*

*A special investigation fee for work begun without permit will be charged at $110/hr. for a minimum charge of $110 and will be in addition to the regular permit fees.*

*Please visit https://www.portlandoregon.gov/bds/ for Bureau of Development Services' latest service updates.*

1.   **Permit Required: Fire Life Safety Violation:** An unapproved dwelling unit has been created at where garage used to be without obtaining required permits and inspections. 29.50.010, 29.50.020

   Because of the above and/or observed conditions, the City requests a complete inspection of the structure(s). You have the right to refuse the requested inspection. However, please be advised that the City may take any legal action necessary to obtain compliance, including but not limited to obtaining a search warrant. Please contact the district Housing Inspector immediately to arrange for a mutually convenient time for the inspection.

   Additional corrections might be required. 29.05.040, 29.50.010, 29.50.020

2.   **Permit Required:** Mechanical work done without obtaining required permits and inspections. *Violations include but are not limited to: All works for creating an additional unit at garage.* The building inspector may require additional corrections. 29.05.040, 29.50.010, 29.50.020

3.   **Permit Required:** Plumbing work done without obtaining required permits and inspections. *Violations include but are not limited to: All works for creating an additional unit at garage.* The building inspector may require additional corrections. 29.05.040, 29.50.010, 29.50.020

4.   **Permit Required:** Electrical work done without obtaining required permits and inspections. *Violations include but are not limited to: All works for creating an additional unit at garage.* The building inspector may require additional corrections. 29.05.040, 29.50.010, 29.50.020

c:   File

Notice of Violation – Property Maintenance Code
4617 N MINNESOTA AVE
TAX# R52050-1050

CASE# 21-033041-HS
YY



# City of Portland, Oregon
## Bureau of Development Services
### Neighborhood Inspections

1900 SW 4th Avenue, Suite 5000
Portland, Oregon 97201
503-823-7306
Fax 503-823-7961
TTY 503-823-6868
www.portlandonline.com/bds

## Fees, Penalties, Reviews, Appeals, and Waiver Information

### FEES

If all Fire, Life, Safety and/or Health, Sanitation violations **are not** corrected, inspected, and approved by a City Housing Inspector within thirty (30) days of the mailing date of the first violation letter, a lien may be placed against the property.  If all other violations **are not** corrected, inspected and approved by the Housing Inspector within sixty (60) days of the mailing date of the first violation letter, a lien may be placed against the property.  The monthly fee is based on the number of units on the property and the number of units in violation.

| 1-2 Units $284.00 per unit | 3 – 10 Units $425.00 per unit | 11 – 19 Units $568.00 per unit | 20 or more Units $709.00 per unit | Residential with Any Non-Residential use & Properties with only Non-Residential use $709.00 per unit |
|---|---|---|---|---|

An additional auditor charge of 10% will be added to the above amounts, along with a possible recording fee.  The monthly fees will double for any property that remains in violation for three (3) months from the initial notice of violation.  Pursuant to Portland Policy Document ENB 12.07, property owners or their representative may request a review of assessed liens/fees for potential reduction once an enforcement case is closed.

**Re-occupation After Notice of Violation:** A $780.00 per month penalty will be assessed if the property or any part thereof is vacant or becomes vacant and is reoccupied before all violations are corrected, inspected, and approved by the City's Housing Inspector.  This is in addition to the monthly code enforcement fees and is assessed per occurrence.

**Hearings:** A $396.00 penalty will be assessed if the City files a complaint with the Code Hearings Officer regarding the continued existence of violations on the property.

### ADMINISTRATIVE REVIEW – Do Violations Exist?

- Pursuant to 3.30.040.E.8, as the property owner or authorized agent, if you believe the finding of the notice was in error you may request an Administrative Review within 15 days of the posting notice or within 15 days of the first violation notice. Code enforcement fees will continue to accrue during the review process.

- If additional violations are cited, any property owner or authorized agent may also request an Administrative Review of additional cited violations within 15 days of the date of the notice citing those additional violations.

- An Administrative Review Fee of $138.00 is due when the written request for an Administrative Review is received.  This fee will only be refunded if it is determined that all of the contested violations were cited in error.

**The written request, along with the $138.00 Administrative Review fee, must be received in our office within 15 days of original notification and must state the reason(s) for the review.** Please make the check payable to the City of Portland.  Compliance timelines and enforcement actions remain in effect during the Administrative Review process.

Mail requests to: Bureau of Development Services
 Neighborhood Inspections & Compliance Services Section
 Review/Appeal Desk
 1900 SW 4th Avenue Suite 5000
 Portland OR 97201

Your request should indicate if you or a representative of the property owner will be appearing in person for the review.  If so, we will notify you and/or your representative of the date and time of the review.  A written determination will be mailed following the review, which will include additional appeal information as set forth in Section 29.80.020.

# Code Enforcement Fee Waivers  (Housing Cases)

A waiver provides for temporary suspension of code enforcement fees assessed against a property.  Waivers are available on a limited basis.  Call 503-823-0891 for more information or to request an application.

## Income-Based Waiver

Upon approval of this waiver, monthly Code Enforcement Fees may be suspended for (twelve) 12 months.  The following requirements must all be met before the waiver may be granted:

1. All cited fire, life safety, health or sanitation violations must be corrected, inspected and approved by the Housing Inspector; or the property is vacant with no significant exterior fire, life safety, health or sanitation  violations; and
2. The property is clear of any other code violation administered by BDS; and
3. The housing case is currently open; and
4. The dwelling is a one or two family residence; and
5. The property owner(s) must meet the income requirements by providing required documentation;
6. The property is owner-occupied or vacant.

## Residential Renovation Waiver

Upon approval of this waiver, monthly Code Enforcement Fees may be suspended for up to six (6) months. **Please note: If permits are required, they must be paid for and issued before the waiver will be granted**.  These requirements must all be met before the waiver may be granted:

1. All cited fire, life safety, health or sanitation violations must be corrected, inspected, and approved by the Housing Inspector; or the property is vacant with no significant exterior fire, life, and safety violations; and
2. The property is clear of any other code violation administered by BDS; and
3. The housing case is currently open; and
4. The building is attached to a permanent foundation or has an issued and active permit for foundation work; and
5. Paid and issued building permit fees of at least
   A. $500 or a project value of $15,000 for one and two family dwellings; or
   B. $1,000 or a project value of $30,000 for properties with 3-10 units; or
   C. $1,500 or project value of $45,000; for properties with 11-19 units; or
   D. $2,000 or project value of $60,000; for properties with 20+ units
6. A submitted work plan that demonstrates a project valuation of non-permit work to be done (or a combination of permit and non-permit work that demonstrates the required valuation as listed above) to rehabilitate the property.
7. A completed waiver application must be received in addition to the above listed requirements before a waiver can be considered.

## Exterior Paint and Roof Waiver
### (no application required)

Upon approval of this waiver, monthly Code Enforcement Fees may be suspended for nine (9) months.  The following requirements must be met before the waiver may be granted:

1. The property is a residential 1or 2 family dwelling,
2. All property maintenance violations with the exception of exterior paint and roof work, must be corrected, inspected, and approved by the Housing Inspector; and
3. The property is clear of any other code violation administered by BDS; and
4. The housing case is currently open.

## New Owner Grace Period
### (no application required)

Upon approval of this waiver, Code Enforcement Fees may be suspended for one (1) month.  The following requirements must be met before the waiver may be granted:

1. The new owner acquired the property with pre-existing housing violations of Title 29; and
2. The existing liens have been satisfied or paid current and the City Auditor's Office has notified BDS of a new owner; and
3. The case is currently open.

**Active Permit, Demolition, Non-Profit and Warehouse Waivers:**  Call the Waiver Desk at 503-823-0891 for more information.

**Free Home Repair Assistance Grants are Available for Low Income Owner Occupied Property Owners that earn 50% or less of median family income.  For more information and to see if you qualify please visit the Portland Housing Bureau website at http://portlandoregon.gov/phb/article/430363.**

All information is subject to change.

# EXHIBIT D

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

STATE OF OREGON )    AFFIDAVIT FOR ADMINISTRATIVE SEARCH

            SS )    WARRANT FOR RESIDENTIAL PREMISES

County of Multnomah )

The undersigned, being first duly sworn, deposes and says:

1.    That I, Mark Davis ("Inspector Davis"), am employed by the City of Portland as a qualified Code Specialist III for the Bureau of Development Services, Property Compliance Office ("BDS"). That in my capacity as a qualified Code Specialist III, I review code violation files kept by BDS in the normal course of business for compliance with City policies and codes. That based on my training and four (4) years' experience as an inspector, I am duly qualified to determine if conditions at properties are in violation of the City's Property Maintenance Regulations.

2.    I have reviewed those records and they indicate that BDS first received a request from a citizen on April 5, 2021, to inspect the premises located at 4611 N. Minnesota Avenue which is also known as ("aka") 4617 N. Minnesota Avenue, City of Portland, County of Multnomah, State of Oregon ("Subject Property"), for water coming through walls in basement, strong sewage/foul odor from water, water flooding into/emptying into basement; trash, debris and non-trash items littering the property; house, garage and accessory structure are open to entry. The BDS enforcement case records on the property show that the complaints have continued to date. Those records also show that the property has not been properly secured to deter unauthorized access. Attached to this affidavit as Exhibit A is a

summary of the BDS Housing Enforcement code case which is currently open with cited conditions in violation of Title 29 Chapter 29.30. Attached to this affidavit as Exhibit A1 is a copy of the most recent violation letter mailed to the owner listing those violations.

3.    That on March 31, 2022, while at the property investigating an additional complaint from a citizen, Sherryl "Yi" Yang ("Housing Inspector Yang"), a certified Housing Inspector, posted the property with a notice of violation of the City's Property Maintenance Regulations, Title 29 Chapter 29.20 of the Code of the City of Portland.

To wit:

A.    An accumulation of trash and debris stored in the outdoor areas of the property, porch/patio, adjacent rights of way and deck, including but not limited to: scrap wood, discards, and litter. (PCC 29.20.010(H))

B.    An accumulation of non-trash items stored in the outdoor areas of the property and adjacent rights of way, including but not limited to: indoor furniture, and recyclables. (PCC 29.20.010(I))

C.    A vacant, open and accessible house, garage and shed or accessory structure. (PCC 29.20.010(B))

4.    Those records also show that a copy of such notice was mailed to the occupant, owners, and persons exercising dominion and control over the Subject Property, Max Sass, directing them to cure the violations or request an administrative appeal of notice. Based on a review of City records, I also find that no request for an administrative review or appeal was received. Those records also show that the occupant, owners, and persons exercising dominion and control over the Subject Property, Max Sass, have been sent multiple notices throughout the Nuisance case enforcement process notifying them the nuisance conditions still existed at the property and required correction.

5.    That on April 15, 2022, and April 28, 2022, Inspector Yang, a certified Housing Inspector, rechecked the property. From the right of way, she observed the following conditions in violation of the Property Maintenance Regulations, Title 29 of the Code of the City of Portland. These conditions are

substantiated by digital photographs that were taken during those inspections, which are a true and accurate depiction of conditions at the property and are attached to this affidavit as Exhibits B and C:

To wit:

    A.    An accumulation of trash and debris stored in the outdoor areas of the property, porch/patio, adjacent rights of way and deck, including but not limited to: scrap wood, discards, and litter. (PCC 29.20.010(H))

    B.    An accumulation of non-trash items stored in the outdoor areas of the property and adjacent rights of way, including but not limited to:  indoor furniture, and recyclables. (PCC 29.20.010(I))

    C.    A vacant, open and accessible house, garage and shed or accessory structure.  (PCC 29.20.010(B))

6.    I received a request to review the nuisance case file on the Subject Property on or about April 28, 2022.  Based on that request, I checked City records and other public records, reviewed the nuisance case file, inspector's notes, and photographs, and found that there are continuing conditions at the property, within the yards (fenced and unfenced), open porches and deck areas, and open and accessible sheds or accessory structures that are in violation of Title 29 of the Code of the City of Portland requiring abatement.

7.    That I desire an administrative search warrant be issued to permit me, in an official capacity, accompanied by a City Contractor, Multnomah County Animal Services Officers, Multnomah County Sheriff's Deputies, and Police Officers of the City of Portland, to enter the exterior of the Subject Property on any day of the week (Monday through Friday) between the hours of 8:00 a.m. and 6:00 p.m. for the purpose of removing and seizing the items listed above, or otherwise abating the conditions that constitute violations of Title 29 of the code of the City of Portland, including disposing of such items at a licensed refuse facility and for the purpose of placing warning notices on the property for other conditions that constitute violations of Title 29 of the Code of the City of Portland.  That I desire an administrative search warrant be issued to allow BDS twenty (20) working days from the date of issuance to serve the warrant, and up to twenty (20) working days after the warrant has been served to

execute the warrant and complete the abatement. (Contract requirements allow the City Contractor ten (10) days to complete and return documentation for work done to abate any cited violations under Title 29 of the Code of the City of Portland.)

8.       That my authority for inspecting the premises and causing the removal of conditions that constitute violations of the Property Maintenance Regulations derives from the Code of the City of Portland, which authorizes the Director of BDS to administer and enforce all provisions of Title 29, including employing qualified inspectors to carry out the provisions of Title 29 and contracting for the removal of conditions that constitute violations of the Property Maintenance Regulations.

WHEREFORE, the undersigned prays for issuance of an administrative warrant for the above-described property.

DATED this _____13th_____ day of ____May____, 2022.

_____,
Mark Davis

Code Specialist III

SUBSCRIBED and SWORN TO before me this _13th_ day of _May_, 2022.

_____
Notary Public for Oregon

OFFICIAL STAMP
MELISSA ANN KUHN
NOTARY PUBLIC - OREGON
COMMISSION NO. 1020587
MY COMMISSION EXPIRES FEBRUARY 10, 2026

My Commission expires: _02|10|26_

Affidavit for Administrative Search Warrant
4611 N. Minnesota Avenue aka 4617 N. Minnesota Avenue
Page 4

# EXHIBIT E

*NEWS*

**Impending Sale of the Northwest Neighborhood Cultural Center Hits Snag With Las Vegas Developer**

**The developer told the building's board that it was having a hard time securing lenders.**

By **Sophie Peel**

January 26, 2023 2:45PM PST



**Northwest Neighborhood Cultural Center** (Capacity Commercial Group)

For more than three years, a group of Northwest Portland neighborhoods has been trying to sell the Northwest Neighborhood Cultural Center, a onetime church building that until recently housed the Northwest Children's Theatre. The 25,000-square-foot building, located at 1819 NW Everett St., is owned by a nonprofit led by six nearby neighborhoods.

The building is a financial albatross for its collective owners because it has amassed a backlog of major maintenance needs and is seismically vulnerable. When the Children's Theatre announced its impending departure in the summer of 2022, the NNCC board declared its renewed intent to sell the building.

In the spring of 2022, after offering a price dip, NNCC membership overwhelmingly approved the sale of the building to a Las Vegas company called Founders Developments that envisioned a boutique hotel at the site. That deal was supposed to close in early 2023.

But Founders is encountering issues in securing the necessary loans, and *WW* has learned that the NNCC board is now negotiating details to grant Founders a second extension for the sale that would expire in September 2023.

In an email to NNCC board chair Dan Anderson on Jan. 12, Founders Developments CEO Tanya Toby wrote: "In attempt to achieve financing for the building we have been through two rounds with lenders at this point and after spending months of completing the loan approval process and outrageous expenses associated, the lenders back out after understanding the building condition, of the seismic upgrade necessary and little or no tenants suitable."

*WW* spoke with Toby and her business partner, Max Sass, 27, via phone in November. The duo described their vision for a boutique "lifestyle" hotel outfitted with nightlife, lounges, a wellness center, a library, a speakeasy room and event spaces. Toby and Sass plan to erect a five-story hotel with 80 rooms, including a rooftop penthouse, on the empty parking lot and to stick all the hotel amenities in the existing historical building. (Because the building is considered a historic landmark, Founders must get approval from the city's Historic Landmarks Commission before it can proceed with construction.)

ADVERTISING

"We stumbled upon the building and fell in love with it," Toby, who lives in Las Vegas, said at the time.

Founders supplied the NNCC board a list of local projects it was working on when the board was first mulling the sale in the summer of 2021. Fewer than half had been developed or had begun development.

When pressed by *WW* in November, Toby and Sass said the NNCC was Founders' only current project—and that the others listed were Sass' personal projects. This development would be Founders' first historic preservation project.

In an email to *WW* on Jan. 26, Toby said that "all is on track and going very well."

"We are completing entitlements and then permits, as you know these are lengthy and complicated processes," Toby said. "Thereafter we are going straight to a construction loan as opposed to two tier financing."

Anderson, the NNCC chair, tells *WW* the board "has voted to approve terms for a second extension. The parties (buyer and seller) are negotiating details of this possible second extension." He added: "As has been observed relative to Wagnerian opera: 'It's not over until the fat lady sings.'"



**Sophie Peel**

# EXHIBIT F

| Multnomah County Official Records<br>E Murray, Deputy Clerk | **2021-119111** |
|---|---|
| MORT-MORT   Pgs=22 Stn=26 ATAH<br>$110.00 $11.00 $10.00 $60.00 | 08/03/2021 03:03:20 PM<br>$191.00 |

After Recording Return To:

CHAOS HOME LOANS LLC
900 S 4TH ST
LAS VEGAS, NEVADA 89101
Loan Number: R003017

16-9-01

Fidelity National Title of Oregon

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

**MIN:** ███████████0179                                  **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated          JULY 29, 2021          , together with all Riders to this document.
**(B)  "Borrower"** is   Max Sass , A SINGLE MAN

Borrower is the trustor under this Security Instrument.
**(C)  "Lender"** is  CHAOS HOME LOANS LLC

Lender is a                    NEVADA  LIMITED LIABILITY COMPANY                    organized
and existing under the laws of                    NEVADA
Lender's address is   900 S 4TH ST, LAS VEGAS, NEVADA 89101

**(D)  "Trustee"** is   Fidelity National Title Company of Oregon
900 Southwest 5th Avenue , Lobby, Portland, Oregon 97204

**(E)  "MERS"** is the Mortgage Electronic Registration Systems, Inc. Lender has appointed MERS as the nominee for Lender for this Loan, and attached a MERS Rider to this Security Instrument, to be executed by Borrower, which

further describes the relationship between Lender and MERS, and which is incorporated into and amends and supplements this Security Instrument.

**(F)**  **"Note"** means the promissory note signed by Borrower and dated         **JULY 29, 2021**               .
The Note states that Borrower owes Lender    **THREE HUNDRED FIFTY-NINE THOUSAND ONE HUNDRED AND 00/100**                         Dollars (U.S. $  **359,100.00**                ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **AUGUST 1, 2051**                    .

**(G)**  **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)**  **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)**  **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐  Adjustable Rate Rider         ☐  Planned Unit Development Rider
☐  Balloon Rider                 ☐  Biweekly Payment Rider
☐  1-4 Family Rider              ☒  Second Home Rider
☐  Condominium Rider             ☒  Other(s) [specify]
                                      MERS Rider

**(J)**  **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)**  **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)**  **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)**  **"Escrow Items"** means those items that are described in Section 3.

**(N)**  **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)**  **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)**  **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)**  **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)**  **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | Multnomah | : |

[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO
A.P.N.: R210494

which currently has the address of   4617 N Minnesota Ave

[Street]

Portland                                     , Oregon        97217        ("Property Address"):

[City]                                                                [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                    ☆DocMagic
Form 3038  1/01

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                        ☆ DocMagic
Form 3038  1/01

Page 4 of 14

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      ☆ DocMagic
Form 3038  1/01

to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay

the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS     ☆DocMagic
Form 3038  1/01

Page 8 of 14

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender. 

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits,

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038  1/01

☆ DocMagic

then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would

be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

---

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038  1/01

☆ DocMagic

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

---

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038  1/01

☆ DocMagic

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

## WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____(Seal)
Max Sass                                        -Borrower

_____         _____
Witness                           Witness

——————————————— [Space Below This Line For Acknowledgment] ———————————————

State of ~~OREGON~~ Nevada

County of ~~Multnomah~~ Clark

This record was acknowledged before me on _____ 8/2/21 _____

(date)

by _ Max Sass _____

_____

(name(s) of individual(s))

N. WOODSON
Notary Public, State of Nevada
No. 05-98616-1
My Appt. Exp. Apr. 9, 2022

(STAMP if required)

_____

(Signature of Notarial Officer)

notary

(Title, e.g., "Notary Public - State of Oregon")

My commission expires: _ 4/9/22 _

Loan Originator: Collin Brian Psioda, NMLSR ID ██ 1489
Loan Originator Organization: CHAOS HOME LOANS LLC, NMLSR ID ██ 6544

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038  1/01

★ DocMagic

Page 14 of 14

# EXHIBIT "A"
Legal Description

Lots 7 and 8, Block 12, M. PATTON'S ADDITION TO ALBINA, in the City of Portland, County of MultnoMah and State of Oregon.

EXCEPTING from Lot 8, that part thereof conveyed to the State of Oregon, by and through its State Highway CoMMission.

MIN: ███████0179                    Loan Number: ██3017

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. RIDER
## (MERS Rider)

THIS MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. RIDER ("MERS Rider") is made this 29th   day of JULY, 2021                    , and is incorporated into and amends and supplements the Deed of Trust (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to CHAOS HOME LOANS LLC, A NEVADA LIMITED LIABILITY COMPANY ("Lender") of the same date and covering the Property described in the Security Instrument, which is located at:

4617 N Minnesota Ave, Portland, Oregon 97217
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that the Security Instrument is amended as follows:

## A. DEFINITIONS
1. The Definitions section of the Security Instrument is amended as follows:

**"Lender"** is CHAOS HOME LOANS LLC
Lender is a NEVADA LIMITED LIABILITY COMPANY    organized and existing under the laws of NEVADA                                            . Lender's address is 900 S 4TH ST, LAS VEGAS, NEVADA 89101

Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is the Nominee for Lender and is acting solely for Lender. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. MERS is appointed as the Nominee for Lender to exercise the rights, duties and obligations of Lender as Lender may from time to time direct, including but not limited to appointing a successor trustee, assigning, or releasing, in whole or in part this Security Instrument, foreclosing or directing Trustee to institute foreclosure of this Security Instrument, or taking such other actions as Lender may deem necessary or appropriate under this Security Instrument. The term "MERS" includes any successors and assigns of MERS. This appointment shall inure to and bind MERS, its successors and assigns, as well as Lender, until MERS' Nominee interest is terminated.

2. The Definitions section of the Security Instrument is further amended to add the following definition:

**"Nominee"** means one designated to act for another as its representative for a limited purpose.

---

MERS RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158  04/2014                    Page 1 of 4

☆ DocMagic

## B.   TRANSFER OF RIGHTS IN THE PROPERTY

The Transfer of Rights in the Property section of the Security Instrument is amended to read as follows:

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | Multnomah | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO
A.P.N.: R210494

which currently has the address of 4617 N Minnesota Ave

[Street]

| Portland | OREGON | 97217 | ("Property Address"): |
| [City] | [State] | [Zip Code] | |

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Lender, as the beneficiary under this Security Instrument, designates MERS as the Nominee for Lender. Any notice required by Applicable Law or this Security Instrument to be served on Lender must be served on MERS as the designated Nominee for Lender. Borrower understands and agrees that MERS, as the designated Nominee for Lender, has the right to exercise any or all interests granted by Borrower to Lender, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, assigning and releasing this Security Instrument, and substituting a successor trustee.

## C.   NOTICES

Section 15 of the Security Instrument is amended to read as follows:

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless

---

MERS RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158  04/2014                              Page 2 of 4

☆DocMagic

Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Borrower acknowledges that any notice Borrower provides to Lender must also be provided to MERS as Nominee for Lender until MERS' Nominee interest is terminated. Any notice provided by Borrower in connection with this Security Instrument will not be deemed to have been given to MERS until actually received by MERS. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

## D. SALE OF NOTE; CHANGE OF LOAN SERVICER; NOTICE OF GRIEVANCE

Section 20 of the Security Instrument is amended to read as follows:

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. Lender acknowledges that until it directs MERS to assign MERS's Nominee interest in this Security Instrument, MERS remains the Nominee for Lender, with the authority to exercise the rights of Lender. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

MERS RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158  04/2014                    Page 3 of 4

☆ DocMagic

## E.  SUBSTITUTE TRUSTEE

Section 24 of the Security Instrument is amended to read as follows:

**24. Substitute Trustee.** In accordance with Applicable Law, Lender or MERS may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this MERS Rider.

_____ (Seal)          _____ (Seal)
Max Sass                     -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                             -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                             -Borrower                                          -Borrower


MERS RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158   04/2014                Page 4 of 4                                   ☆ DocMagic

# EXHIBIT "A"

Legal Description

Lots 7 and 8, Block 12, M. PATTON'S ADDITION TO ALBINA, in the City of Portland, County of MultnoMah and State of Oregon.

EXCEPTING from Lot 8, that part thereof conveyed to the State of Oregon, by and through its State Highway CoMMission.

Loan Number: █████ 3017

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this    29th    day of    JULY 2021    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower,"
whether there are one or more persons undersigned) to secure Borrower's Note to CHAOS HOME
LOANS LLC, A NEVADA LIMITED LIABILITY COMPANY
(the "Lender") of the same date and covering the Property described in the Security Instrument (the
"Property"), which is located at:

4617 N Minnesota Ave, Portland, Oregon 97217
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender
further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by
the following:

**6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home.
Borrower will maintain exclusive control over the occupancy of the Property, including short-term
rentals, and will not subject the Property to any timesharing or other shared ownership arrangement
or to any rental pool or agreement that requires Borrower either to rent the Property or give a
management firm or any other person or entity any control over the occupancy or use of the
Property. Borrower will keep the Property available primarily as a residence for Borrower's
personal use and enjoyment for at least one year after the date of this Second Home Rider, unless
Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless
extenuating circumstances exist which are beyond Borrower's control.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application
process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's
knowledge or consent gave materially false, misleading, or inaccurate information or statements to
Lender (or failed to provide Lender with material information) in connection with the Loan.
Material representations include, but are not limited to, representations concerning Borrower's
occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

_____(Seal)
Max Sass                                                    -Borrower

MULTISTATE SECOND HOME RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3890  1/01 (rev. 4/19)                    Page 2 of 2

☆ DocMagic

# EXHIBIT G



# CITY OF PORTLAND
OFFICE OF MANAGEMENT AND FINANCE

BUREAU OF REVENUE AND FINANCIAL SERVICES

**Ted Wheeler, Mayor**
**Thomas W. Lannom, Interim Chief Financial Officer**
**Tyler Wallace, Interim Revenue Division Director**

**Celita Holt, Interim Manager**
**Tax Division**
**Revenue Division**
111 SW Columbia Street, Suite 600
Portland, Oregon 97201-5840
(503) 823-5157
FAX (503) 823-5192
TTY (503) 823-6868

---

## Foreclosure Recommendation Report

The Revenue Division recommends foreclosure on **4611 N Minnesota Ave** for delinquent City Liens. The lien accounts meet delinquency requirements for foreclosure and no mitigating factors were discovered that would prevent foreclosure or indicate that an adjustment of the lien amount is in order.

### Summary Information

**Site Address:** 4611 N Minnesota Ave
**Recorded Property Owner:** Max Sass
**Property ID:** R210494
**Lien Account Numbers:** 173424, 174116 and 174449
**Type of Liens:** Code Enforcement and Nuisance
**Use of Property:** Residential Improved
**Amount of Delinquent Liens:** $29,185.35
**Payoff Amount Recommended: $29,185.35**

### General Information

This property is included on the list of "Distressed Vacant Properties" provided by the Bureau of Development Services and identified as priority for foreclosure. Development Services and the Portland Police Bureau have expressed concerns that these properties are nuisances to the neighborhoods where they are located. In many instances, the Police Bureau is called to disturbances at these properties frequently. Neighbors complain that many of these properties are inhabited by unlawful occupants and there are commonly drug activities taking place, which jeopardizes the public health, safety, and welfare of the neighborhood.

Many of these properties are investment properties owned by financial institutions or absent owners who have no vested interest in the neighborhood effects such distressed properties have on the community. They are demonstrated hazards and magnets for crime. For these reasons, the Revenue Division's recommendations for these distressed and egregious properties are concise and generally maintain the amount owed as is with no recommended reduction in lien amount, except in cases where mitigating circumstances point toward improved property owner compliance with a reduced

---

*An Equal Opportunity Employer*
*To help ensure equal access to programs, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*
[www.portlandoregon.gov/revenue](www.portlandoregon.gov/revenue)



# CITY OF PORTLAND
OFFICE OF MANAGEMENT AND FINANCE

BUREAU OF REVENUE AND FINANCIAL SERVICES

**Ted Wheeler, Mayor**
**Thomas W. Lannom, Interim Chief Financial Officer**
**Tyler Wallace, Interim Revenue Division Director**

**Celita Holt, Interim Manager**
**Tax Division**
**Revenue Division**
111 SW Columbia Street, Suite 600
Portland, Oregon 97201-5840
(503) 823-5157
FAX (503) 823-5192
TTY (503) 823-6868

lien amount.

### *Lien Details*

| Lien No. | Assessment Date | Lien Type | Balance |
|---|---|---|---|
| 173424 | 9/18/2021 | Code Enforcement | $2,804.50 |
| 174116 | 5/18/2022 | Code Enforcement | $19,236.18 |
| 174449 | 10/10/2022 | Nuisance | $7,144.67 |
| Total amount owed as of May 17, 2024 | | | $29,185.35 |

Please note the balance will be recalculated on the sale date.

### *Property Summary*

This property has fire damage and is covered with graffiti. Due to the fire portions of the roof have severe damage leaving the home open to the outside elements. The property is open to entry and there is trash and non-trash items continually being left at the property. The property owner is out of state and has not started making the repairs to the property.

### *Police Involvement*

There are no police calls for this residence.

### *Evaluation Criteria*

City Code 5.3.060 states that "the Revenue Division may evaluate individual delinquent open liens to develop recommendations on revising the payment amount of the lien and the payment terms.

| Criteria (City Code 5.30.060) | Yes | No | Unknown |
|---|---|---|---|
| Property owner has committed prior City Code violations or has a delinquent account | ✓ | | |
| Property owner has taken steps to correct violation or resolve any delinquency | ✓ | | |
| Property owner's financial condition allows to resolve the problem | | | ✓ |
| Violation of high gravity and magnitude | ✓ | | |

*An Equal Opportunity Employer*
*To help ensure equal access to programs, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*
*www.portlandoregon.gov/revenue*



# CITY OF PORTLAND
OFFICE OF MANAGEMENT AND FINANCE

BUREAU OF REVENUE AND FINANCIAL SERVICES

**Ted Wheeler, Mayor**
**Thomas W. Lannom, Interim Chief Financial Officer**
**Tyler Wallace, Interim Revenue Division Director**

**Celita Holt, Interim Manager**
**Tax Division**
**Revenue Division**
111 SW Columbia Street, Suite 600
Portland, Oregon 97201-5840
(503) 823-5157
FAX (503) 823-5192
TTY (503) 823-6868

| | | | |
|---|---|---|---|
| Violation was intentional or negligent caused by the property owner | ✓ | | |
| Violation was repeated or continuous | ✓ | | |
| High degree of difficulty to correct the violation or delinquency | ✓ | | |
| Economic or financial benefit accrued to property owner as a result of the violation | | | ✓ |
| Property owner is cooperative and making an effort to correct the violation | ✓ | | |
| Cost to the City to investigate and correct the violation | ✓ | | |
| Any other relevant factor | ✓ | | |

The Revenue Division has reviewed the information related to this property and its history of violations using the criteria listed above. The office found no mitigating factors that would suggest that a reduced lien amount would encourage improved compliance, property improvement, or elimination of hazards.

### *Communication with Owner*

The Liens Team has mailed out 7 letters to owner from November 25, 2021, to May 28, 2024. I have spoken with the owner, and he is planning to redevelop this property into a multi-unit. He is in the process of getting financing to bring this into fruition.

*An Equal Opportunity Employer*
*To help ensure equal access to programs, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*
*www.portlandoregon.gov/revenue*

# EXHIBIT H

| Multnomah County Official Records<br>E Murray, Deputy Clerk | **2021-170288** |
|---|---|
| MORT-MORT   Pgs=22 Stn=13 ATPV<br>$110.00 $11.00 $10.00 $60.00 | 11/19/2021 11:49:33 AM<br>**$191.00** |

After Recording Return To:

CHAOS HOME LOANS LLC
900 S 4TH ST
LAS VEGAS, NEVADA 89101
Loan Number: R003661

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST

**MIN:** ████████6614

**MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** **"Security Instrument"** means this document, which is dated   NOVEMBER 18, 2021   , together with all Riders to this document.
**(B)** **"Borrower"** is   Max Sass , A SINGLE MAN

Borrower is the trustor under this Security Instrument.
**(C)** **"Lender"** is   CHAOS HOME LOANS LLC

Lender is a   NEVADA   LIMITED LIABILITY COMPANY   organized and existing under the laws of   NEVADA
Lender's address is   900 S 4TH ST, LAS VEGAS, NEVADA 89101

**(D)** **"Trustee"** is   Fidelity National Title Company of Oregon
900 Southwest 5th Avenue , Lobby, Portland, Oregon 97204

**(E)** **"MERS"** is the Mortgage Electronic Registration Systems, Inc. Lender has appointed MERS as the nominee for Lender for this Loan, and attached a MERS Rider to this Security Instrument, to be executed by Borrower, which

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038  1/01
Page 1 of 14

☆ DocMagic

further describes the relationship between Lender and MERS, and which is incorporated into and amends and supplements this Security Instrument.

**(F)** **"Note"** means the promissory note signed by Borrower and dated       NOVEMBER 18, 2021       .
The Note states that Borrower owes Lender    THREE HUNDRED FIFTY-NINE THOUSAND ONE HUNDRED AND 00/100                                 Dollars (U.S. $ 359,100.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than DECEMBER 1, 2051          .

**(G)** **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☐ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☒ Second Home Rider |
| ☐ Condominium Rider | ☒ Other(s) [specify]<br>MERS Rider |

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | Multnomah | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO
A.P.N.: R210494

which currently has the address of    4617 N Minnesota Ave

[Street]

Portland                                        , Oregon        97217        ("Property Address"):

[City]                                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

---

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3038  1/01
                                    Page 3 of 14

☆DocMagic

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater

or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient

to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay

the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

---

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                    ☆ DocMagic
Form 3038  1/01

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits,

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS ☆ DocMagic
Form 3038  1/01

then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

 **15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

 **16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

 As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

 **17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

 **18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

 If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

 If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

 **19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would

be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

   **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

   Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

   **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

   Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

---

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                    ☆ DocMagic
Form 3038  1/01

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

**26. Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

**27. Required Evidence of Property Insurance.**

### WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____(Seal)
Max Sass                         -Borrower

_____        _____
Witness                                 Witness

---

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                  ☆DocMagic
Form 3038  1/01
                                Page 13 of 14

———————————————— [Space Below This Line For Acknowledgment] ————————————————

State of ~~OREGON~~ Nevada ⅏

County of ~~Multnomah~~ Clark ⅏

This record was acknowledged before me on _____ 11|18|21 _____
                                                            (date)

by   Max Sass _____

_____

_____

(name(s) of individual(s))

(Signature of Notarial Officer)

| ROGER SAMPSON |
| Notary Public-State of Nevada |
| APPT. NO. 21-6237-01 |
| My Appt. Expires 11-07-2025 |

Notary Public, State of Nevada
(Title, e.g., "Notary Public - State of Oregon")

My commission expires: ___ 11|7|25 ___

(STAMP if required)

Loan Originator: Collin Brian Psioda, NMLSR ID ███ 489, NMLSR ID ███ 5544
Loan Originator Organization: CHAOS HOME LOANS LLC, NMLSR ID

OREGON - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      ☆DocMagic
Form 3038  1/01
                                    Page 14 of 14

# EXHIBIT "A"
Legal Description

Lots 7 and 8, Block 12, M. PATTON'S ADDITION TO ALBINA, in the City of Portland, County of Multnomah and State of Oregon.

EXCEPTING from Lot 8, that part thereof conveyed to the State of Oregon, by and through its State Highway Commission.



MIN: ██████████6614                      Loan Number: ██3661

# MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. RIDER
## (MERS Rider)

THIS MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. RIDER ("MERS Rider") is made this 18th day of NOVEMBER, 2021                , and is incorporated into and amends and supplements the Deed of Trust (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to CHAOS HOME LOANS LLC, A NEVADA LIMITED LIABILITY COMPANY
("Lender") of the same date and covering the Property described in the Security Instrument, which is located at:

4617 N Minnesota Ave, Portland, Oregon 97217
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that the Security Instrument is amended as follows:

## A. DEFINITIONS

1. The Definitions section of the Security Instrument is amended as follows:

**"Lender"** is CHAOS HOME LOANS LLC
Lender is a NEVADA LIMITED LIABILITY COMPANY      organized and existing under the laws of
NEVADA                                                      . Lender's address is
900 S 4TH ST, LAS VEGAS, NEVADA 89101

Lender is the beneficiary under this Security Instrument. The term "Lender" includes any successors and assigns of Lender.

**"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is the Nominee for Lender and is acting solely for Lender. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. MERS is appointed as the Nominee for Lender to exercise the rights, duties and obligations of Lender as Lender may from time to time direct, including but not limited to appointing a successor trustee, assigning, or releasing, in whole or in part this Security Instrument, foreclosing or directing Trustee to institute foreclosure of this Security Instrument, or taking such other actions as Lender may deem necessary or appropriate under this Security Instrument. The term "MERS" includes any successors and assigns of MERS. This appointment shall inure to and bind MERS, its successors and assigns, as well as Lender, until MERS' Nominee interest is terminated.

2. The Definitions section of the Security Instrument is further amended to add the following definition:

**"Nominee"** means one designated to act for another as its representative for a limited purpose.

---

MERS RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158  04/2014                    Page 1 of 4                    ☆ DocMagic

## B.  TRANSFER OF RIGHTS IN THE PROPERTY

The Transfer of Rights in the Property section of the Security Instrument is amended to read as follows:

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  COUNTY | of | Multnomah | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE EXHIBIT "A" ATTACHED HERETO
A.P.N.: R210494

which currently has the address of 4617 N Minnesota Ave

[Street]

| Portland | OREGON | 97217 | ("Property Address"): |
|---|---|---|---|
| [City] | [State] | [Zip Code] | |

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Lender, as the beneficiary under this Security Instrument, designates MERS as the Nominee for Lender. Any notice required by Applicable Law or this Security Instrument to be served on Lender must be served on MERS as the designated Nominee for Lender. Borrower understands and agrees that MERS, as the designated Nominee for Lender, has the right to exercise any or all interests granted by Borrower to Lender, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, assigning and releasing this Security Instrument, and substituting a successor trustee.

## C.  NOTICES

Section 15 of the Security Instrument is amended to read as follows:

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless

MERS RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158  04/2014                    Page 2 of 4

☆DocMagic

Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Borrower acknowledges that any notice Borrower provides to Lender must also be provided to MERS as Nominee for Lender until MERS' Nominee interest is terminated. Any notice provided by Borrower in connection with this Security Instrument will not be deemed to have been given to MERS until actually received by MERS. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

## D. SALE OF NOTE; CHANGE OF LOAN SERVICER; NOTICE OF GRIEVANCE
Section 20 of the Security Instrument is amended to read as follows:

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. Lender acknowledges that until it directs MERS to assign MERS's Nominee interest in this Security Instrument, MERS remains the Nominee for Lender, with the authority to exercise the rights of Lender. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

### E.  SUBSTITUTE TRUSTEE
Section 24 of the Security Instrument is amended to read as follows:

**24. Substitute Trustee.** In accordance with Applicable Law, Lender or MERS may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this MERS Rider.

_____ (Seal)        _____ (Seal)
Max Sass                      -Borrower                                    -Borrower


_____ (Seal)        _____ (Seal)
                              -Borrower                                    -Borrower


_____ (Seal)        _____ (Seal)
                              -Borrower                                    -Borrower


MERS RIDER - Single Family                                         ☆ DocMagic
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3158  04/2014                    Page 4 of 4

# EXHIBIT "A"
Legal Description

Lots 7 and 8, Block 12, M. PATTON'S ADDITION TO ALBINA, in the City of Portland, County of Multnomah and State of Oregon.

EXCEPTING from Lot 8, that part thereof conveyed to the State of Oregon, by and through its State Highway Commission.

Loan Number: ████ 3661

# SECOND HOME RIDER

THIS SECOND HOME RIDER is made this 18th day of NOVEMBER 2021 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower,"
whether there are one or more persons undersigned) to secure Borrower's Note to CHAOS HOME
LOANS LLC, A NEVADA LIMITED LIABILITY COMPANY
(the "Lender") of the same date and covering the Property described in the Security Instrument (the
"Property"), which is located at:

4617 N Minnesota Ave, Portland, Oregon 97217
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender
further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by
the following:

**6. Occupancy.** Borrower will occupy and use the Property as Borrower's second home.
Borrower will maintain exclusive control over the occupancy of the Property, including short-term
rentals, and will not subject the Property to any timesharing or other shared ownership arrangement
or to any rental pool or agreement that requires Borrower either to rent the Property or give a
management firm or any other person or entity any control over the occupancy or use of the
Property. Borrower will keep the Property available primarily as a residence for Borrower's
personal use and enjoyment for at least one year after the date of this Second Home Rider, unless
Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless
extenuating circumstances exist which are beyond Borrower's control.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application
process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's
knowledge or consent gave materially false, misleading, or inaccurate information or statements to
Lender (or failed to provide Lender with material information) in connection with the Loan.
Material representations include, but are not limited to, representations concerning Borrower's
occupancy of the Property as Borrower's second home.

---

MULTISTATE SECOND HOME RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3890  1/01 (rev. 4/19)                    Page 1 of 2

✰ DocMagic

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

_____ (Seal)
Max Sass                                    -Borrower

MULTISTATE SECOND HOME RIDER - Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3890  1/01 (rev. 4/19)                    Page 2 of 2

☆ DocMagic

# EXHIBIT I



THE MONEY SOURCE

3138 E Elwood St, Phoenix, AZ 85034
Support@TheMoneySource.com

## Purchase Advice for Loan # ███ 162
Seller Loan # ███ 3661 · Servicing Loan # ████ 7889

| | |
|---|---|
| Seller: | CHAOS HOME LOANS LLC |
| Borrower: | SASS, MAX |
| Property Address: | 4617 N MINNESOTA AVE PORTLAND, OR 97217 |
| Loan Program: | C30 |
| Original Loan Amount: | $359,100.00 |
| Interest Rate: | 3.500% |
| 1st Pmt Due on Loan: | 01/01/2022 |
| 1st Pmt Due Investor: | 02/01/2022 |

### WIRE INFO

| | |
|---|---|
| Wire Date: | 12/21/2021 |
| BANK: | FLAGSTAR BANK |
| ABA #: | ████1852 |
| Account: | 1558 |
| Wire Amount: | $370,067.68 |

### PRICING

| | |
|---|---|
| RATE SHEET PRICE | 102.015 |
| SRP | 2.234 |
| TERM > 15 YRS, FICO 720-739, LTV > 80%, LTV <= 85% | (0.500) |
| TOTAL ADJUSTMENTS | 1.734 |
| **NET PRICE** | **103.749** |

### Purchase Calculation Detail

**PRICE**

| | | |
|---|---|---|
| UNPAID PRINCIPAL BALANCE | $358,534.86 | |
| NET PRICE | X 103.749% | |
| **TOTAL PRICE** | | $371,976.33 |

**INTEREST**

| | | |
|---|---|---|
| ORIGINAL LOAN AMOUNT | $359,100.00 | |
| ANNUAL INTEREST RATE | 3.500% | |
| DAILY INTEREST | $34.38 | |
| # OF DAYS | X -11 days | |
| **TOTAL INTEREST** | | ($378.18) |

**ESCROW**

| | | |
|---|---|---|
| HAZARD INSURANCE | $194.13 | |
| COUNTY PROPERTY TAX | $772.02 | |
| AGGREGATE AMOUNT | ($267.45) | |
| PAYMENTS INTO ESCROW ACCOUNT | $432.77 | |
| **ESCROW BALANCE TO BE TRANSFERRED** | | ($1,131.47) |

**FEES**

| | | |
|---|---|---|
| FUNDING FEE | $319.00 | |
| TAX SERVICE FEE | $80.00 | |
| **TOTAL FEES:** | | ($399.00) |

| | |
|---|---|
| Total Wire | $370,067.68 |

LOAN PURCHASED IN 4 CALENDAR DAYS

**Loan Delivered:** 12/17/21

**Loan Purchased:** 12/21/21

# EXHIBIT J

# CORRESPONDENT LOAN PURCHASE AGREEMENT

This Correspondent Loan Purchase Agreement ("Agreement") is made this *17* day of *June*, 2020, by and between:

**THE MONEY SOURCE INC.**, a New York corporation ("TMS"),

and

_Chaos Home Loans_, a *LLC* corporation ("Seller").

TMS and Seller are hereinafter referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, Seller desires to sell certain mortgage loans to TMS through its Correspondent Program in accordance with the terms and conditions of this Agreement.

WHEREAS, Seller has completed and submitted to TMS a Correspondent Application Package, and based upon the information provided by Seller therein and the documentation provided by Seller therewith, TMS has approved Seller to submit loans to TMS for review and purchase through TMS's Correspondent Program;

WHEREAS, TMS agrees to purchase certain loans secured by real property, together with the servicing rights thereof and all promissory notes and other documentation proving the validity of said loans and servicing rights (the "Loans"), from Seller through TMS's Correspondent Program, and Seller agrees to sell to TMS certain Loans pursuant to the terms and conditions set forth herein, and in TMS's Correspondent Seller's Manual, as amended from time to time (the "Manual").

NOW THEREFORE, in consideration of the above Recitals and the mutual promises and covenants contained herein, the receipt and the sufficiency which are hereby acknowledged, the Parties do hereby agree as follows:

## 1) MANUAL, EXHIBITS, AND DEFINITIONS

The Manual is incorporated herein by reference and shall be deemed to be an inseparable and indispensable part of this Agreement, but shall not affect the enforceability or operation of this Agreement for any reason. All Loans purchased pursuant to the Agreement shall be subject to the terms of the Manual and this Agreement. In the event of any inconsistency between the provisions of the Manual and the provisions of this Agreement, the provisions of the Manual shall prevail over and supersede the inconsistent provisions of this Agreement, unless specifically amended by way of subsequent addendum to this Agreement. In the event of any inconsistency between the provisions of the Agreement, the Manual, and a Commitment (as defined below), the terms of the Commitment shall prevail over and supersede the inconsistent provision(s) of the Agreement and the Manual. TMS reserves the right to amend or modify the Manual (including, without limitation, by adding new provisions of the same or a different nature as the existing provisions of the Manual, or by deleting provisions of the Manual) in its sole discretion from time to time. TMS shall, at its sole option, provide the original Manual and/or notice of any amendments or modifications to the Manual or any memoranda, bulletins or other information related to the Manual by posting the same on an Internet web site designated from time to time by TMS, notwithstanding the effective date of any such amendment or modification.

Initial _____

All Exhibits attached hereto, or materials referred to in this Agreement, are incorporated by reference into this Agreement. Any capitalized terms not defined herein but for which a definition is contained in the Manual shall have the meaning set forth in the Manual.

## 2) ELIGIBLE LOANS

A. Only those Loans fully complying with the standards set forth in the sections of the Manual entitled "Underwriting Guidelines" and "Mortgage Products" are eligible for purchase under this Agreement. Seller must be approved, qualified and/or licensed to originate such Loans.

B. Seller shall fully underwrite each Loan prior to submission to TMS in accordance with sections of the Manual entitled "Underwriting Guidelines" and "Lending Requirements", or, if available, use a TMS-approved automated underwriting system for underwriting the Loan. All underwriting and lending requirements used by Seller must follow all applicable Agency guidelines and applicable regulations.

C. Seller shall be responsible for assuring that Loans submitted to TMS comply with all terms and conditions of this Agreement and the Manual.

D. TMS retains discretion to accept or reject any nonconforming or other type loans and decide upon the eligibility of any loan offered by Seller, presuming Seller is and will remain in good standing with all appropriate licensing authorities.

## 3) COMMITMENT TO PURCHASE LOANS

This Agreement sets forth the terms and conditions under which Seller will sell Loans to TMS, however, there is no obligation created by this Agreement. The procedure pursuant to which Seller may commit to sell a Loan to TMS is detailed in the Lock Policy section of the Manual. For purposes of this Agreement, TMS and Seller will consider a Best Effort Commitment to be mandatory and subject to the terms listed in the Manual for a Mandatory Flow Commitment, if the Loan closes. TMS will confirm the conditions of the sale of the Loan to TMS by delivering a confirmation ("Commitment") to Seller which sets forth the terms of the transaction, including the price TMS will pay for each Loan, as determined pursuant to the pricing standards set forth in the Manual (the "Purchase Price"). The terms of the Commitment, including the Purchase Price, shall be in effect for the period of time requested by Seller and approved by TMS (the "Commitment Period").

## 4) DELIVERY OF LOAN DOCUMENTATION AND REVIEW

A. A Loan shall be deemed delivered to TMS if: (i) it is received by TMS within the Commitment Period; (ii) it is in compliance with the requirements set forth in the Funding Documentation, Final Documentation, and Collateral Package sections of the Manual; and (iii) there are no outstanding conditions which would prevent TMS from funding the purchase of the Loan.

B. The sale of Loan(s) by Seller, and the purchase of Loan(s) by TMS, shall each be on a non-exclusive basis.

C. Seller acknowledges that prior to TMS's purchase of a Loan under this Agreement, TMS shall have the right to complete a full review of the mortgage file, information, and documentation relating to such Loan to determine whether the related Loan complies with the terms and conditions of the Underwriting Guidelines and Mortgage Products sections of the Manual and the terms and conditions of this Agreement ("Review Period"). TMS will use commercially reasonable efforts to complete its review of each Loan as soon as practicable. The Review Period will be deemed complete with respect to any Loan upon TMS's determination that the Loan complies with all terms and conditions of the Mortgage Programs section of the Manual and this Agreement. Notwithstanding the foregoing, the fact that TMS has conducted or has failed

TMS Loan Purchase Agreement-v-9-2019

Initial _____

to conduct any partial or complete examination of the mortgage file, information, and/or documentation related to a Loan shall not affect TMS's right to demand repurchase pursuant to Section 8 of this Agreement, or to avail itself of any other remedy available hereunder.

D. Seller agrees to deliver to TMS the Final Documentation for a Loan **within 180 calendar days** after the closing of the Loan. If Seller can show to TMS's satisfaction that Seller has utilized all reasonable efforts to obtain the Final Documentation, but Seller is not able to deliver them within such time period, TMS may extend the period for delivery an additional 30 calendar days. TMS reserves the right to charge late document delivery fees as described in the Manual should any Final Documentation not be delivered by the end of the 180 calendar day period. Seller agrees to correct any Final Documentation within 15 calendar days after being notified by TMS that any documents are unacceptable.

## 5) UNDERWRITING AND PROPERTY APPRAISAL

A. TMS shall have the right, but not the obligation, to underwrite any Loan submitted for purchase pursuant to this Agreement, or otherwise ensure that any Loan submitted for purchase complies with all terms and conditions of this Agreement and the Manual; provided that neither the existence nor the exercise of this right shall affect in any way Seller's obligations hereunder, including without limitation, Seller's repurchase obligations under Section 8 hereof and Seller's indemnification obligations under Section 10 hereof.

B. Seller shall, when applicable, deliver to TMS an appraisal of the real estate security for each such Loan, signed by a "Qualified Appraiser," as defined in the Manual, prior to TMS's approval to purchase such Loan.

## 6) PAYMENT OF PURCHASE PRICE AND SELLER'S WIRE INSTRUCTIONS

TMS shall, after receipt of a Collateral Package which fully complies with the requirements of the Manual, including the Funding Documentation section of the Manual, deliver the Purchase Price (less any fees or discounts due to TMS) set forth in the applicable Commitment to Seller in accordance with Seller's wire instructions or in accordance with any bailee letter or trust receipt submitted with the Loan, subject to the provisions contained in the Payment of Purchase Proceeds attached hereto as EXHIBIT "A," as determined in the sole and absolute discretion of TMS. The sale of Loans by Seller to TMS pursuant to transactions under this Agreement includes the servicing rights related to the Loans and all transactions under this Agreement are "servicing released" purchase and sale transactions for all intents and purposes, it being understood that the Purchase Price paid by TMS to Seller for each Loan includes a premium that compensates Seller for the servicing rights related to the Mortgage Loan and upon payment of the Purchase Price by TMS to Seller, TMS becomes the owner of the Loan, including the servicing rights related to the Loan.

## 7) SELLER'S OBLIGATIONS, REPRESENTATIONS AND WARRANTIES

A. Seller represents and warrants to TMS, the validity of such representations and warranties being conditions precedent to the purchase of any Loan, as to each Loan offered for sale under this Agreement that as of the date of TMS's purchase of such Loan:

1) The Loan documents have been duly executed by the trustor/mortgagor, acknowledged and recorded; each Loan is valid and complies with all criteria contained in the Manual; the note and deed of trust/mortgage constitute the entire Agreement between the trustor/mortgagor and the beneficiary/mortgagee, and there is no verbal understanding or written modification which would affect the terms of the note or the deed of trust/mortgage except by written instrument delivered and expressly made known to the beneficiary/mortgagee and recorded if recording is necessary to protect the interests of the beneficiary/mortgagee.

TMS Loan Purchase Agreement-v-9-2019                                      Initial _____

2) The mortgage and the related promissory note or other evidence of indebtedness of the mortgagor secured by the mortgage (the "Note") are on forms that are conforming to applicable guidelines of the Federal Home Loan Mortgage Corporation (FHLMC), the Federal Housing Administration (FHA), the United States Department of Agriculture (USDA), the United States Department of Veterans Affairs (VA), Fannie Mae (FNMA), and Ginnie Mae (GNMA) (each an "Agency"). The mortgage and related Note contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the mortgaged property of the benefits of the security provided thereby, including (i) in the case of a mortgage designated as a deed of trust by trustee's sale, and (ii) otherwise by judicial or non-judicial foreclosure. Upon default by a mortgagor on a mortgage loan and foreclosure on, or trustee's sale of, the mortgaged property pursuant to the proper procedures, the holder of the Loan will be able to deliver good and merchantable title to the mortgaged property. There is no homestead or other exemption or right available to the mortgagor or any other person or restriction on the Seller or any other person, including without limitation, any federal, state or local, law, ordinance, decree, regulation, guidance, attorney general action, or other pronouncement, whether temporary or permanent in nature, which would interfere with, restrict or delay, the ability of the Seller, TMS or any servicer or any successor either (a) the right to sell the mortgaged property at a trustee's sale or otherwise, or (b) the right to foreclose on the related Loan.

3) Seller is the sole owner of the Loan and has the authority to sell, transfer and assign the same on the terms set forth in this Agreement. The Loan is free and clear of any and all assignments, encumbrances, options, rights, claims, liens and security interests. Seller has the right to sell and assign each Loan to TMS without the consent, approval or agreement of any other person, and Seller has not assigned any interest in the Loan to any other person. By delivery and endorsement of the Note to TMS, TMS shall be the sole owner of the Note.

4) The full principal amount of the Loan has been advanced to the trustor/mortgagor, either by payment directly to such person or by payment made on such person's request or approval. The unpaid principal balance of the Loan is as represented by Seller. All costs, fees and expenses incurred in making, closing and recording the Loan have been paid. No part of the mortgaged property has been released from the lien of the Loan, the terms of the Loan have in no way been changed or modified, and the Loan is current and not in default.

5) Each Loan is a valid first lien, or, if specifically approved by TMS, a valid second lien on the mortgaged property, and the mortgaged property is free and clear of all encumbrances and liens having priority over the lien of such Loan, except for the first lien, if applicable, and liens for real estate taxes and special assessments not yet due and payable and those exceptions allowed in connection with Loans insured by FHA or guaranteed by VA or USDA ("Government Loans") and other exceptions set forth in the Manual.

6) The mortgaged property is free and clear of all mechanics' and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Seller aware of any facts which could give rise to any such lien.

7) With respect to each FHA Loan, Seller has taken all steps required by FHA regulations (including, without limitation, (i) the underwriting and closing of such FHA Loan in accordance with FHA regulations and any conditions imposed by the FHA in its "firm commitment" which relates to such FHA Loan; and (ii) the timely remittance of the related mortgage insurance premium to the FHA in accordance with FHA regulations), which are a prerequisite to the issuance of the FHA Mortgage Insurance Certificate ("MIC") and the issuance of such MIC is subject only to the completion of standard FHA clerical procedures. With respect to each VA Loan, Seller has taken all steps required by VA regulations (including, without limitation, (i) the underwriting and closing of such VA Loan in accordance with VA regulations and any conditions imposed by the VA in its "firm commitment" which relates to such VA loan; and (ii) timely remittance of the related funding fee to the VA in accordance with VA regulations), which are a prerequisite to the issuance of the Loan and Guaranty Certificate

Page 4 of 25

Initial _____

("LGC") and the issuance of such LGC is subject only to the completion of standard VA clerical procedures. The evidence of any required MIC or LGC must be delivered to TMS within sixty (60) days of the date on which TMS pays the Purchase Price to the Seller and TMS takes title to the Loan ("Purchase Date").

8) All federal and state laws, rules and regulations applicable to the Loans have been complied with, including but not limited to: the Real Estate Settlement Procedures Act, the Flood Disaster Protection Act, the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts, and all applicable statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions, predatory and abusive lending or interest charges. All points, fees and charges (including finance charges), whether or not financed, assessed, collected or to be collected in connection with the origination of each loan have been disclosed in writing to the borrower in accordance with applicable state and federal laws and regulations.

9) No Loan is the subject of, and Seller is not aware of any facts which could give rise to, litigation which could affect TMS's ability to enforce the terms of the obligation or its rights under the mortgage loan documents.

10) There is in force for each Loan either: (a) a paid-up title insurance policy on the Loan issued by a title company in an amount at least equal to the outstanding principal balance of the Loan, which may require prior approval by TMS; or (b) an attorney's mortgage lien opinion.

11) There is in force for each Loan valid hazard insurance policy coverage and, where applicable, valid flood insurance policy coverage, and such coverage meet the requirements of TMS specified in the Manual.

12) Seller shall register each Loan, prior to sale to TMS, with the Mortgage Electronic Registration Systems ("MERS") as outlined in the Manual.

13) Seller shall record, whenever necessary, the corporate assignment in the name of "The Money Source Inc." at the time the deed of trust/mortgage is recorded, and the assignment of the Loan from Seller to TMS shall be valid and enforceable.

14) The borrower has no rights of rescission, set-offs, counter-claims or defenses to the note or deed of trust/mortgage securing the note arising from the acts and/or omissions of Seller.

15) There is no improvement located on or being part of the mortgaged property that is in violation of any applicable zoning law or regulation.

16) All improvements included for determining the appraised value of the mortgaged property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the mortgaged property.

17) There is no proceeding pending for total or partial condemnation of any mortgaged property and said property is free of substantial damage (including, but not limited to, any damage by fire, earthquake, windstorm, vandalism or other casualty) and in good repair.

18) There are no circumstances or conditions with respect to any Loan, mortgaged property, trustor/mortgagor or trustor's/mortgagor's credit standing that reasonably could be expected to cause private institutional investors to regard any Loan as an unacceptable investment, cause any Loan to become delinquent or adversely affect the value or marketability of the Loan.

19) All documents submitted are genuine. All other representations as to each such Loan are true and correct and meet the requirements and specifications of all parts of this Agreement and the Manual. No

TMS Loan Purchase Agreement-v-9-2019                                    Initial _____

fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to the Loan has taken place on the part of the Seller, or any other party (including without limitation the mortgagor, any appraiser, any builder/developer, any settlement agent or loan officer) involved in the origination or sale of the Loan, or in the application of any insurance in relation to such Loan. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. The Seller has reviewed all of the documents constituting the loan file and credit file and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein. If a mortgage insurer fails to pay a claim submitted with respect to the related Loan as a result of the mortgage insurer successfully asserting a defense based on fraud, then such failure to pay shall constitute a breach of this representation. Any breach of this representation shall be deemed to materially and adversely affect the value of the Loan and shall require an immediate repurchase of the affected Loan.

20) The consideration received by the Seller upon the sale of any Loan under this Agreement constitutes fair consideration and reasonable equivalent value of the Loan.

21) The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2003, and the laws and regulations administered by the U.S. Department of Treasury's Office or Foreign Assets Control ("OFAC"), which prohibits dealings with certain countries, territories, entities, and individuals named in OFAC's Sanction Programs and on Specially Designated Nationals and Blocked Persons lists (Collectively, the "Anti-Money Laundering Laws"). The Seller has established an anti-money laundering compliance program to the extent required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable borrower and the origin of the assets used by said borrower to purchase the property in question, and maintains, and will maintain sufficient information to identify the applicable borrower for purposes of the Anti-Money Laundering Laws.

22) The borrower has not notified the Seller, and the Seller has no knowledge of any relief requested or allowed to the borrower under the Servicemembers' Relief Act or any other federal or state law that would have the effect of suspending or reducing the borrower's payment obligation under a Loan or that would prevent or restrict the ability of TMS to commence or continue with foreclosure of the mortgaged property securing the Loan or any other remedied available under the Loan documents.

23) No Loan is subject to the requirements of the Home Ownership and Equity Protection Act of 1994. No Loan is classified as a "high cost," "threshold," "covered," "abusive," or "predatory" Loan or a similar loan under any applicable state, federal or local law (or similar classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having higher interest rates, points and/or fees).

24) No Borrower was encouraged, required or "Steered" to select a loan product offered by Seller which is a higher cost product designed for less creditworthy borrowers, unless at the time of the Loan's origination, such borrower did not qualify taking into account credit history and debt to income ratios for a lower cost credit product then offered by the Seller.

25) No mortgaged property securing a Loan is in a zip code declared by the Federal Emergency Management Agency (FEMA) as being an "Individual Assistance" property or "Category 1" property (or such similar term(s) or classification(s) that may be used by FEMA from time to time).

26) Each mortgage loan that is "nontraditional mortgage loan" within the meaning of Interagency Guidance on Nontraditional Mortgage Product Risk, 71 FR 58609, and complies in all respects with such guidance, including any interpretations, applications or implementation plans with respect thereto that have been communicated and/or agreed to by regulator of the Seller, as originator of the Loan.

TMS Loan Purchase Agreement-v-9-2019

Initial _____

27) The Seller's decision to purchase or originate any mortgage loan or to deny any mortgage loan application is an independent decision and is in no way made as a result of TMS's decision to purchase or not to purchase or the price TMS may offer to pay for any such loan, if originated.

28) All Loans for which mortgage/credit life, accidental death, disability, unemployment, or any similar insurance is collected as part of the mortgagor's monthly payment are identified in the Loan file and fully comply with applicable law. None of the Loans has a single payment credit life insurance or other optional insurance product that has been considered "predatory" by any Agency. Any Loan involved with any type of optional insurance has been properly serviced including, without limitation, the proper application and collection of premiums, the maintenance of complete and accurate records, processing and payment of claims and the handling of correspondence. None of the Loans has an optional insurance product that, as of the Purchase Date, is being provided free of charge to a Mortgagor.

29) As of the applicable Purchase Date for each Loan, there is no damage to the mortgaged property from waste, fire, windstorm, flood, tornado, earthquake or earth movement, hazardous or toxic substances, other casualty, or any other property related circumstances or conditions that would adversely affect the value or marketability of any Loan or mortgaged property, and adequate insurance is in place to cover all such events. As of the applicable Purchase Date, there is no proceeding pending that would adversely affect the Loan and, to the best of Seller's knowledge, there is no imminent threat of the partial or total condemnation of the mortgaged property.

30) No mortgagor agreed to submit to arbitration to resolve any dispute arising out of or relating in any way to the Loan transaction; any breach of this representation shall be deemed to materially and adversely affect the value of the Loan and shall require a repurchase of the affected Loan.

31) As of the Purchase Date, the Loan is not 16 calendar days or more delinquent and Seller has no knowledge of any default or breach existing or threatened under the Note.

32) There is no exception to or condition affecting the title to the mortgaged property other than usual and customary exceptions satisfactory to TMS which do not adversely affect title to, or the marketability of, the mortgaged property. There is in force a paid-in-full mortgagee title insurance policy with respect to the mortgaged property issued by a title insurance company acceptable to TMS on standard American Land Title Association mortgagee policy forms in an amount satisfactory to TMS and containing all endorsements required by TMS or the Manual. By assignment or endorsement of Seller's interest in the Loan, TMS, its successors and assigns, is designated as a mortgagee and additional named insured with regard to the title insurance. Seller has not done, by act or omission, anything which would impair such title insurance coverage.

B. Seller represents and warrants to TMS that as of the date first set forth above and as of the date of TMS's purchase of each Loan hereunder:

1) Seller is duly organized, validly existing and in good standing under the laws of its state of incorporation or organization and is qualified and/or licensed as necessary to transact business, including the originating and selling of mortgage loans, and is in good standing in each state where the property securing a Loan is located.

2) Seller has the full power and authority to hold and sell each Loan; and neither the execution and delivery of this Agreement, nor the acquisition or origination of the Loans, nor the sale of the Loans, nor the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any term, condition or provision of, Seller's certificate of incorporation or by-laws, any license held by Seller or governing

Page 7 of 25

TMS Loan Purchase Agreement-v-9-2019

Initial _____

Seller's activities or any agreement to which Seller is a party or by which Seller is bound, or constitute a material default or result in an acceleration under any of the foregoing.

3)      No consent, approval, authorization or order of any court, governmental body or any other person or entity is required for the execution, delivery and performance by Seller of this Agreement, including but not limited to, the sale of the Loan(s) to TMS.

4)      There is no suit, action, arbitration or legal or administrative or other proceeding pending or threatened against Seller which would affect its ability to perform its obligations under this Agreement.

5)      Seller is not a party to, bound by, or in breach or violation of any agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects, or may in the future materially and adversely affect, the ability of Seller to perform its obligations under this Agreement or the Manual, including, without limitation, Seller's repurchase and indemnification obligations pursuant to Sections 8, 9 and 10 of this Agreement.

6)      The Seller has not dealt with any broker, agent or other person that may be entitled to any commission or compensation in connection with the sale of any Loan to TMS pursuant to the terms of this Agreement.

7)      Neither this Agreement nor any statement, report or other document furnished or to be furnished by Seller pursuant to this Agreement or in connection with the transactions contemplated herein contains any untrue statements of fact or omits to state a fact necessary to make the statements contained therein true and accurate and not misleading in any manner.

8)      The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Seller, and the transfer, assignment, and conveyance of the Loans pursuant to this Agreement are not subject to bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

9)      With respect to any FHA Loan submitted by Seller, Seller is approved by HUD to participate in its "direct endorsement" mortgage insurance program; with respect to a VA Loan submitted by Seller, Seller is approved to originate and submit VA loans for VA approval and to underwrite mortgage loans with "automatic authority" (as defined by VA regulations)  Seller is not currently, nor within the two year period preceding the date of this Agreement has it been, subject to any administrative sanctions imposed by HUD or Department of VA.

10)     Requirements, directions, or guidance of the Agencies applicable to the Loans or to the origination, sale, or sourcing of the Loans, and any and all requirements of any applicable federal, state, or local law including, without limitation, usury, truth in lending, real estate settlement procedures, consumer credit protection, predatory and abusive lending laws, equal credit opportunity, fair housing, HVCC/AIR and disclosure laws, or unfair and deceptive practices laws applicable to the origination, sale, and servicing of the Loan including, without limitation, any provisions relating to prepayment penalties, have been complied with, and the consummation of the transactions contemplated hereby will not involve the violation of any such requirements, laws or regulations.  The Seller maintains, and shall maintain, evidence of such compliance as required by applicable law, regulation, or Agency requirements and shall make such evidence available for inspection at the Seller's office during normal business hours upon reasonable advance notice.  Each Loan, at the time it was made, complied with all applicable Agency requirements, directions, and guidance and with all applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws.

TMS Loan Purchase Agreement-v-9-2019                                        Initial _____

**8) SELLER'S REPURCHASE OBLIGATIONS / EARLY PAYMENT DEFAULTS**

A.   Seller shall repurchase any Loan sold to TMS pursuant to this Agreement **within thirty (30) days of receipt of written notice from TMS** of any of the following circumstances (the "Repurchase Obligation"):

   1)   Seller fails to deliver to TMS <u>within 180 days</u> from the date each Loan was purchased the original documents specified in the Loan Delivery section of the Manual.

   2)   TMS determines that there is any evidence of fraud in the origination of the Loan or in the sale of the Loan to TMS, or that any information or documentation in the Loan file is not true and correct, or if material information was not disclosed in the Loan file.

   3)   If there is a basis to demand indemnification and/or repurchase, whereby TMS determines the Loan is not eligible for GNMA, FNMA or FHLMC pool participation or whole loan purchase or purchase by a private investor, or, if TMS has sold such Loan in whole or in part to GNMA, FNMA, FHLMC or a private investor, and GNMA, FNMA, FHLMC or the private investor requests TMS to repurchase said interest or reimburse it for losses, or the mortgage insurer denies coverage on the Loan; provided the reason for such ineligibility, repurchase, reimbursement, or denial shall be due to a failure of the Loan to meet requirements specified in the Manual at the time of TMS's purchase of the Loan from Seller.

   4)   <u>EARLY PAYMENT DEFAULT</u> - If TMS and/or its assigns determine that an Early Payment Default, or "EPD" (as defined below) exists with respect to any Loan. For purposes of this Agreement, an Early Payment Default exists in each of the following circumstances:

      a)   With respect to any Loan sold by Seller, if the first payment due to TMS or its assigns is not received by TMS, whether from the borrower directly or forwarded by Seller if the Borrower has submitted the payment to Seller, by the last day of the month in which it is due. A payment for which TMS deducted funds at the time it purchased the Loan from Seller shall not be considered the first payment due TMS; or

      b)   With respect to any FHA or VA Loan sold by Seller, if <u>any of the first four (4) payments due become 60 or more days delinquent from the due date</u>; or

      c)   With respect to any Agency (FNMA, FHLMC) Loan sold by Seller, if <u>any of the first four (4) payments due become 60 or more days delinquent from the due date</u>.

      <u>*Payment in Lieu option within Repurchase Demand</u>
      In lieu of Seller's Repurchase Obligation resulting from any EPD, TMS, in its *sole and absolute discretion*, may allow Seller to indemnify TMS for any future potential losses provided Seller: (i) pays TMS a <u>$3,500.00</u> administrative fee for TMS expenses; and (ii) returns any servicing release premium (amount paid over par / applicable carrying costs) paid to Seller in reference to such Loan. Upon election of the option and satisfaction of the payment in lieu, Seller acknowledges the provision of indemnification by TMS for the benefit of Seller on said Loan, exclusive of fraud or incurable defect discovered thereafter. To the extent FNMA, FHLMC, and or GNMA provide relief to TMS for any liabilities or repurchase obligations resulting from an EPD, TMS shall be under no obligation to provide comparable relief to Seller. This payment in lieu option shall not be applicable in certain situations, which include but are not limited to, when instances of fraud are uncovered regarding the Loan by TMS, the Loan is deemed uninsurable, and/or when Trailing Documents are not provided or are absent from the Loan file. As such, TMS retains full discretion to extend or not to extend this option to Seller, in lieu of full repurchase.

   5)   Seller fails to observe or perform, or breaches any of the representations, warranties, or agreements contained in this Agreement or the Manual with respect to a particular Loan.

TMS Loan Purchase Agreement-v-9-2019                                     Initial _____

6)    With regard to FHA Loans, Seller fails to submit a FHA MIC within sixty (60) days from the Purchase Date.

7)    With regard to FHA Loans, in the reasonable judgment of TMS, the related MIC cannot be obtained, or any required mortgage insurance or guaranty, lapses, is rescinded, or claim thereon is denied or not paid.

8)    If there exists a basis to demand indemnification and/or repurchase, under this Agreement, that materially and adversely affects the value and marketability of the related servicing rights, or the interests of TMS, regardless of whether Losses actually have occurred, or if an investor requests that TMS repurchase a Loan or remove a Loan from a pool (as permitted pursuant to any applicable agreement(s), and other than a request based on a failure to service the Loan in accordance with all applicable requirements after the Purchase Date) subject to any limitations of the investor, TMS may require Seller to repurchase from TMS the applicable servicing rights, and in the case of an investor request (as permitted pursuant to the applicable Servicing Agreement(s)), repurchase the related Loan from TMS, or if permitted under applicable requirements repurchase the Loan directly from the Investor. Seller shall repurchase the servicing rights at the Repurchase Price, and shall repurchase the Loan, if applicable, at a price equal to the amount necessary to repurchase such Loan from the Investor or remove it from the applicable pool, including all amounts necessary to satisfy the Investor's indemnification, "make whole" or other request for payment, as may be the case, and including interest thereon calculated at the mortgage interest rate through the last day of the month of repurchase.

B.  REPURCHASE PROCEDURE:

1)    TMS will provide written notice to the Seller of the circumstances giving rise to Seller's Repurchase Obligation.

2)    Seller shall have no longer than three (3) business days to acknowledge receipt of such notice from TMS. If Seller acknowledges receipt of the repurchase notice within the timeframe provided herein, Repurchase must occur within thirty (30) days of receipt of notice from TMS. Should Seller fail to acknowledge the receipt of the repurchase notice, the timeframe for which repurchase must occur will be thirty (30) days from the date of the repurchase notice, without exception. Failure by Seller to acknowledge will not impair TMS's repurchase rights or Seller's obligations to do so, within the prescribed 30-day period above referenced.

3)    Upon acknowledging receipt of the repurchase notice, Seller may submit a written request for an extension of time to repurchase, which TMS may grant in its sole and absolute discretion. If an extension of time is granted, Seller will be obligated to reimburse TMS for all costs incurred as a result of granting such extension.

4)    In the event the Repurchase is not completed within the timeframe outlined above, subject to any applicable extension granted by TMS, TMS may set-off the total Repurchase Price from subsequent amounts due to the Seller. Alternatively, TMS may, in its sole discretion, obtain a bid for a market price on the Loan and require Seller to indemnify and reimburse TMS for the marketing loss incurred or implied by the market price, plus the service-release premium, any premium pricing paid by TMS to Seller, plus any other applicable components of the Repurchase Price described in Section 9 below.

5)    The Seller will affect a Repurchase by wire transfer to TMS of immediately available funds in the total amount of the Repurchase Price. TMS's acceptance of any amount less than the total Repurchase Price shall not constitute a waiver of the total amount due, nor any other remedy available under this Agreement.

TMS Loan Purchase Agreement-v-9-2019                                      Initial

6) Upon receipt by TMS of the Repurchase Price, TMS shall release to the Seller the related Loan file(s) and shall execute and deliver to the Seller such instruments of transfer or assignment, in each case without recourse and in recordable form, as shall be necessary to vest in the Seller, or its designee, title to such repurchased Loans.

7) Seller will assume the cost of recordation of assignments and other costs of transfer of any repurchased Loan(s). The "Repurchase Date" is the date when TMS receives the Repurchase Price funds by wire transfer. Should TMS collect any interest or other servicing fees from any mortgagor subsequent to the Repurchase Date, Seller shall be reimbursed for all such amounts.

8) Upon completion of the repurchase of a Loan intended for insuring by FHA, TMS will transfer the case number to the Seller in FHA Connection, completing the assignment of the Loan to the Seller as the new holding and servicing mortgagee, whereupon the Seller will resume the rights and responsibilities of mortgagee.  In the case of a Loan that was rejected for insuring, the Seller will assume the responsibilities set forth in the FHA SF Handbook 4000.1, including obtaining from FHA and applying refunded MIP.

9) In the event that any Agency Loan is subject to Repurchase, Seller shall have no right or obligation to communicate with any such Agency on behalf of TMS.  TMS shall be solely responsible for all communications with any Agency in connection with any Loans subject to repurchase until the Repurchase Date.

C. Seller's Repurchase Obligation with respect to a Loan shall not be affected in any way by: (i) the initiation or prosecution of a foreclosure proceeding, or the occurrence of a foreclosure sale, with respect to the Loan (or the acceptance of a deed-in-lieu of foreclosure by TMS); (ii) the transfer of title to the mortgaged property to TMS or any third party; (iii) the modification of the Loan by TMS, any subsequent investor, or the servicer; (iv) the waiver of all or a portion of the unpaid principal balance of the Loan by TMS, any subsequent investor, or the servicer; or (v) any other action or omission by TMS, any subsequent investor, or the servicer, including, without limitation, normal and customary servicing of the Loan, including any loss mitigation efforts that affect or impair any rights or remedies against the mortgagor under the terms of the Note or applicable law.  It is expressly understood that the term Repurchase Obligation encompasses within its meaning the repurchase of the property from TMS, if TMS has acquired the property, or, if a third party has acquired the property, reimbursing TMS in the amount specified in Section 9.C of this Agreement.

D. If TMS has made a demand on Seller to repurchase a Loan pursuant to Section 8 of this Agreement, TMS shall have the right to withhold any moneys due Seller in connection with the Loan(s) subject to the Repurchase Obligation or any other Loans until the parties have agreed that the Repurchase Obligation is satisfied.

E. TMS's right to demand repurchase of any Loan by Seller under this Agreement shall be in addition to, and not in lieu of, any other rights and remedies available to TMS under this Agreement, including Seller's indemnification obligations under Section 10 of this Agreement.

F. TMS is not required to demand repurchase within any particular time and may elect not to require immediate repurchase.  However, any delay in making a repurchase demand does not constitute a waiver by TMS of any of its rights or remedies.

G. In the event that TMS notifies Seller of a Repurchase Obligation due to a defect that cannot be cured, TMS may, in its sole and absolute discretion, allow Seller to refinance the Loan, and resell it to TMS for a service release premium that shall be the greater of premium over par or the service release premium paid on the Loan, subject to the terms and conditions for refinancing set forth in Section 11 of this Agreement.

TMS Loan Purchase Agreement-v-9-2019                                          Initial _____

9) **REPURCHASE PRICE**

A.  Seller shall promptly reimburse TMS for the repurchase price for Loans, subject to a Repurchase Obligation pursuant to Section 8 hereof, and as referenced in Section 10 below, which shall be as follows:

   1)  The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by TMS, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by TMS; plus

   2)  All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the Loan through and including the last day of the month in which the repurchase is made; plus

   3)  All costs and expenses, including but not limited to reasonable attorneys' fees, incurred by TMS in enforcing Seller's Repurchase Obligation and/or resulting from any breaches of Seller's representations and warranties under this Agreement; plus

   4)  The higher of the original servicing-release premium paid by TMS with respect to such Loan (represented as the total servicing-release premium paid as published on the Loan Purchase Advice, or calculated internally by TMS), or premium paid to seller in Purchase Price; plus

   5)  Any unreimbursed advances of taxes or insurance made by TMS with regard to such Loan as of the date of repurchase; plus

   6)  Any unreimbursed costs, expenses or advances incurred by TMS, in connection with such Loan and its servicing; plus

   7)  Any additional amount(s) or pass-through costs, that TMS or any affiliate is required to pay, to repurchase the Loan from any subsequent assignee; less

   8)  Any proceeds of mortgage insurance with respect to the Loan collected by TMS.

B.  If the mortgaged property securing the Loan has been foreclosed upon and purchased by TMS at a foreclosure sale, then the repurchase price pursuant to Section 8 hereof, notwithstanding the amount of TMS's credit bid, shall be:

   1)  The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by TMS, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by TMS; plus

   2)  All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the Loan through and including the last day of the month in which the foreclosure sale occurs; plus

   3)  All costs and expenses, including but not limited to reasonable attorneys' fees, incurred by TMS in connection with the foreclosure and in enforcing Seller's Repurchase Obligation hereunder; plus

   4)  The original servicing release premium paid by TMS with regard to such Loan; plus

   5)  Any unreimbursed advances of taxes or insurance made by TMS with regard to such Loan as of the date of repurchase; plus

Page 12 of 25

TMS Loan Purchase Agreement-v-9-2019                                                    Initial _____

    6)    Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the end of the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

    7)    Any proceeds of mortgage insurance collected by TMS with respect to the Loan.

C.    If the real property security for the Loan has been sold at foreclosure and purchased by a third party, the amount Seller shall pay TMS to fulfill its Repurchase Obligation pursuant to Section 8 of this Agreement shall be as follows:

    1)    The current unpaid principal balance of such Loan if it has been pooled or resold. If such loan has not been pooled or resold by TMS, the repurchase price shall be at the original price, less principal reduction since the original purchase of the Loan by TMS; plus

    2)    All interest accrued but unpaid on the principal balance of the Loan from the paid-to-date of the Loan through and including the last day of the month in which the foreclosure sale occurs; plus

    3)    All costs and expenses, including but not limited to reasonable fees and expenses of counsel (both in-house and outside counsel), incurred by TMS in enforcing Seller's Repurchase Obligations hereunder; plus

    4)    The higher of original servicing-released premium paid by TMS with regard to such Loan, or premium paid to Seller in Purchase Price; plus

    5)    Any unreimbursed advances of taxes or insurance made by TMS with regard to such Loan as of the date of repurchase; plus

    6)    Interest on the amounts set forth in paragraphs (1) through (5) above at the Loan rate from the end of the month in which the foreclosure sale occurred until and including the date of repurchase by Seller; less

    7)    The net proceeds of the foreclosure sale (sale price minus costs and expenses, including but not limited to reasonable attorneys' fees, incurred by TMS in connection with the foreclosure sale); less

    8)    Any proceeds of mortgage insurance collected by TMS in connection with the Loan.

## 10) INDEMNIFICATION

A.    Seller shall hold TMS harmless and shall indemnify TMS from and against any and all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorneys' fees ("Loss"), arising out of or in connection with any negligence, fraud or a material omission on the part of Seller in receiving, processing or funding any Loan committed to TMS for sale under Section 2 above, during the origination period and Commitment Period up to and including the Purchase Date. Seller's obligation to TMS in this regard shall remain effective after TMS's purchase of the Loan if the actions giving rise to the Loss arose prior to purchase but was undetected at time of purchase. This paragraph shall not modify Seller's obligations contained elsewhere in this Agreement.

B.    Seller shall also hold TMS harmless and shall indemnify TMS from and against any and all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees (both in-house and outside counsel), arising out of or in connection with any breach of any one or more of the obligations set forth in paragraphs (1) through (8) of Section 8.A of this Agreement.

---

Page 13 of 25

C.  Seller shall hold TMS harmless and shall indemnify TMS from and against any and all losses arising out of or in any way related to Seller's breach of any representation or warranty set forth in Section 7.A and 7.B of this Agreement.

D.  The obligations of Seller arising under this Section 10 shall survive any sale or assignment of any Loan by TMS to any third party or any suspension of Seller hereunder or any termination of this Agreement.

## 11)  EARLY PAYOFF / NO SOLICITATION

Loans sold to Purchaser cannot be solicited by Seller for refinance for a period of <u>one hundred eighty days</u> ("180 days") from the date the Loan is purchased by Purchaser.  Borrowers requesting a refinance from Seller within the aforementioned 180-day period must be referred to Purchaser, or, provided the refinanced loan meets all Purchaser requirements as specified in the Manual, the Loan may be processed by the Seller and sold to Purchaser for a service release premium, if any, to be negotiated by the parties, and subject to the discretion of the Purchaser.

In the event a loan is refinanced within 180 days of the purchase date, or any early payoff of the loan occurs, Seller may be responsible for repayment of any and all Service Release Premium paid on the Loan as follows:

In the event that the borrower refinances the Loan or early payoff occurs, within 180 days following the Purchase Date of the loan purchase, by Purchaser and/or its assigns, regardless of whether refinanced with or without Seller, this shall be considered an early payoff (EPO) and Seller will be responsible for full reimbursement to Purchaser and/or its assigns.  Upon notification from Purchaser, Seller shall then promptly reimburse Purchaser for the total Servicing Released Premium paid as published on the Loan Purchase Advice, or calculated internally by Purchaser.

For FHA loans, a payment for which Purchaser deducted funds at the time it purchased the Loan from Seller shall not be considered one of the first six payments due Purchaser.

There are no time constraints or required form for notification and lack of immediate or any notification will not impair Purchaser's rights to EPO reimbursement, whenever such EPO occurs.

## 12)  FINANCIAL STATEMENTS / ANNUAL CERTIFICATIONS

On the date of this Agreement, the Seller shall provide to TMS fiscal year-end audited financial statements.  Each year afterwards, Seller shall complete an annual recertification in form and substance acceptable to TMS, as set forth in the Manual, certifying Seller's compliance with the terms of this Agreement, which shall include the prior fiscal year audited financial statements.  TMS may also require the Seller to provide interim financial statements. Seller shall immediately advise TMS of any material change in the Seller's circumstances, financial or otherwise, including but not limited to, a change in Seller's ownership.

Seller shall notify TMS in writing within thirty (30) days following the initiation or threat of any disciplinary action, enforcement action, lawsuit, administrative proceeding, or similar action or proceeding by FHA, VA, Freddie Mac, Fannie Mae, HUD, or GNMA, or of any pending investigation by FHA, VA, Freddie Mac, Fannie Mae, HUD, or GNMA, against Seller or any of Seller's affiliated companies, or against any of the directors, officers, employees, or agents of either Seller or any of Seller's affiliated companies, which reasonably may have an adverse effect on either or both of the Parties to this Agreement.

Seller shall notify TMS within thirty (30) days of any of the following events:

1.  Any material changes in its ownership, financial condition, or principal management.

TMS Loan Purchase Agreement-v-9-2019

Initial _____

2. Any administrative sanctions imposed upon Seller, any investigations, audits, examinations, or reviews by any Agency or regulator of Seller not in the ordinary course of business or any audit.

3. Entry of any court judgment or regulatory order in which Seller is or may be required to pay a claim or claims which, in Seller's opinion, could have a material adverse effect on Seller's financial condition, on Seller's ability to perform its obligations under this Agreement, or on Seller's ability to continue its operations in a manner similar to its current operations.

4. Seller admits to committing, or is found to have committed, a material violation of any law, regulation, or order relating to its mortgage operation that could have a material adverse effect on Seller's performance under this Agreement, or on Seller's ability to continue its operations in a manner similar to its current operations.

5. As applicable, if any debt, deposit, financial strength or any other financial, operational or performance rating for Seller is downgraded one or more levels below the level in effect as of the date of the agreement by one or more rating agencies.

6. Any disqualification or suspension of Seller by an Agency, including any notification or knowledge, from any source, of any disqualification or suspension, or any warning of any such disqualification or suspension or impending or threatened disqualification or suspension.

7. The occurrences of any actions, inactions or events upon which an Agency may, in accordance with Agency guides, disqualify or suspend Seller as a seller/servicer.

8. In the event Seller's regulator monitors or reviews Seller's capitalization, any adverse change in Seller's capitalization to a level which is below, or is reasonably likely to be considered by Seller's regulator to be below, a status of "well capitalized," as defined by Seller's regulator, or such similar status as required and defined by Seller's regulator.

9. Any merger, consolidation or reorganization of Seller, or any changes in Seller's ownership by direct or indirect means. Indirect means includes any change in ownership of Seller's direct or indirect corporate parent.

10. Any change in Seller's name, principal business address and/or its main telephone phone number;

11. Any material change in Seller's financial or operational conditions which is reasonably likely to adversely impact its ability to perform its obligations under this Agreement.

## 13) PROHIBITION AGAINST USE OF NAME OR AFFILIATION

Nothing in this Agreement shall be construed to appoint or permit Seller as a joint venturer, partner, representative, employee or agent of TMS, and Seller shall not hold itself out as such. Nor shall Seller use TMS's name in any advertising, written or broadcast material without TMS's express prior written consent. This prohibition shall not prevent Seller from using any advertising media provided to it by TMS for use by Seller, which contains any trademark, trade name or logo of TMS, provided however, no such trademark, trade name, or logo shall be altered in any way and all notices attached thereto must remain in place. Nothing in this Section transfers any rights in and to any trademarks, trade names, or logos of TMS, including trademark or copyright rights, whether or not registered, to Seller, and all good will attached to any such trademarks, trade names, and logos shall be for the benefit of TMS. TMS reserves the right to withdraw its permission to use any such trademarks, trade names, or logos at any time and for any reason.

## 14) TERMINATION- SUSPENSION

A. This Agreement may be terminated as to future commitments for sale of Loans by either Party at any time, but such termination shall not in any respect change or modify the obligation of Seller with respect to Loans already subject to a Commitment. The effective time of termination shall be the earlier of the time written notice is actually received by the other Party or five days after written notice is posted in the United States Postal Service by the canceling Party. Termination of this Agreement shall not in any way affect either Seller's or TMS's obligations, representations, warranties or indemnifications with respect to Loans already purchased by TMS; provided, however, that TMS may immediately terminate its obligations hereunder without notice and immediately return to Seller any Loans subject to a Commitment, and Seller shall accept

TMS Loan Purchase Agreement-v-9-2019

Initial _____

such loans if TMS reasonably determines that there has been any deception, fraud, concealment or material misrepresentation by Seller in performing any of its duties, obligations, responsibilities or actions undertaken in connection with this Agreement or in connection with any Loan sold to TMS pursuant to this Agreement, or if in TMS's reasonable belief  TMS determines that the Seller in no longer able to fulfill its obligations under this Agreement, including its repurchase and indemnification obligations under this Agreement.

B.  In addition to the termination rights set forth in Paragraph A above, in the event that TMS believes in good faith that Seller has breached an obligation (including a Repurchase Obligation under Section 8), representation, warranty or covenant under the Agreement, or will be unable to fulfill any of its obligations under the Agreement or the Manual (including a Repurchase Obligation under Section 8), TMS may, in its sole and absolute discretion, suspend this Agreement as to future Commitments for the sale of Loans by Seller.  Such suspension shall be effective immediately upon Seller's receiving written notice of same from TMS and shall last until TMS, in its sole discretion, determines to reactive or terminate this Agreement.

## 15)  OFFSET

TMS may offset against the price for any loan delivered for purchase by the Seller, or against any other amounts owed by TMS to Seller pursuant to this Agreement or any other contract or instrument between the Seller and TMS, any outstanding amounts owed to TMS by the Seller or any affiliate of the Seller, including, but not limited to, the following: (i) fees, penalties, and expenses arising out of the Seller's failure to timely deliver any final documentation; (ii) pair-off fees, penalties or changes relating to delivered or undelivered Loans; (iii) costs and expenses arising out of the Seller's breach of any of its representations, warranties or covenants under this Agreement; and (iv) costs and expenses incurred by TMS as a result of action taken by TMS based on TMS's reasonable belief that the Seller in no longer able to fulfill its obligations under this Agreement, including its repurchase and indemnification obligations under this Agreement.

## 16)  ENTIRE AGREEMENT

The entire agreement between the parties is contained in this Agreement and in the Manual and cannot be modified in any respect except by an amendment in writing signed by both parties, except for TMS's right to amend the Manual at any time and from time to time, as set forth in Section 1 of this Agreement. The invalidity of any portion of this Agreement shall in no way affect the balance thereof.

Any part, provision, representation or warranty of this Agreement that is prohibited or that is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement that is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law that prohibits or renders void or unenforceable any provision hereof.  If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any Party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure, the economic effect of which is as close as possible to the economic effect of this Agreement, without regard to such invalidity.

## 17)  ASSIGNMENT

Seller may not assign its rights or delegate its duties or obligations under this Agreement without the prior written consent of TMS.  This Agreement shall be binding on and inure to the benefit of the permitted successors and assigns of the parties hereto.

---

TMS Loan Purchase Agreement-v-9-2019

Initial

## 18) ARBITRATION

In the sole discretion of TMS, any dispute or claims under this Agreement may be resolved by final and binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") using expedited procedures. The arbitration will be conducted by one arbitrator, with expertise in secured lending, agreed upon by the Parties (and such agreement shall not be unreasonably withheld). In the absence of agreement by the Parties as to the arbitrator, the AAA shall select an arbitrator who has expertise in secured lending matters. Arbitration will take place in Suffolk County, New York. The parties will share all expenses for the AAA services and the arbitrators. Arbitration will not affect any termination rights under this Agreement.

## 19) ATTORNEY'S FEES AND EXPENSES – CHOICE OF LAW AND FORUM – WAIVER OF JURY TRIAL

If any Party hereto shall bring an arbitration proceeding or other legal action (lawsuit) against the other as a result of any alleged breach or failure by the other Party to fulfill or perform any covenants or obligations under this Agreement, then the prevailing Party obtaining a final award in such action shall be entitled to receive from the non-prevailing Party reasonable attorneys' fees incurred by reason of such action and all costs of arbitration or litigation and preparation thereof. This Agreement shall be governed by, construed and enforced in accordance with applicable federal law and the laws of the State of New York. In addition, any suit or proceeding required to enforce the terms of this Agreement, subject to the arbitration agreement in Section 18 above, if filed, shall be brought, in the Federal or State courts located in Suffolk County, New York, which courts shall have sole and exclusive in personam, subject matter and other jurisdiction in connection with such suit or proceedings, and venue shall be appropriate for all purposes in such courts. It being understood and agreed that Seller irrevocably waives any right to challenge venue based upon inconvenient forum (forum non-conveniens).

**EACH PARTY TO THIS AGREEMENT WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

## 20) CONFIDENTIALITY

<u>In General</u>: The Parties will keep confidential, and will cause its employees, contractors, affiliates, and agents to keep confidential, any and all information obtained from the other Party which is designated as confidential and will not use such information for any purpose other than those intended by this Agreement. However, the Parties will not be subject to this obligation for any information provided by the other Party which either (i) was in such Party's possession at the time of the disclosure and was not subject to any confidentiality obligations; (ii) was in the public domain at the time of disclosure, or subsequently enters the public domain through no act or failure to act on the part of such Party; (iii) is lawfully obtained by such Party from a third party; (iv) the Parties agree in writing that the information may be provided to a third party; or (v) is required to be disclosed by applicable law, regulation, rule or court order.

## 21) PRIVACY

A. All customer information in the possession of the either Party ("Customer Information") is and shall remain confidential and proprietary information of each Party except: (i) as otherwise set forth in this Agreement; or (ii) information independently obtained by the Parties and not derived in any manner from information obtained under or in connection with this Agreement.

Page 17 of 25

TMS Loan Purchase Agreement-v-9-2019

Initial _____

B. The Parties agree to comply with every and all applicable Federal, State, and local statutes, regulations and rules applicable to the protection and privacy of consumer information, including but not limited to the privacy provisions of the Gramm-Leach-Bliley Act, 15 U.S.C § 6801 et seq. ("The Privacy Requirements") and implementation of appropriate measures designed to safeguard Customer Information (an "Information Security Program").

C. The Parties shall not disclose any Customer Information to any person or entity, other than the employees, agents, contractors, and affiliates of the Parties who need to know such information in order to perform its duties under this Agreement.

D. The Parties shall maintain at all times an Information Security Program.

E. The Parties shall assess, manage, and control risks relating to the security and confidentiality of Customer Information, and shall implement the standards relating to such risks in the manner set forth in the Interagency Guidelines Establishing Information Security Standards, Section 216 of the Fair and Accurate Credit Transaction Act ("FACTA") (including its implementating regulations) as well as any amendments thereto or other applicable laws or regulations regarding safeguarding information enacted or released by any regulatory agency having jurisdiction over Seller.

F. Without limiting the scope above, the Parties shall use at least the same physical, technical, and other security measures to protect all Customer Information in such Parties' possession or control, as the Parties use for their own confidential and proprietary information.

G. If TMS provides an account number to the Seller to enable the Parties to carry out the purpose of this Agreement, the Seller shall (i) use such account number only for such specific purposes and for no other purpose; and (ii) destroy all records relating to such account number upon TMS's request.

H. In no event shall Seller use any account number to (i) market any product or service of the Seller of any other person or entity (other than TMS); or (ii) initiate charges to any customer's Loan account.

I. From time to time upon TMS's request, the Seller shall allow TMS during normal business hours to inspect the Seller's books and records relating to Seller's compliance with the Privacy Requirements and Information Security Program.

J. The Parties shall comply with all Privacy Requirements and shall immediately notify the other Party if there is a breach of its security related to customers of the other Party so that such customers may be notified in accordance with any applicable Privacy Requirements.

## 22) NO REMEDY EXCLUSIVE - WAIVER

No remedy under this Agreement is exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity including specific performance and injunctive relief. Any forbearance by a Party to this Agreement in exercising any right or remedy under this Agreement or otherwise afforded by applicable law shall not be a waiver or preclude the exercise of that or any other right or remedy.

## 23) NOTICE

Page 18 of 25

Unless otherwise provided in this Agreement, all notices, requests, demands and other communications which are required or permitted to be given under this Agreement shall be in writing.  Notices sent in writing shall be deemed delivered when delivered, postage prepaid, by Certified Mail, Registered Mail, or nationally recognized overnight delivery to the address set forth below, or such other address that the recipient may later provide in writing to the other Party.  E-Mail communications shall be considered acceptable notice if TMS so deems.

| | | | |
|---|---|---|---|
| **To (TMS):** | The Money Source Inc. | **To (Seller):** | *Chaos Home Loans LLC* |
| | 135 Maxess Road | | *900 S 4th St* |
| | Melville, NY 11747 | | *Las Vegas NV 89101* |
| | Attention: Frank Giglio, Esq., | Attention: | *Collin Psioda* |
| | General Counsel | | |

## 24) COUNTERPARTS

This Agreement and the other Purchase Documents may be executed in any number of counterparts, all of which together shall constitute one agreement.  This Agreement may be executed and delivered by electronic signatures, which shall, for all purposes hereunder, be deemed effective as original signatures.  Photocopies, facsimiles, and electronic images of signatures in PDF form shall be deemed to be originals.

**IN WITNESS WHEREOF**, each party has caused this Agreement to be executed by its duly authorized officer, along with the Agreement to commence all as of the Effective Date above written.

**THE MONEY SOURCE INC.**                    **SELLER**

_____          _____
Authorized Signatory - TMS                Authorized Signatory - Seller

Print Name: _____             Print Name: *Collin Psioda*

Title: _____              Title: *CEO*

Date Signed: _____, 2020         Date Signed: *June 17*, 2020

---

TMS Loan Purchase Agreement-v-9-2019                            Initial *CP*

**EXHIBIT "A"**

**Payment of Purchase Proceeds**

## I. Disbursement of Funds

By Wire Transfer, Check or Draft. Seller expressly acknowledges and agrees that TMS will pay, by wire transfer, check or draft, the Purchase Price for Loan(s) purchased hereunder to a warehouse lender ONLY, which must be an Approved Payee (as hereafter defined). The payment of the Purchase Price by TMS to a warehouse lender that is not an Approved Payee shall not make such warehouse lender an Approved Payee, nor shall it constitute a waiver of any of TMS's rights hereunder. All payments by TMS to an Approved Payee, on behalf of Seller, by wire transfer shall be subject to all applicable federal, state and local laws and regulations and the then-current policy of the Board of Governors of the Federal Reserve System on Reduction of Payments System Risk. Seller expressly acknowledges and agrees that TMS shall not be responsible or liable in any manner for any delay caused by such applicable laws, regulations and/or the policy.

## II. Approved Payees.

(a)     Warehouse Lender. In order for a warehouse lender to be designated an Approved Payee, Seller must submit to TMS a written request, including the name and address of the applicable warehouse lender, demonstrating a need for such designation. Notwithstanding the foregoing, TMS reserves the right to refuse to designate any warehouse lender as an Approved Payee.

(b)     Approval Process. TMS shall review the applicable documents and notify Seller within two (2) business days as to whether a warehouse lender has been designated by TMS, in its sole discretion, to be an Approved Payee. TMS may withdraw its approval of any warehouse lender as an Approved Payee at any time, in its sole discretion, with or without notice.

Page 20 of 25

TMS Loan Purchase Agreement-v-9-2019                                                    Initial _____

EXHIBIT "B"

## Form of Secretary's Certificate

I, _Collin Psioda_____, am the duly elected Secretary of

_Chaos Home Loans LLC_____ ("Company"), and I hereby certify that:

1.      Each of the persons listed below has been duly elected to, and now holds, the title of the Company set forth opposite his or her name and is currently serving, in such capacity.  The signature of each such person set forth opposite his or her title is his or her true and genuine signature:

| Name | Title | Signature |
|------|-------|-----------|
| Collin Psioda | CEO | _signature_ |
|  |  |  |
|  |  |  |
|  |  |  |

2.      Attached hereto as Exhibit C is a true and complete copy of the Company's board resolutions, which were duly and validly adopted either at a special or regular meeting or by unanimous consent.  Such board resolutions authorize the execution of the Correspondent Loan Purchase Agreement ("Agreement"), by and between The Money Source Inc. and Company.  Such board resolutions have not been amended, modified or rescinded in any respect and remain in full force and effect, without modification or amendment, as of the date hereof.

Dated: _06/17/2020_____          By: _signature_____
                                                                Secretary

Page 21 of 25

TMS Loan Purchase Agreement-v-9-2019                                                            Initial _CP_

## EXHIBIT "C"

### Form of Board Resolutions

### ACTION BY UNANIMOUS WRITTEN CONSENT

### OF THE BOARD OF DIRECTORS OF

*Chaos Home Loans LLC* _____ ("Company")

The undersigned, being all of the Directors currently in office of Company, hereby consent to and adopt the following resolutions as if at a meeting of the Board of Directors held on the date first above written:

WHEREAS, the Company desires to sell mortgage loans to The Money Source Inc., ("TMS") under a Correspondent Loan Purchase Agreement by and between TMS and Company (the "Agreement").

NOW, THEREFORE, IT IS RESOLVED BY THE BOARD OF DIRECTORS OF THE COMPANY THAT:

1.    Company is hereby authorized and directed to enter into and execute each of the following documents:

    (a)    the Correspondent Loan Purchase Agreement between Company and TMS (the "Agreement");

    (b)    any and all other agreements and documents in connection with the Agreement,

2.    Any one of the following officers are separately and independently authorized and directed to execute and deliver the Agreement, and to do any and all things which he or she may deem necessary or desirable in connection with the Agreement, including approving, executing and delivering any amendments or modifications thereto:

| Name/Title | Signature |
|---|---|
| Collin Psioda / CEO | *(signature)* |
| | |
| | |
| | |

3.    Any one of the following officers and/or employees is separately and independently authorized to take the following actions in connection with the Correspondent Loan Purchase Program: (a) request a purchase of a mortgage Loan; (b) sign receipts acknowledging delivery of funds and documents from TMS; (c) request and effect transfers of funds; and (d) ship and release documents to TMS:

[Continued on next page]

TMS Loan Purchase Agreement-v-9-2019

Initial _____

| Name/Title | Signature | Restrictions (if any) |
|---|---|---|
| Collin Psioda, CEO | _(signature)_ | None |
| | | |
| | | |
| | | |
| | | |

RESOLVED, FURTHER, that all actions heretofore taken by any authorized officer of the Company in connection with the transactions contemplated by the foregoing resolutions be, and each such action hereby is, approved, ratified and affirmed in all respects.

This written consent may be executed by the several members of this Board of Directors in counterparts. All the counterparts, or the signed signature pages thereof attached to one counterpart, shall constitute the appropriate approval of this written consent and shall be filed with the Minutes of the proceedings of this Board of Directors.

IN WITNESS WHEREOF, the undersigned, being all of the Directors of the Company, have executed this Unanimous Written Consent, effective as of the date first written above.

| Name | Signature |
|---|---|
| Collin Psioda | _(signature)_ |
| | |
| | |
| | |
| | |
| | |

TMS Loan Purchase Agreement-v-9-2019

Initial _____

## EXHIBIT "D"

## POWER OF ATTORNEY

**KNOW ALL MEN BY THESE PRESENTS:**

WHEREAS, The Money Source Inc., ("TMS") and _Chaos Home Loans LLC_ ("Seller") have entered into the Correspondent Loan Purchase Agreement, dated as of _June 17_, 20_20_ (the "Agreement"), pursuant to which TMS has agreed to purchase loans from Seller under their Correspondent Loan Purchase Program subject to the terms and conditions set forth therein; and

WHEREAS, Seller has agreed to give to TMS a power of attorney on the terms and conditions contained herein in order for TMS to take any action that TMS may deem necessary or advisable to accomplish the purposes of the Agreement;

NOW, THEREFORE, Seller hereby irrevocably constitutes and appoints TMS as its true and lawful Attorney-in-Fact, with full power and authority hereby conferred in its name, place and stead and for its use and benefit, to do and perform the following in connection with the loans to be sold by Seller to TMS under the Agreement or as otherwise provided below:

(1)     to receive, endorse and collect all checks made payable to the order of Seller representing any payment on account of the Loans;

(2)     to assign or endorse any mortgage, deed of trust, promissory note or other instrument relating to the Loans;

(3)     to correct any assignment, mortgage, deed of trust or promissory note or other instrument relating to the Loans, including, without limitation, un-endorsing and re-endorsing a promissory note to another investor;

(4)     to complete lost note affidavits relating to the Loans;

(5)     to issue title requests and instructions relating to the Loans;

(6)     to give notice to any individual or entity of its ownership interest in the Loans; and

(7)     to service and administer the Loans, including, without limitation, the receipt and collection of all sums payable in respect of the Loans.

Seller hereby ratifies and confirms all that said Attorney-in-Fact shall lawfully do or cause to be done by authority hereof.

Third parties without actual notice may rely upon the power granted under this Power of Attorney upon the exercise of such power by the Attorney-in-Fact.

[Signatures on following page]

Company

TMS Loan Purchase Agreement-v-9-2019

Initial _____

By: _____

Name: _Collin Psioda_____

Title: _CEO_____

WITNESS my hand this _____17_____ day of __JUNE__ , 20 _20_ .

STATE OF _Nevada_____

County of __Clark_____

This instrument was acknowledged, subscribed and sworn to before me this ___17___ day of

_JUNE 2020_, by _____IZANA ROBINSON_____ (Notary Public)

_____

Notary Public

My Commission Expires: _Nov 9·2022_

<table>
<tr><td>IZANA ROBINSON<br>NOTARY PUBLIC<br>STATE OF NEVADA<br>Appt. No. 18-4304-1<br>My Appt. Expires November 09, 2022</td></tr>
</table>

Notary Seal:

TMS Loan Purchase Agreement-v-9-2019

Initial _____

# EXHIBIT K

Case 3:25-cv-02295-SI    Document 101    Filed 04/22/25    Page 148 of 194



City of Portland, Oregon

## 4611 N MINNESOTA AVE

**PORTLAND, OR 97217**

## 2021-117514-000-00-CO

**PERMIT**

| | |
|---|---|
| **IVR Number** | 4759649 |
| **Permit/Case Type** | Commercial Building Permit<br>Apartments/Condos (3 or more units)<br>New Construction |
| **Work/Case Description** | PDOX PS - NEW 3-STORY, 23-UNIT APARTMENT BUILDING WITH ASSOCIATED SITE WORK. ***SEPARATE MECHANCIAL PERMIT REQUIRED TO MEET VENTILATOIN REQUIREMENTS OF ossc1202.5*** |
| **Set Up Date** | 12/28/2021 |
| **Under Review Date** | 2/04/2022 |
| **Issue Date** | |
| **Final Date** | |
| **Latest Activity** | 2/06/2023 |
| **Status** | Under Review |

**Activity**

| Activity | Type | Must Check | Activity Status | Last Activity | Current Review Goal Date | Completed |
|---|---|---|---|---|---|---|
| 2nd Screen App Set-Up | Application | Y | Approved | 01/13/2022 | | 01/13/2022 |
| P & Z - Property Check | Application | Y | Approved | 01/14/2022 | | 01/14/2022 |
| Life Safety - Application Check | Application | Y | Approved | 01/18/2022 | | 01/18/2022 |
| Intake - DSC | Issuance/Intake | Y | Intake | 01/18/2022 | | 01/18/2022 |
| Temporary SDC Exemption participation | Process Management | Y | Checksheet | 08/21/2025 | | |
| Demo Release Review | Process Management | Y | Open | 01/13/2022 | 03/07/2022 | |
| Assign Plan and File Location | Process Management | N | Open | 02/04/2022 | 03/07/2022 | |
| Assign Reviews - CO | Process Management | N | Open | 12/28/2021 | 03/07/2022 | |
| Corrections Received - CO | Process Management | N | Completed | 01/27/2023 | | 01/27/2023 |
| Corrections Received - CO | Process Management | N | Completed | 02/01/2023 | | 02/01/2023 |
| Process Manager | Process Management | N | Open | 12/28/2021 | 03/07/2022 | |
| Point of Contact | Process Management | N | Open | 12/28/2021 | | |
| Plans checked out to Applicant | Process Management | N | Open | 02/04/2022 | | |
| Assign Address | Addressing | Y | Approved | 03/15/2022 | | 03/15/2022 |
| Planning and Zoning Review | Planning and Zoning | Y | Checksheet | 02/02/2023 | | |
| Erosion Control Plan Review | Erosion Control | Y | Approved | 02/02/2023 | | 02/02/2023 |
| Site Development Review | Site Development | Y | Checksheet | 02/02/2023 | | |
| Spec. Insp. - Site Dev. | Site Development | N | Required | 03/03/2022 | | 03/03/2022 |
| Life Safety Review | Life Safety | Y | Checksheet | 02/03/2023 | | |
| Energy Code Review | Life Safety | Y | Checksheet | 02/03/2023 | | |
| Structural Review | Structural | Y | Checksheet | 02/03/2023 | | |
| Spec. Insp. - Structural | Structural | N | Required | 03/08/2022 | | 03/08/2022 |
| Deferred Submittals | Structural | N | Required | 03/08/2022 | | 03/08/2022 |
| Commercial Plumbing Review | Commercial Plumbing | Y | Checksheet | 01/30/2023 | | |

| Activity | Type | Must Check | Activity Status | Last Activity | Current Review Goal Date | Completed |
|---|---|---|---|---|---|---|
| Struct Spec. Insp. Form Reqd | Special Inspections Review | Y | Open | 03/08/2022 | | |
| Soils Spec. Insp. Form Reqd | Special Inspections Review | Y | Open | 03/03/2022 | | |
| Fire Plan Review | Fire Review | Y | Checksheet | 02/03/2023 | | |
| Source Control Review | Environmental Services | Y | Checksheet | 02/06/2023 | | |
| Sewer and Storm System Review | Environmental Services | Y | Checksheet | 02/01/2023 | | |
| PBOT TDM Review | Transportation | Y | Checksheet | 02/08/2022 | | |
| Transportation SDC Review | Transportation | Y | Approved | 03/01/2022 | | 03/01/2022 |
| Transportation SDC Review | Transportation | Y | Approved | 01/31/2023 | | 01/31/2023 |
| Trans - Street Systems Review | Transportation | Y | Checksheet | 02/09/2023 | | |
| Street Systems - Assign Reviews | Transportation | N | Open | 12/28/2021 | | |
| Water SDC Payment Plan | Water Review | N | Open | 12/28/2021 | | |
| Water Available Review | Water Review | Y | Checksheet | 01/16/2024 | | |
| Water Quality Backflow Review | Water Review | Y | Approved | 02/06/2023 | | 02/06/2023 |
| Parks SDC Review | Parks Review | Y | Approved | 01/27/2023 | | 01/27/2023 |
| Parks SDC Review | Parks Review | Y | Approved | 03/17/2022 | | 03/17/2022 |
| Urban Forestry Review | Parks Review | Y | Checksheet | 03/07/2022 | | |
| Inclusionary Housing Review | Housing Review | Y | Checksheet | 02/02/2023 | | |
| Send Letter of intent to expire | Document Management | N | Open | 12/28/2021 | 05/27/2022 | |
| Pre-Issuance Check | Issuance | Y | Open | 02/01/2023 | | |

Please Note: The Current Review Goal Date value could be empty when the Activity Status is listed as Completed or Checksheet, or if the Activity is not required: Must Check column is N

# EXHIBIT L

Page 1 of 2

Date  08/12/2025

**STATE OF OREGON**

**OFFICE OF STATE FIRE MARSHAL**

**INCIDENT REPORT**

| ALARM NO.: | RP220026183 |
|---|---|
| EXPOSURE NO.: | |

| DISTRICT OF INCIDENT: | **PORTLAND FIRE BUREAU** | COUNTY: | **MULT** | DEPT. RESPONDING: | **PORTLAND FIRE BUREAU** |
|---|---|---|---|---|---|

| ALARM DATE: | **03/20/2022** | ALARM TIME: | **15:45** | ARRI. DATE: | **03/20/2022** | ARRI. TIME: | **15:48** | BACK DATE: | **03/20/2022** | BACK TIME: | **16:31** |
|---|---|---|---|---|---|---|---|---|---|---|---|

TYPE OF SITUATION FOUND:  **BUILDING FIRE**

INCIDENT ADDRESS:  **4617 N MINNESOTA AV**　　　　　APT:

CITY/ZIP:  **PORTLAND  97217**　　CENSUS TRACT:  **3501**　DISTRICT:  **2**

LOCATION TYPE:  **STREET ADDRESS**　MAP#:  **5194A**　NEIGHBORHOOD:  **OVRLK**　FMA:  **24**

INITIAL TYPE CODE:  **F**　FINAL TYPE CODE:  **RFIRE**　ALARM LEVEL:  **1**

OCCUPANT:　DOB:　TELEPHONE:

BUSINESS NAME:　DOB:　TELEPHONE:

BUSINESS OWNER:

ADDRESS:

CITY/STATE/ZIP:

BUILDING NAME:　DOB:　TELEPHONE:

BUILDING OWNER:

ADDRESS:

CITY/STATE/ZIP:

REPORTED BY:　DOB:　TELEPHONE:

ADDRESS:

CITY/STATE/ZIP:

| NUMBER OF PATIENTS: | **0** | NUMBER OF EXPOSURES: | **0** | FIRST ONSCENE: | **E24** |
|---|---|---|---|---|---|

| CAREER F/F: | **31** | VOLUNTEER F/F: | **0** | ENGINES: | **4** | AERIAL APPARATUS: | **2** | OTHER VEHICLES: | **4** | MUTUAL AID: | **NO** |
|---|---|---|---|---|---|---|---|---|---|---|---|

ACTIONS TAKEN:  **CANCELED @ SCENE, EXTINGUISH, INCIDENT COMMAND, INVESTIGATE, PROVIDE MANPOWER, RIT TEAM, SAFETY, SEARCH, TAKE HYDRANT (LAY LINE FOR OTHER UNIT), VENTILATE**

MUTUAL AID AGENCIES:

METHOD OF EXTINGUISHMENT:  **WATER CARRIED ON INITIAL APPARATUS**

AGENT OF EXTINGUISHMENT:  **WATER ONLY**

SPECIFIC PROPERTY USE:  **ONE- AND TWO-FAMILY DWELLING, NOT CLASSED ABOVE**　INSPECTABLE AREA:

GENERAL PROPERTY USE:  **1 OR 2 FAMILY RESIDENCE**

| # OF RESIDENTIAL LIVING UNITS: | **0** | # BUILDINGS INVOLVED: | **1** | ACRES BURNED: | **0** | LESS THAN ONE ACRE BURNED: | |
|---|---|---|---|---|---|---|---|

MOBILE PROPERTY INVOLVED:

YEAR:　MAKE:　MODEL:

SERIAL #::　LICENSE #:　STATE:

ROOM/AREA OF ORIGIN:  **CRAWL SPACE, SUBSTRUCTURE SPACE, BASEMENT**

EQUIPMENT INVOLVED:  **NONE**

YEAR:　MAKE:　MODEL:

SERIAL #:　POWER SOURCE:　PORTABLE:

HUMAN FACTORS INVOLVED IN IGNITION:

NUM. OF JUV.　AGE:

IGNITION FACTOR:  **IGNITION FACTOR UNDETERMINED**

IGNITION FACTOR NARRATIVE:  **UNDETERMINED**

FORM OF HEAT:  **FORM OF HEAT OF IGNITION UNKNOWN**

MATERIAL FIRST IGNITED WAS MADE OF:  **LITTER (COMBINATION OF MATERIAL WITH NO VALUE)**

ITEM FIRST IGNITED:  **FORM OF MATERIAL NOT KNOWN/NOT REPORTED**

CAUSE OF IGNITION:  **CAUSE UNDETERMINED AFTER INVESTIGATION**

FACTOR CONTRIBUTING TO IGNITION:  **NONE**

Date  08/12/2025

**STATE OF OREGON**

**OFFICE OF STATE FIRE MARSHAL**

**INCIDENT REPORT**

| ALARM NO.: | RP220026183 |
|---|---|
| EXPOSURE NO.: | |

| VALUES AND LOSSES | | | | | |
|---|---|---|---|---|---|
| | BUILDING | CONTENTS | MOBILE PROPERTY AND CONTENTS | OTHER | TOTAL |
| ESTIMATED VALUE | $50,000.00 | $0.00 | $0.00 | $0.00 | $50,000.00 |
| ESTIMATED LOSS | $500.00 | $0.00 | $0.00 | $0.00 | $500.00 |

**STRUCTURE INFORMATION**

| | | |
|---|---|---|
| LEVEL OF FIRE ORIGIN: **GROUND LEVEL** | FLOOR OF ORIGIN (STRUCTURE FIRES ONLY): | |

APPROXIMATE BUILDING AGE:        BUILDING SIZE (GROUND FLOOR ONLY):        **0 - 999 SQ. FEET**

MAIN FLOOR SIZE (SQ FT):  **800**        MAIN FLOOR LENGTH:  **25**        MAIN FLOOR WIDTH:  **35**

NUMBER OF STORIES AT OR ABOVE GRADE:  **1**        BELOW GRADE:  **1**        FLOOR OF ORGIN BELOW GRADE:

STRUCTURE TYPE:  **ENCLOSED BUILDING**        BUILDING STATUS:  **BEING DEMOLISHED**

CONSTRUCTION TYPE:  **UNPROTECTED WOOD FRAME (TYPE V)**

ROOF COVERING:  **CLASS C OF COMPOSITION OR PREPARED MATERIALS**

FACTOR CONTRIBUTING TO FLAME TRAVEL:  **NO IMPORTANT FACTOR CONTRIBUTING TO FLAME TRAVEL**

AVENUE OF SMOKE TRAVEL:  **STAIRWELL**

| EXTENT OF DAMAGE CAUSED BY | FIRE SUPPRESSION EFFORTS CONFINED TO |
|---|---|
| FLAME:  **OBJECT OF ORIGIN** | EXTINGUISHING AGENT:  **OBJECT OF ORIGIN** |
| SMOKE:  **STRUCTURE OF ORIGIN** | FIRE CONTROL:  **OBJECT OF ORIGIN** |

DETECTOR TYPE  **NO DETECTOR PRESENT**        POWER SUPPLY:

OPERATION:        PERFORMANCE:

REASON FOR FAILURE:

AUTOMATIC EXTINGUISHING SYSTEM TYPE:  **NO AUTOEXTINGUISHING SYSTEM  PRESENT**        # OF HEADS OPENED

OPERATION:

REASON FOR FAILURE:

**ALL INCIDENTS**

FOLLOW-UP INVESTIGATION REQUESTED:  **YES**        IF YES, WHO WILL INVESTIGATE:  **LOCAL FD PERSONNEL OR TEAM**

| NUMBER OF | FIRE SERVICE: | OTHER: | NUMBER OF | FIRE SERVICE: | OTHER: |
|---|---|---|---|---|---|
| INJURIES | 0 | 0 | FATALITIES | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| MEMBER MAKING REPORT:  **KELLER, DAVID S** | TITLE: | **LTM** | DATE: | **03/21/2022** |
| ADDITIONAL INFORMATION BY:  **GARRISON, ROBERT G** | TITLE: | **INVC** | DATE: | **03/28/2022** |

DEATH DATE, OTHER THAN INCIDENT DATE:

**REMARKS**

**I 375**

**THIS WAS A VACANT HOUSE HERE THAT HAS BEEN BEING OCCUPIED BY TRANSIENTS. THE NEIGHBORS SAY THAT THE HOUSE IS GOING TO BE TORN DOWN FOR NEW CONDOS. THE HOUSE WAS FULL OF TRASH, NEEDLES, AND OTHER DRUG ITEMS. THE FIRE WAS IN A PILE OF TRASH LOCATED IN THE BASEMENT. THIS FIRE WAS CAUSED BY TRANSIENTS BUT IT IS NOT KNOWN HOW.**

# EXHIBIT M

| Page 1 of 2 | **STATE OF OREGON** | **ALARM NO.:** | **RP220036208** |
|---|---|---|---|
| Date  08/12/2025 | **OFFICE OF STATE FIRE MARSHAL** | **EXPOSURE NO.:** | **1** |
| | **INCIDENT REPORT** | | |

| DISTRICT OF INCIDENT: | **PORTLAND FIRE BUREAU** | COUNTY: | **MULT** | DEPT. RESPONDING: | **PORTLAND FIRE BUREAU** |
|---|---|---|---|---|---|

| ALARM DATE: | **04/18/2022** | ALARM TIME: | **09:45** | ARRI. DATE: | **04/18/2022** | ARRI. TIME: | **09:46** | BACK DATE: | **04/18/2022** | BACK TIME: | **14:57** |
|---|---|---|---|---|---|---|---|---|---|---|---|

TYPE OF SITUATION FOUND:    **BUILDING FIRE**

| INCIDENT ADDRESS: | **4617  N  MINNESOTA  AV** | | | | APT: | |
|---|---|---|---|---|---|---|
| CITY/ZIP: | **PORTLAND  97217** | | CENSUS TRACT: | **3501** | DISTRICT: | **2** |
| LOCATION TYPE: | **STREET ADDRESS** | MAP#: **5194A** | NEIGHBORHOOD: | **OVRLK** | FMA: | **24** |

| INITIAL TYPE CODE: | **F** | FINAL TYPE CODE: | **RFIRE** | ALARM LEVEL: | **1** |
|---|---|---|---|---|---|

| OCCUPANT: | | DOB: | | TELEPHONE: |
|---|---|---|---|---|

| BUSINESS NAME: | | DOB: | | TELEPHONE: |
|---|---|---|---|---|
| BUSINESS OWNER: | **SASS, MAX** | | | |
| ADDRESS: | **9516 W FLAMINGO RD, STE 205** | | | |
| CITY/STATE/ZIP: | **LAS VEGAS, NV 89147** | | | |

| BUILDING NAME: | **VACANT RENTAL PROPERTY** | DOB: | | TELEPHONE: |
|---|---|---|---|---|
| BUILDING OWNER: | | | | |
| ADDRESS: | | | | |
| CITY/STATE/ZIP: | | | | |

| REPORTED BY: | | DOB: | | TELEPHONE: |
|---|---|---|---|---|
| ADDRESS: | | | | |
| CITY/STATE/ZIP: | | | | |

| NUMBER OF PATIENTS: | **0** | NUMBER OF EXPOSURES: | **1** | FIRST ONSCENE: | **E13** |
|---|---|---|---|---|---|

| CAREER F/F: | **47** | VOLUNTEER F/F: | **0** | ENGINES: | **7** | AERIAL APPARATUS: | **3** | OTHER VEHICLES: | **6** | MUTUAL AID: | **NO** |
|---|---|---|---|---|---|---|---|---|---|---|---|

ACTIONS TAKEN:    **AIR UNIT OPERATIONS, CANCELED @ SCENE, CANCELED ENROUTE, EXTINGUISH, EXTINGUISH, SALVAGE & OVERHAUL, FIRE-SCENE HYDRAULIC OPERATIONS, INCIDENT COMMAND, INVESTIGATE, PROVIDE MANPOWER,**

MUTUAL AID AGENCIES:

| METHOD OF EXTINGUISHMENT: | **WATER FROM HYDRANT, DRAFT OR STANDPIPE** |
|---|---|

| AGENT OF EXTINGUISHMENT: | **WATER ONLY** |
|---|---|

| SPECIFIC PROPERTY USE: | **ONE- AND TWO-FAMILY DWELLING, NOT CLASSED FURTHER** | INSPECTABLE AREA: |
|---|---|---|

| GENERAL PROPERTY USE: | **1 OR 2 FAMILY RESIDENCE** |
|---|---|

| # OF RESIDENTIAL LIVING UNITS: | **0** | # BUILDINGS INVOLVED: | **0** | ACRES BURNED: | **0** | LESS THAN ONE ACRE BURNED: |
|---|---|---|---|---|---|---|

| MOBILE PROPERTY INVOLVED: | | | |
|---|---|---|---|
| YEAR: | MAKE: | MODEL: | |
| SERIAL #:: | LICENSE #: | STATE: | |

| ROOM/AREA OF ORIGIN: | **PATIO, COURT, TERRACE** |
|---|---|

| EQUIPMENT INVOLVED: | **NONE** | | |
|---|---|---|---|
| YEAR: | MAKE: | MODEL: | |
| SERIAL #: | POWER SOURCE: | PORTABLE: | |

| HUMAN FACTORS INVOLVED IN IGNITION: | | |
|---|---|---|
| NUM. OF JUV: | AGE: | |

| IGNITION FACTOR: | **EXPOSURE FIRE** |
|---|---|
| IGNITION FACTOR NARRATIVE: | **EXPOSURE** |

| FORM OF HEAT: | **HEAT FROM DIRECT FLAME, CONVECTION CURRENTS** |
|---|---|
| MATERIAL FIRST IGNITED WAS MADE OF: | **SAWN WOOD ( ALL FINISHED LUMBER)** |
| ITEM FIRST IGNITED: | **AWNING, CANOPY** |
| CAUSE OF IGNITION: | **CAUSE, OTHER** |
| FACTOR CONTRIBUTING TO IGNITION: | **EXPOSURE FIRE** |

Page 2 of 2

Date   08/12/2025

**STATE OF OREGON**

**OFFICE OF STATE FIRE MARSHAL**

**INCIDENT REPORT**

| | |
|---|---|
| **ALARM NO.:** | RP220036208 |
| **EXPOSURE NO.:** | 1 |

| VALUES AND LOSSES | | | | | |
|---|---|---|---|---|---|
| | BUILDING | CONTENTS | MOBILE PROPERTY AND CONTENTS | OTHER | TOTAL |
| ESTIMATED VALUE | **$100,000.00** | **$1,000.00** | **$0.00** | **$0.00** | **$101,000.00** |
| ESTIMATED LOSS | **$100,000.00** | **$1,000.00** | **$0.00** | **$0.00** | **$101,000.00** |

### STRUCTURE INFORMATION

| | |
|---|---|
| LEVEL OF FIRE ORIGIN:   **GROUND LEVEL** | FLOOR OF ORIGIN (STRUCTURE FIRES ONLY): |

APPROXIMATE BUILDING AGE:          BUILDING SIZE (GROUND FLOOR ONLY):     **1,000 - 4,999 SQ. FEET**

MAIN FLOOR SIZE (SQ FT):   **1000**          MAIN FLOOR LENGTH:   **40**          MAIN FLOOR WIDTH:   **25**

NUMBER OF STORIES AT OR ABOVE GRADE:   **1**    BELOW GRADE:   **1**    FLOOR OF ORGIN BELOW GRADE:

STRUCTURE TYPE:   **ENCLOSED BUILDING**          BUILDING STATUS:   **VACANT AND UNSECURED**

CONSTRUCTION TYPE:   **PROTECTED WOOD FRAME ( TYPE V - 1 HR)**

ROOF COVERING:   **CLASS C OF COMPOSITION OR PREPARED MATERIALS**

FACTOR CONTRIBUTING TO FLAME TRAVEL:   **FACTOR CONTRIBUTING TO FLAME TRAVEL UNKN/NOT RPTED**

AVENUE OF SMOKE TRAVEL:   **OPEN CONSTRUCTION**

| EXTENT OF DAMAGE CAUSED BY | FIRE SUPPRESSION EFFORTS CONFINED TO |
|---|---|
| FLAME:   **STRUCTURE OF ORIGIN** | EXTINGUISHING AGENT:   **STRUCTURE OF ORIGIN** |
| SMOKE:   **STRUCTURE OF ORIGIN** | FIRE CONTROL:   **STRUCTURE OF ORIGIN** |

| | |
|---|---|
| DETECTOR TYPE   **NO DETECTOR PRESENT** | POWER SUPPLY: |
| OPERATION: | PERFORMANCE: |
| REASON FOR FAILURE: | |

AUTOMATIC EXTINGUISHING SYSTEM TYPE:   **NO AUTOEXTINGUISHING SYSTEM  PRESENT**          # OF HEADS OPENED

OPERATION:

REASON FOR FAILURE:

### ALL INCIDENTS

FOLLOW-UP INVESTIGATION REQUESTED:   **NO**    IF YES, WHO WILL INVESTIGATE:

| NUMBER OF | FIRE SERVICE: | OTHER: | NUMBER OF | FIRE SERVICE: | OTHER: |
|---|---|---|---|---|---|
| INJURIES | **0** | **0** | FATALITIES | **0** | **0** |

| | | | |
|---|---|---|---|
| MEMBER MAKING REPORT:   **FOGARTY, SEAN A** | TITLE:   **LTEM** | DATE:   **04/18/2022** |
| ADDITIONAL INFORMATION BY:   **GARRISON, ROBERT G** | TITLE:   **INVC** | DATE:   **04/26/2022** |

DEATH DATE, OTHER THAN INCIDENT DATE:

### REMARKS

SIGNIFICANT VEHICLE AND RESIDENTIAL FIRE.  NOTE: CLASSIFIED AS "HOMELESS RELATED" DUE TO KNOWN PRESENCE OF SQUATTERS ON PROPERTY, PRIOR SIMILAR FIRES.  IN THE COURSE OF THE FIRE, CURRENT SQUATTING ACTIVITY VERIFIED IN LARGE DETACHED GARAGE TOWARD BRAVO/CHARLIE (SOUTHWEST) CORNER OF HOUSE.  TENT LOCATED INSIDE STRUCTURE, APPEARS TO BE CURRENTLY IN USE.  PIC OF LOCATION SENT TO LT PICARD WITH THIS AREA MARKED ON PHOTO.

RFIRE, PER INV GARRISON WAS EXPOSURE RELATED TO VEHICLE FIRE IN DRIVEWAY ON BRAVO SIDE.  FULL LOSS.  CLEARED WITH SIGNIFICANT OVERHAUL, BLDG VACANT AND UNSECURED.

Page 1 of 2

Date   08/12/2025

**STATE OF OREGON**

**OFFICE OF STATE FIRE MARSHAL**

**INCIDENT REPORT**

| ALARM NO.: | RP220036208 |
|---|---|
| EXPOSURE NO.: | |

| DISTRICT OF INCIDENT: | **PORTLAND FIRE BUREAU** | | COUNTY: | **MULT** | | DEPT. RESPONDING: | **PORTLAND FIRE BUREAU** |
|---|---|---|---|---|---|---|---|

| ALARM DATE: | **04/18/2022** | ALARM TIME: | **09:45** | ARRI. DATE: | **04/18/2022** | ARRI. TIME: | **09:46** | BACK DATE: | **04/18/2022** | BACK TIME: | **14:57** |
|---|---|---|---|---|---|---|---|---|---|---|---|

TYPE OF SITUATION FOUND:     **PASSENGER VEHICLE FIRE**

| INCIDENT ADDRESS: | **4617 N MINNESOTA AV** | | APT: | |
|---|---|---|---|---|
| CITY/ZIP: | **PORTLAND 97217** | CENSUS TRACT: **3501** | DISTRICT: | **2** |
| LOCATION TYPE: | **STREET ADDRESS** | MAP#: **5194A**   NEIGHBORHOOD: **OVRLK** | FMA: | **24** |

| INITIAL TYPE CODE: | **F** | FINAL TYPE CODE: | **RFIRE** | ALARM LEVEL: | **1** |
|---|---|---|---|---|---|

| OCCUPANT: | | DOB: | | TELEPHONE: | |
|---|---|---|---|---|---|

| BUSINESS NAME: | | DOB: | | TELEPHONE: | |
|---|---|---|---|---|---|
| BUSINESS OWNER: | | | | | |
| ADDRESS: | | | | | |
| CITY/STATE/ZIP: | | | | | |

| BUILDING NAME: | | DOB: | | TELEPHONE: | |
|---|---|---|---|---|---|
| BUILDING OWNER: | | | | | |
| ADDRESS: | | | | | |
| CITY/STATE/ZIP: | | | | | |

| REPORTED BY: | | DOB: | | TELEPHONE: | |
|---|---|---|---|---|---|
| ADDRESS: | | | | | |
| CITY/STATE/ZIP: | | | | | |

| NUMBER OF PATIENTS: | **0** | NUMBER OF EXPOSURES: | **1** | FIRST ONSCENE: | **E13** |
|---|---|---|---|---|---|

| CAREER F/F: | **47** | VOLUNTEER F/F: | **0** | ENGINES: | **7** | AERIAL APPARATUS: | **3** | OTHER VEHICLES: | **6** | MUTUAL AID: | **NO** |
|---|---|---|---|---|---|---|---|---|---|---|---|

ACTIONS TAKEN:     **AIR UNIT OPERATIONS, CANCELED @ SCENE, CANCELED ENROUTE, EXTINGUISH, EXTINGUISH, SALVAGE & OVERHAUL, FIRE-SCENE HYDRAULIC OPERATIONS, INCIDENT COMMAND, INVESTIGATE, PROVIDE MANPOWER,**

MUTUAL AID AGENCIES:

| METHOD OF EXTINGUISHMENT: | **WATER FROM HYDRANT, DRAFT OR STANDPIPE** |
|---|---|
| AGENT OF EXTINGUISHMENT: | **WATER ONLY** |

| SPECIFIC PROPERTY USE: | **ONE- AND TWO-FAMILY DWELLING, NOT CLASSED ABOVE** | INSPECTABLE AREA: |
|---|---|---|
| GENERAL PROPERTY USE: | **1 OR 2 FAMILY RESIDENCE** | |

| # OF RESIDENTIAL LIVING UNITS: | **0** | # BUILDINGS INVOLVED: | **1** | ACRES BURNED: | **0** | LESS THAN ONE ACRE BURNED: | **X** |
|---|---|---|---|---|---|---|---|

MOBILE PROPERTY INVOLVED:     **AUTOMOBILE INCLUDING AMBULANCES**

| YEAR: | **2008** | MAKE: | **CHEVY** | MODEL: | **BLAZER** | | |
|---|---|---|---|---|---|---|---|
| SERIAL #:: | **UNK** | | LICENSE #: | **UNK** | STATE: | **OR** | |

ROOM/AREA OF ORIGIN:     **UNDETERMINED**

EQUIPMENT INVOLVED:     **UNDETERMINED**

| YEAR: | MAKE: | | MODEL: | |
|---|---|---|---|---|
| SERIAL #: | POWER SOURCE: | | PORTABLE: | |

HUMAN FACTORS INVOLVED IN IGNITION:

NUM. OF JUV.          AGE:

IGNITION FACTOR:     **IGNITION FACTOR UNDETERMINED**

IGNITION FACTOR NARRATIVE:     **UNDETERMINED**

| FORM OF HEAT: | **FORM OF HEAT OF IGNITION UNKNOWN** |
|---|---|
| MATERIAL FIRST IGNITED WAS MADE OF: | **TYPE OF MATERIAL, UNKNOWN/NOT REPORTED** |
| ITEM FIRST IGNITED: | **FORM OF MATERIAL NOT KNOWN/NOT REPORTED** |
| CAUSE OF IGNITION: | **CAUSE, OTHER** |
| FACTOR CONTRIBUTING TO IGNITION: | **NONE** |

Page 2 of 2

**STATE OF OREGON**

**OFFICE OF STATE FIRE MARSHAL**

**INCIDENT REPORT**

Date  08/12/2025

| | |
|---|---|
| **ALARM NO.:** | RP220036208 |
| **EXPOSURE NO.:** | |

| VALUES AND LOSSES | | | | | |
|---|---|---|---|---|---|
| | BUILDING | CONTENTS | MOBILE PROPERTY AND CONTENTS | OTHER | TOTAL |
| ESTIMATED VALUE | **$0.00** | **$0.00** | **$5,000.00** | **$0.00** | **$5,000.00** |
| ESTIMATED LOSS | **$0.00** | **$0.00** | **$5,000.00** | **$0.00** | **$5,000.00** |

| STRUCTURE INFORMATION | |
|---|---|
| LEVEL OF FIRE ORIGIN:  **GROUND LEVEL** | FLOOR OF ORIGIN (STRUCTURE FIRES ONLY): |

APPROXIMATE BUILDING AGE:    BUILDING SIZE (GROUND FLOOR ONLY):

MAIN FLOOR SIZE (SQ FT):    MAIN FLOOR LENGTH:    MAIN FLOOR WIDTH:

NUMBER OF STORIES AT OR ABOVE GRADE:  **1**    BELOW GRADE:    FLOOR OF ORGIN BELOW GRADE:

STRUCTURE TYPE:    BUILDING STATUS:

CONSTRUCTION TYPE:

ROOF COVERING:

FACTOR CONTRIBUTING TO FLAME TRAVEL:

AVENUE OF SMOKE TRAVEL:

| EXTENT OF DAMAGE CAUSED BY | FIRE SUPPRESSION EFFORTS CONFINED TO |
|---|---|
| FLAME: | EXTINGUISHING AGENT: |
| SMOKE: | FIRE CONTROL: |

DETECTOR TYPE    POWER SUPPLY:

OPERATION:    PERFORMANCE:

REASON FOR FAILURE:

AUTOMATIC EXTINGUISHING SYSTEM TYPE:    # OF HEADS OPENED

OPERATION:

REASON FOR FAILURE:

| ALL INCIDENTS | | | | | |
|---|---|---|---|---|---|
| FOLLOW-UP INVESTIGATION REQUESTED:    **NO**    IF YES, WHO WILL INVESTIGATE: | | | | | |
| NUMBER OF | FIRE SERVICE: | OTHER: | NUMBER OF | FIRE SERVICE: | OTHER: |
| INJURIES | **0** | **0** | FATALITIES | **0** | **0** |

| | | | | |
|---|---|---|---|---|
| MEMBER MAKING REPORT: | **FOGARTY, SEAN A** | TITLE: | **LTEM** | DATE: **04/18/2022** |
| ADDITIONAL INFORMATION BY: | **GARRISON, ROBERT G** | TITLE: | **INVC** | DATE: **04/26/2022** |

DEATH DATE, OTHER THAN INCIDENT DATE:

**REMARKS**

SIGNIFICANT VEHICLE AND RESIDENTIAL FIRE.  NOTE: CLASSIFIED AS "HOMELESS RELATED" DUE TO KNOWN PRESENCE OF SQUATTERS ON PROPERTY, PRIOR SIMILAR FIRES.  IN THE COURSE OF THE FIRE, CURRENT SQUATTING ACTIVITY VERIFIED IN LARGE DETACHED GARAGE TOWARD BRAVO/CHARLIE (SOUTHWEST) CORNER OF HOUSE.  TENT LOCATED INSIDE STRUCTURE, APPEARS TO BE CURRENTLY IN USE.  PIC OF LOCATION SENT TO LT PICARD WITH THIS AREA MARKED ON PHOTO.

VEHICLE ON BRAVO SIDE OF RESIDENCE, PER INV GARRISON IS TO BE LISTED AS PRIMARY FIRE, WHICH THEN EXTENDED TO HOUSE.  UNABLE TO LOCATE VIN OR PLATE.  NO RESIDENTS OR OWNERS KNOWN TO BE PRESENT.

I 375

THIS IS A VACANT HOUSE THAT IS SCHEDULED TO BE TORN DOWN FOR CONDOS. I HAVE BEEN HERE ON ANOTHER FIRE IN FEBRUARY. THERE HAS BEEN A LOT OF TRANSIENT ACTIVITY AT THIS HOUSE. THE FIRE IN FEBRUARY WAS IN THE BASEMENT AND THE CAUSE WAS UNDETERMINED. THERE IS EVIDENCE OF WARMING FIRES SMOKING, AND DRUG USE ALL OVER THE PROPERTY. THE CAR THAT WAS ON FIRE TODAY WAS HERE WHEN I WAS HERE LAST TIME. THE VEHICLE HAS BEEN STRIPPED DOWN AT THAT TIME I DID NOT APPEAR TO RUN. THE FIRE TODAY DID START IN THE VEHICLE AND THEN SPREAD TO THE HOME. THERE WERE NO WITNESSES OR OTHER INFORMATION AS TO HOW TH FIRE STARTED.

# EXHIBIT N















# EXHIBIT O

INSURED: MAX SASS

IN PAYMENT OF: FIRE LOSS ON 4/26/2022.

PAY: TWO HUNDRED FORTY-NINE THOUSAND NINETY-EIGHT DOLLARS AND TWENTY CENTS

**Allstate**

TO THE ORDER OF
911 RESTORATION AND MAX SASS AND CHAOS HOME LOANS LLC ISAOA ATIMA
5821 SE POWELL BLVD
PORTLAND OR  97206-2857

VOID IF NOT PRESENTED WITHIN THREE HUNDRED, SIXTY-FIVE DAYS OF DATE OF ISSUE

| CLAIM NUMBER | | | 8787 |
| --- | --- | --- | --- |
| ▮8088 | | | |
| TAX ID | | EMPLOYEE ID | |
| | | HLD6 | 64-1278 |
| Bank of America NA Atlanta, Dekalb Cty, Georgia | | Bank of America Customer Connection | 611 |

$ 249,098.20

| INVOICE NUMBER | MCO | DATE ISSUED |
| --- | --- | --- |
| | 5080 | 05/27/2022 |

COMPANY: ALLSTATE VEHICLE AND PROPERTY INSURANCE COMPANY

*Julie Parsons*

*John C Qintozzi*

AUTHORIZED SIGNATURES

⑂196338787⑂ ⑈061112788⑈ 329 911 9562⑂

Security Features:

The security features listed below, as well as those not listed, exceed industry guidelines.

FEDERAL RESERVE BOARD OF GOVERNORS REG. CC

Endorse Here
X

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
Reserved for Financial Institution Use

WELLS FARGO BANK, N.A.
Cesar E Chavez & Powell
3625 SE Cesar E Chavez Blvd
Portland, OR 97206

# EXHIBIT P



**Allstate.**
You're in good hands.

*P.O. BOX 660636*
*DALLAS TX 75266*

MAX SASS
PO BOX 1487
AMERICAN FORK UT 840036405


May 27, 2022

INSURED: MAX SASS                               PHONE NUMBER: 800-497-7940
DATE OF LOSS: April 26, 2022                    FAX NUMBER: 866-447-4293
CLAIM NUMBER: ▊▊▊8088 KPL                       OFFICE HOURS:


Dear Mr. Sass,

Thank you for taking the time to discuss with me regarding the above-captioned loss.

Per my attached repair estimates, the cost to rebuild your home and the actual cash value of your Dwelling has exceeded your Dwelling Protection Coverage of $256,284.00. As such, per your Deluxe HO policy numbered ▊▊▊3246, you are entitled to Additional Protection Coverage for Dwelling debris removal of 5% of $256,284.00. As such, the total amount of Dwelling Protection Coverage that is available to you is $269,098.20 in reference to the above-captioned loss. To assist you with your rebuild efforts, we are issuing payment of $20,000.00 to you directly and the remaining balance of $249,098.20 shall be issued to you and listed mortgagee of record, Chaos Home Loans LLC.

As we discussed, your HO policy has Extended Limits Endorsement which will provide you with additional 20% of $256,284.00 for Dwelling Protection Coverage of $51,256.80. In order for you to receive the extra coverage, you must incur rebuild cost of over $320,355.00 (demo & rebuild combined).

Please be advised that your HO policy has Building Code Endorsement (BC) of $12,815.00. The foundation of your home is not included in my repair estimate as it is deemed salvageable. However, if you are unable to use your existing foundation due to building code issue, please let me know so that we can consider BC payment for you.

Please let me know if you have any questions.


Sincerely,

*PEIR LEE*

PEIR LEE
800-497-7940 Ext. 1978516
Allstate Vehicle and Property Insurance Company


GENI001                                         ▊▊▊8088 KPL

# EXHIBIT Q

## Replacement Cost Estimate

Prepared by: User chld5@allstate.com
(chld5@allstate.com@xm8_4509a40c242840797588)
Valuation ID: BE6KU86.4

### Owner Information

Name: **MAX SASS**
Street: **4617 N MINNESOTA AVE**
City, State ZIP: **PORTLAND, OR 97217**
Country: **USA**
Policy #: **0817263246**

Date Entered: 05/24/2022
Date Calculated: 05/26/2022
Created By: User chld5@allstate.com
(chld5@allstate.com@xm8_4509a40c242840797588)
User: 71 XM8Profile (71@xm8profiles)

### General Information

Most Prevalent Number of Stories: **1 Story**
Use: **Single Family Detached**
Home Quality Grade: **Standard**
Site Access: **Urban Access**

Sq. Feet: **1536**
Year Built: **1905**
Cost per Finished Sq. Ft.: $209.23

### Foundation

Foundation Shape: **4-5 Corners - Square/Rectangle**
Percent of lowest level that is finished: **0%**
Property Slope: None (0 - 15 degrees)

Foundation Type: **100% Basement**
Foundation Material: **100% Concrete**
Walk-out Basement: **No**

### Exterior

Roof Shape: **Gable**
Roof Construction: 100% Wood Framed
Exterior Wall Construction: **100% Wood Framing**

Number of Dormers: 0
Roof Cover: **100% Composition - Architectural Shingle**
Exterior Wall Finish: **100% Siding - Cedar (Clapboard)**

### Interior

Average Wall Height: **8**
Floor Coverings: **100% Hardwood - Plank**
Interior Wall Finish: **100% Paint**

Interior Wall Material: **100% Plaster**
Hardwood flooring exists beneath the finished floor: Yes
Ceiling Finish: 100% Paint

### Key Rooms

Kitchens: **1 Extra Large - (18'x12')**
Bathrooms: **1 Full Bath**
Bedrooms: **2 Medium - (10'x10')**

### Attached Structures

Patio(s) / Porch(es): **60 sq. ft. Cedar Decking Porch**

### Systems

Heating: **5 Electric Baseboard/Wall Heaters**

### Estimated Cost Breakdown

Appliances: $1,944.15
Exterior Finish: $34,780.70
Heating/AC: $3,834.56
Plumbing: $8,556.03
Rough Framing: $54,571.60
Windows: $16,312.22
Other Fees and Taxes: $68,722.78

Electrical: $12,580.08
Floor Covering: $17,146.89
Interior Finish: $74,262.27
Roofing: $7,850.38
Site Access Labor: $16,614.54
Permits: $4,203.83

## Estimated Replacement Cost

Calculated Value:

# $321,380.03
($315,299.00 - $327,460.00)

## Actual Cash Value

Structure ACV (Age: 117, Effective Age: 15):

# $286,123.16

The estimated replacement costs and other data reflected herein in this "Report" represent approximated costs to rebuild a structure similar to the structure described herein. The estimate is (i) intended to reflect pricing for labor, materials, applicable permits and fees, sales tax, and contractor's overhead and profit and (ii) not intended to reflect costs for major excavation or land value.

This Report is not intended to: (i) serve as the sole source of information, but rather one of several sources, for estimating replacement costs and not guaranteed to represent actual replacement costs; (ii) serve as a statement as to the existence or condition of the structure or property; and (iii) serve as market value appraisals or an assessment of market conditions. This Report has not been adapted to or conformed to any mortgage-lending or real estate-industry regulations, standards or purposes and, without limitation, may not be used or distributed for any real estate-related purpose, including distribution to a mortgage lending institution or use for purposes of a real estate closing. Residential property prefill powered by SmartSource®. The Verisk Logo, 360Value® and SmartSource are registered trademarks of Insurance Services Office, Inc.

The following slab items are excluded from this value: Foundation

# EXHIBIT R



## Site Address:  4611 N MINNESOTA AVE

| | |
|---|---|
| 21-033041-000-00-HS<br>Todays Date:  February 29, 2024<br>Anastasia Howard Senior Housing<br>Inspector | Owner:  MAX SASS<br>9516 W FLAMINGO RD STE 205<br>LAS VEGAS, NV 89147 |

Photos from row (PDX Maps above)



East and south elevations



Garage and carport





R581148 – second property



North elevation

Front of house




Open drain pipe

T/D along vacant lot and ROW corridor






## Site Address:  4611 N MINNESOTA AVE & N Minnesota (vacant lot) R520501060

| | |
|---|---|
| 21-033041-000-00-HS<br>Todays Date:  March 29, 2024<br>Anastasia Howard Senior Housing<br>Inspector | Owner:  MAX SASS<br>9516 W FLAMINGO RD STE 205<br>LAS VEGAS, NV 89147 |

Photos from row





Row cleared by city

Trash on lot, 1-2 cu yds




Hh items 2 cu yds



Garage, damaged carport, vehicle



South side appears open to entry



North side appears secure



## Site Address:  4611 N Minnesota & 4617 N Minnesota

24-020498-000-00-NU
Todays Date:  April 12, 2024
Mark Davis Code Specialist III

Owner:  MAX SASS
9516 W FLAMINGO RD STE 205
LAS VEGAS, NV 89147

 

 



## Site Address: 4611 N Minnesota & 4617 N Minnesota

24-020498-000-00-NU
Todays Date: May 20, 2024
Mark Davis Code Specialist III

Owner: MAX SASS
9516 W FLAMINGO RD STE 205
LAS VEGAS, NV 89147

5 yards of trash    1530sqft of TG&W    41 LF of veg over the sidewalk











20sqft man door

8sqft basement window, needs framing

# EXHIBIT S

Case 3:25-cv-00295 ... Document 101 ... Filed 04/27/2025 ... Page 186 of 194 ...21C8EAFB6E2E…

```
Subject:        Allstate claim: ████6007   File ███4964   Fire
From:           claims@claims.allstate.com
To:             Retail.Claims@dimont.com
Sent:           Friday, August 9, 2024 4:08 PM
Attachments:    SASS SETTLEMENT LETTER.pdf; DEMO ESTIMATE.PDF; DAMAGE ESTIMATE.pdf; 2022 FIRE
CHECK.tif
```

Hello,
This file is closed because it is a duplicate to fire claim ████████8088 that occurred in 2022. I have attached a copy of the paperwork, including a front/ back copy of the check to support the lender at the time was protected and the check was cashed.   Yvette Lewis Phone: (330) 528-4176 Fax: (866) 447-4293 claims@claims.allstate.com Allstate Vehicle and Property Insurance Company CONFIDENTIALITY/PRIVACY NOTICE: This e-mail, including any attachments, may contain personal, private and confidential information intended solely for use by the individual to whom it is addressed. If you are not the intended addressee, please be aware that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you received this message in error, please notify the sender immediately by e-mail and delete from your system.  **** Please do not delete your unique Conversation ID ****   *** Conversation ID: ████████████dad49 ***

# EXHIBIT T



Home  /  Portland City Council  /  Council Documents  /  Ordinance

# 191773

( Ordinance )

## Initiate foreclosure action on 4611 N Minnesota Ave for the collection of delinquent City Liens placed against the property

Passed

The City of Portland ordains:

Section 1.  The Council finds:

1. Portland City Code Chapter 5.30 establishes a process for foreclosing delinquent liens on properties. The foreclosure process is generally used as a last resort, after repeated code violation fines and liens have gone unpaid.

2. Portland City Code section 5.30.100 requires the Bureau of Revenue and Financial Services, Revenue Division (Revenue) to prepare a proposed foreclosure list and  submit the list to the City Council for action.

3. In April 2024, the Bureau of Development Services submitted properties it identified as priority vacant and distressed properties to the Bureau of Revenue and Financial Services, Revenue Division for foreclosure consideration. After review and analysis of the cases, this property qualified to be added to the foreclosure list and is being submitted to Council based on their potential to help solve public health, safety, or welfare objectives, pursuant of City Code 5.30.100. Additional consideration was given to the number of abatements, whether the property owner had multiple delinquencies and the negative impact the property was causing to the neighborhood.

4. Revenue mailed notices to the property owner and mortgagees, by certified mail with return receipts required, of pending foreclosure action on the property between April 30 and May 28, 2024, as required by Portland City Code section 5.30.050 (D).

NOW, THEREFORE, the Council directs:

### Introduced by

[Former Mayor Ted Wheeler](#)

### City department

[Revenue Division](#)

### Contact

**Kevin Foster**

Foreclosure Prevention Manager (Coordinator III)

✉ [kevin.foster@portlandoregon.gov](mailto:kevin.foster@portlandoregon.gov)
Include property address in the subject line of emails.

📞 [503-823-5186](tel:503-823-5186)
Monday - Friday 7:30am - 4:30pm

### Agenda Type

Regular

### Date and Time Information

| Meeting Date |
| --- |
| June 12, 2024 |

A. The City Council approves Foreclosure List 2024-02, as attached as Exhibit A-1, and directs the City Treasurer to begin foreclosure proceedings to sell the following property:

    1. 4611 N Minnesota Ave, Max Sass, owners of record. Tax no. R520501050.

B. The City Council accepts the Foreclosure Reports, attached as Exhibit B-1.

C. Pursuant to Portland City Code Chapter 5.30 and 5.30.210, the owner or any person having an interest in the property, or their legal representative, may redeem the property by paying the redemption price to the City Treasurer at    any time within three months from the date of the foreclosure sale.

## Official Record (Efiles)

[Ordinance and supplemental documents](https://efiles.portlandoregon.gov/record/16920700) (https://efiles.portlandoregon.gov/record/16920700)

An ordinance when passed by the Council shall be signed by the Auditor. It shall be carefully filed and preserved in the custody of the Auditor (City Charter Chapter 2 Article 1 Section 2-122)

Passed by Council
June 12, 2024

Auditor of the City of Portland
Simone Rede

## Impact Statement

### Purpose of Proposed Legislation and Background Information

This ordinance begins foreclosure proceedings on one property with delinquent City liens that are eligible for foreclosure under City Code 5.30. The liens were placed against the property by the Bureau of Development Services for code enforcement, code violations, or nuisance abatement.  All the liens are delinquent, and in some cases the violations have not been corrected.

This property comes before Council as part of a coordinated effort by the Mayor's Office, Bureau of Development Services and Office of Management and Finance's, Bureau of Revenue and Financial Services, Revenue Division to actively pursue remedies, including foreclosure, for vacant and distressed properties. This property has been identified as causing

significant problems for neighbors and are the subject of multiple and frequent police calls and numerous enforcement activities.

The Foreclosure Prevention Manager in the Revenue Division has reviewed each case to ensure it meets criteria for foreclosure. The Foreclosure Prevention Manager has also reviewed whether any aggravating or mitigating conditions exist within the case history that would prevent the City from moving forward with foreclosure or warrant an adjustment of lien amounts. The property owner and mortgagees have received notification of the pending foreclosure action.

## Financial and Budgetary Impacts

Once the City forecloses on this property, proceeds generated by the sale will recover the cost of conducting the sale, the amount owed on liens, and collection and foreclosure costs for the Revenue Division, the City Treasurer, and the Bureau of Development Services.

Based on the number and amount of the liens, as of May 17, 2024, the amount expected to be recovered is $29,185.35. Actual cost recovery may differ.

There is not a budgetary impact.

## Community Impacts and Community Involvement

This property has presented major problems for the neighbors and neighborhoods in the community. Problems include criminal behavior, unlawful occupants, and unsafe and/or unhealthy conditions. Foreclosure is being employed as one of the tools available to the City to resolve blight and put properties back into productive use.

## 100% Renewable Goal

Not applicable.

## Financial and Budget Analysis

*Analysis provided by City Budget Office*

This action authorizes initiation of foreclosure proceedings on property with delinquent City liens at 4611 N Minnesota Ave. Proceeds generated by the sale will recover the cost of conducting the sale, the amount owed on liens, and collection and foreclosure costs for the Revenue Division, the City Treasurer, and the Bureau of Development Services. Per bureau estimates, the amount expected to be recovered is approximately $29,185.35.

## Document History

| Agenda | Council action |
|---|---|
| **June 5, 2024**<br>Regular Agenda<br>City Council | **Passed to second reading**<br>Passed to second reading June 12, 2024 at 9:30 a.m. |
| **June 12, 2024**<br>Regular Agenda<br>City Council | **Passed**<br><br>**Aye (5):**<br>Ryan, Rene Gonzalez, Mingus Mapps, Carmen Rubio, Ted Wheeler |



# CITY OF PORTLAND

OFFICE OF MANAGEMENT AND FINANCE

BUREAU OF REVENUE AND FINANCIAL SERVICES

**Ted Wheeler, Mayor**
**Thomas W. Lannom, Interim Chief Financial Officer**
**Tyler Wallace, Interim Revenue Division Director**

**Celita Holt, Interim Manager**
**Tax Division**
**Revenue Division**
111 SW Columbia Street, Suite 600
Portland, Oregon 97201-5840
(503) 823-5157
FAX (503) 823-5192
TTY (503) 823-6868

## Foreclosure Recommendation Report

The Revenue Division recommends foreclosure on **4611 N Minnesota Ave** for delinquent City Liens. The lien accounts meet delinquency requirements for foreclosure and no mitigating factors were discovered that would prevent foreclosure or indicate that an adjustment of the lien amount is in order.

### Summary Information

**Site Address:** 4611 N Minnesota Ave
**Recorded Property Owner:** Max Sass
**Property ID:** R210494
**Lien Account Numbers:** 173424, 174116 and 174449
**Type of Liens:** Code Enforcement and Nuisance
**Use of Property:** Residential Improved
**Amount of Delinquent Liens: $29,185.35**
**Payoff Amount Recommended: $29,185.35**

### General Information

This property is included on the list of "Distressed Vacant Properties" provided by the Bureau of Development Services and identified as priority for foreclosure. Development Services and the Portland Police Bureau have expressed concerns that these properties are nuisances to the neighborhoods where they are located. In many instances, the Police Bureau is called to disturbances at these properties frequently. Neighbors complain that many of these properties are inhabited by unlawful occupants and there are commonly drug activities taking place, which jeopardizes the public health, safety, and welfare of the neighborhood.

Many of these properties are investment properties owned by financial institutions or absent owners who have no vested interest in the neighborhood effects such distressed properties have on the community. They are demonstrated hazards and magnets for crime. For these reasons, the Revenue Division's recommendations for these distressed and egregious properties are concise and generally maintain the amount owed as is with no recommended reduction in lien amount, except in cases where mitigating circumstances point toward improved property owner compliance with a reduced

*An Equal Opportunity Employer*
*To help ensure equal access to programs, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*
*www.portlandoregon.gov/revenue*



# CITY OF PORTLAND
OFFICE OF MANAGEMENT AND FINANCE

BUREAU OF REVENUE AND FINANCIAL SERVICES

**Ted Wheeler, Mayor**
**Thomas W. Lannom, Interim Chief Financial Officer**
**Tyler Wallace, Interim Revenue Division Director**

**Celita Holt, Interim Manager**
**Tax Division**
**Revenue Division**
111 SW Columbia Street, Suite 600
Portland, Oregon 97201-5840
(503) 823-5157
FAX (503) 823-5192
TTY (503) 823-6868

lien amount.

### *Lien Details*

| Lien No. | Assessment Date | Lien Type | Balance |
|---|---|---|---|
| 173424 | 9/18/2021 | Code Enforcement | $2,804.50 |
| 174116 | 5/18/2022 | Code Enforcement | $19,236.18 |
| 174449 | 10/10/2022 | Nuisance | $7,144.67 |
| Total amount owed as of May 17, 2024 | | | $29,185.35 |

Please note the balance will be recalculated on the sale date.

### *Property Summary*

This property has fire damage and is covered with graffiti. Due to the fire portions of the roof have severe damage leaving the home open to the outside elements. The property is open to entry and there is trash and non-trash items continually being left at the property. The property owner is out of state and has not started making the repairs to the property.

### *Police Involvement*

There are no police calls for this residence.

### *Evaluation Criteria*

City Code 5.3.060 states that "the Revenue Division may evaluate individual delinquent open liens to develop recommendations on revising the payment amount of the lien and the payment terms.

| Criteria (City Code 5.30.060) | Yes | No | Unknown |
|---|---|---|---|
| Property owner has committed prior City Code violations or has a delinquent account | ✓ | | |
| Property owner has taken steps to correct violation or resolve any delinquency | ✓ | | |
| Property owner's financial condition allows to resolve the problem | | | ✓ |
| Violation of high gravity and magnitude | ✓ | | |

*An Equal Opportunity Employer*
*To help ensure equal access to programs, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*
*www.portlandoregon.gov/revenue*



# CITY OF PORTLAND

OFFICE OF MANAGEMENT AND FINANCE

BUREAU OF REVENUE AND FINANCIAL SERVICES

**Ted Wheeler, Mayor**
**Thomas W. Lannom, Interim Chief Financial Officer**
**Tyler Wallace, Interim Revenue Division Director**

**Celita Holt, Interim Manager**
**Tax Division**
**Revenue Division**
111 SW Columbia Street, Suite 600
Portland, Oregon 97201-5840
(503) 823-5157
FAX (503) 823-5192
TTY (503) 823-6868

| | | | |
|---|---|---|---|
| Violation was intentional or negligent caused by the property owner | ✓ | | |
| Violation was repeated or continuous | ✓ | | |
| High degree of difficulty to correct the violation or delinquency | ✓ | | |
| Economic or financial benefit accrued to property owner as a result of the violation | | | ✓ |
| Property owner is cooperative and making an effort to correct the violation | ✓ | | |
| Cost to the City to investigate and correct the violation | ✓ | | |
| Any other relevant factor | ✓ | | |

The Revenue Division has reviewed the information related to this property and its history of violations using the criteria listed above. The office found no mitigating factors that would suggest that a reduced lien amount would encourage improved compliance, property improvement, or elimination of hazards.

### *Communication with Owner*

The Liens Team has mailed out 7 letters to owner from November 25, 2021, to May 28, 2024. I have spoken with the owner, and he is planning to redevelop this property into a multi-unit. He is in the process of getting financing to bring this into fruition.

*An Equal Opportunity Employer*
*To help ensure equal access to programs, services and activities,*
*the Office of Management & Finance will reasonably modify policies/procedures and provide auxiliary*
*aids/services to persons with disabilities upon request.*
*www.portlandoregon.gov/revenue*